IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RADIAN ASSET ASSURANCE INC., a New
York corporation,

        Plaintiff,

vs.                                       No. CIV 09-0885 JB/DJS

COLLEGE OF THE CHRISTIAN
BROTHERS OF NEW MEXICO known as
THE COLLEGE OF SANTA FE,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Radian Asset Assurance Inc.'s Motion
to Dismiss Defendant College of Santa Fe's Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(6), filed
October 29, 2010 (Doc. 196)("Motion").  The Court held a hearing on November 29, 2010.  The
primary issues are: (i) whether Defendant College of the Christian Brothers of New Mexico d/b/a
the College of Santa Fe (the College)("College") is a party to or insured under Plaintiff Radian Asset
Assurance, Inc.'s Financial Guaranty Insurance Policy (dated September 21, 2006), filed October
29, 2010 (Doc. 198-1, Ex. A)("Bond Policy"); (ii) whether the College states a claim of fraudulent
inducement; (iii) whether the College states a claim of prima-facie tort; and (iv) whether the statute
of limitations has run on the College's Unfair Practices Act ("UPA"), NMSA 1978, § 57-12-2D;
Unfair Insurance Practices Act ("UIPA"), NMSA 1978, §§ 59A-16-1 to 59A-16-30); and fraudulent-
inducement Counterclaims.  The Court grants the Motion.

## FACTUAL BACKGROUND

The Court takes its factual background from the allegations from the Amended Answer.  For the

purposes of this Motion, the Court assumes, as it must, that factual allegations to be true.  The Court does not, however accept as true the College's legal conclusions.

      **1.**      __The College's lack of Sophistication.__

      Radian Asset began dealing with the College in approximately the spring of 2006.  The College contracted with Radian Asset to provide two insurance policies, and the College paid Radian Asset the premiums for those two policies.  <u>See</u> Defendant College of the Christian Brothers of New Mexico Known as the College of Santa Fe's Amended Answer to Plaintiff's First Amended Complaint and Counterclaims Against Radian Asset Assurance, Inc. for Violation of Unfair Insurance Practices Act, Violation of Unfair Practices Act, Fraudulent Inducement, Breach of Good Faith and Fair Dealing, Violation of Duties of an Insured, and Prima Facie Tort ¶ 3, at 41, filed October 15, 2010 (Doc. 164)("Amended Answer").  The two insurance policies purchased by the College were bought in conjunction with a Bond transaction of the College in 2006.  <u>See</u> Amended Answer ¶ 4, at 41.  The College and Radian Asset agreed that Radian Asset would issue (i) an insurance policy guaranteeing that Radian Asset would pay principal and interest payments owed on $25,000,000.00 of City of Santa Fe, New Mexico Educational Facilities Refunding and Improvement Revenue Bonds if the College defaulted on its obligation to pay such amounts when due, <u>see</u> Financial Guaranty Insurance Policy (dated September 21, 2006), filed October 29, 2010 (Doc. 198-1, Ex. A)("Bond Policy"); and (ii) an insurance policy guaranteeing that Radian Asset would pay certain obligations of the College under the terms of an interest rate exchange agreement between the College and Royal Bank of Canada ("Royal Bank") if the College defaulted on its obligation to pay such obligations when due, <u>see</u> Financial Guaranty Insurance Policy (dated September 21, 2006), filed October 29, 2010 (Doc. 198-1, Ex. B)("Swap Policy").

The College was not sophisticated in bond transactions and relied upon the bond underwriter, RBC Capital Markets (hereinafter, "RBC"), and the insurer, Radian Asset, in many respects as to various aspects of the bond transaction, including the insurance aspects of the transaction.  See Amended Answer ¶ 5, at 41.  In particular, the College relied upon RBC and Radian Asset to inform the College what information was required by Radian Asset, to inform the College if any additional information should be provided, and to prevent the information from being presented in a misleading fashion.  See Amended Answer ¶ 5, at 41.  Radian Asset knew that the College was not sophisticated in bond transactions and more particularly that the College had been involved in no bond transactions previously that included the issuance of bond insurance, and the College did not know upon what an insurance company might rely or find material in its decision to insure or not insure and what the insuring of a bond transaction entailed.  See Amended Answer ¶¶ 6, 12, 17, at 41, 43.  Radian Asset further knew that, in the College's prior bond transactions, the College had relied upon RBC or its predecessors to act as an advisor as to what and how to present information in the bond transaction to institutional rating companies, like Standard & Poors, and to do so in a non-misleading fashion.  See Amended Answer ¶ 13, at 43.  Radian Asset also knew the College also relied on Radian Asset to instruct it on providing the material information upon which those entities typically involved in educational bond transactions such as bond insurers would rely.  See Amended Answer ¶ 13, at 43.

Radian Asset did not inform the College that it insured only those bonds that Radian Asset concluded are not at risk of defaulting, nor did Radian Asset inform the College that Radian Asset considered itself to have the right to manipulate the rights it possessed under the various agreements and policies that were executed and issued to Radian Asset's benefit and the College's detriment.

See Amended Answer ¶ 8, at 42.  Beyond the language of the Bond Policy, which states: "[t]he Insurer shall, to the extent of any payment made by it pursuant to this Policy, be deemed to have acquired and become the Holder of the Bonds or portions thereof or interest thereon paid from such payment and shall be fully subrogated to all rights to payment thereof," Bond Policy at 2, Radian Asset did not explain to the College that it interpreted the insurance policies to allow Radian Asset to step into the bondholder's shoes and be fully subrogated to all rights to payment on the Bonds, including deficiencies, interest, and attorneys' fees from the College.  See Amended Answer ¶ 9, at 42.  The College contends that Radian Asset did not disclose its interpretation of its insurance policies and the other Bond documentation until the October-November 2008 time frame, when Radian Asset served its Complaint on the College.  See Amended Answer ¶ 11, at 42-43.

Radian Asset represented to the College that Radian Asset was knowledgeable in evaluating the financial strength and ability of institutions such as the College to meet its debt service obligations on the Bonds.  See Amended Answer ¶¶ 24, 30, at 44, 46.  Radian Asset further represented that it could make its own determination as to the likelihood that the College was likely to be able to meet its debt service obligations on the Bonds, and the College relied on these representations.  See Amended Answer ¶¶ 24, 30, at 44, 46.  Radian Asset knew that the College was not a strong nor a financially sophisticated institution, that the College's Standard & Poor's rating was only a BBB-, that the College in prior years had strained operations and lacked fundraising, and that Radian Asset's insurance was being offered only to strengthen the otherwise less attractive market appeal that the Bonds would have.  See Amended Answer ¶¶ 14, 16, 18, 23, at 43, 44. Radian Asset's underwriting review of the College, which was based on fiscal year 2005 and earlier -- up to fourteen-month-old data -- determined whether to issue the Policies, and the College

believed Radian Asset was doing its own due diligence.  <u>See</u> Amended Answer ¶¶ 24-28, 35, at 44-45, 46.  As of the time it issued the insurance policies, Radian Asset believed the College was likely to be able to meet its Bond obligations, never told the College that the College was unlikely to meet its obligations under the Bonds, and never gave the College "evaluative techniques with which the College could assess such a likelihood."  Amended Answer ¶¶ 26, 28, at 45.  Had Radian Asset told the College that the College was unlikely to meet its obligations under the Bonds and if Radian Asset had given the College evaluative techniques with which the College could assess the likelihood of the College not meeting its obligations under the Bonds, the College would not have gone forward with the bond transaction.  <u>See</u> Amended Answer ¶¶ 29, 32, at 45, 46.  Without the new indebtedness, including payment to Radian Asset of almost one-million dollars in premiums, the College may have been able to continue in existence or at least would have been able to pay its debts by selling its assets; instead, the College, after losing all of its assets, was left with claims and exposures to various entities of some ten-million dollars.  <u>See</u> Amended Answer ¶ 34, at 46.

### 2.   <u>Radian Asset's Financial Guaranty Insurance and Its Bond Policy Commitment Letter</u>.

Radian issued its Bond and Swap Policies, dated September 21, 2006, in connection with the closing of the Bonds.  Neither Policy lists the College as an "insured" or a beneficiary.  Instead, both Policies state that they are issued to persons or entities other than the College -- the Bond Policy to the Bond Trustee for the benefit of bondholders and the Swap Policy to the Royal Bank of Canada as beneficiary.  Nor did the College sign either policy.

### a.   <u>The Bond Policy</u>.

Radian Asset made an unconditional and irrevocable guaranty in the Bond Policy to pay amounts owed on the Bonds to the Bond Trustee -- Wells Fargo -- for the benefit of the bondholders

if the College did not pay those amounts.  The Bond Policy states:

> Radian Asset Assurance Inc. ("Insurer"), a corporation organized under the laws of the State of New York, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably guarantees the payment of the obligation (hereinafter defined) to the Insurance Trustee for the benefit of the Holders (hereinafter defined) from time to time of the Bonds.  This Policy does not insure against any risk other than nonpayment of the Obligation by or on behalf of the Obligor or any other obligor to the Bond Trustee.

Bond Policy at 1.  The Bond Policy states that "the Insurer has caused this Policy to be issued to the Insurance Trustee for the benefit of the Holders from time to time of the Bonds."  Bond Policy at 2.  The "Insurance Trustee" under the Bond Policy is identified as the Bank of New York.  Bond Policy at 1.  The "Bond Trustee" is identified as Wells Fargo Bank, N.A.  Bond Policy at 1.  The Policy defines "Holder" as the registered owners of the Bonds, and specifies that it "shall not include the Obligor or any person or entity whose direct or indirect obligation constitutes the underlying security for the Obligation."  Bond Policy at 2.

The College is defined as the "Obligor" under the Bond Policy, and not the insured or the beneficiary.  See Bond Policy at 1.  In addition, the College has no right to make a claim under the Bond Policy.  Instead, the Bond Policy specifies that claims may be made to Radian Asset only by the Insurance Trustee -- the Bank of New York.  See Bond Policy at 1.  The Bond Policy also states that payment under the Bond Policy of amounts due "shall satisfy the Insurer's obligations under this Policy, in full."  Bond Policy at 1.  The Bond Policy further states that Radian Asset stands in the shoes of the bondholders to the extent of any payments, acquiring their rights to proceed against the College for non-payment: "The Insurer shall, to the extent of any payment made by it pursuant to this Policy, be deemed to have acquired and become the Holder of the bonds or portions thereof or interest thereon paid from such payment and shall be fully subrogated to all rights to payment

thereof."  Bond Policy at 2.

The College also entered into a Standby Bond Purchase Agreement, whereby Royal Bank under certain circumstances would have to purchase the Bonds from the open market bondholders if the Bonds could not be remarketed.  See Amended Answer ¶ 40, at 48.  The College presumes that, if Royal Bank stepped in and purchased Bonds, Radian Asset would not have to pay the bondholders.  See Amended Answer ¶ 40, at 48.

> **b.      The Swap Policy.**

The Swap Policy unconditionally and irrevocably obligates Radian Asset to make to Royal Bank -- the Swap Counterparty -- certain payments that the College owed on the Swap Policy if the College did not make the payments.  The Swap Policy states:

> Radian Asset Assurance Inc. . . . in consideration of the payment of the premium and subject to the terms of this Policy, is held and firmly bound unto the Beneficiary identified below[, Royal Bank,] for, and unconditionally and irrevocably agrees to pay, subject to the terms and conditions set forth herein, the payment of each and every Insured Payment which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Principal.

Swap Policy at 1.  "Insured Payments" are those "due and payable by the Principal to the Beneficiary in accordance with the terms and provisions of the Swap Agreement" excluding payments relating to early termination.  Swap Policy at 2.  The Swap Policy states that it is "issued to the Beneficiary."  Swap Policy at 3.

Royal Bank is defined as the "Beneficiary" of the Swap Policy.  Swap Policy at 1.   The College is defined as the "Principal," and not as the insured or the Beneficiary.  Swap Policy at 3. The only claims under the Swap Policy that the Swap Policy expressly contemplates are those that the Beneficiary -- Royal Bank -- makes.  See Swap Policy at 2.  The Swap Policy provides that, upon payment, Radian Asset "will become the owner of all right to payment of such Defaulted

Amount and shall be fully subrogated to all of Beneficiary's rights thereto, including Beneficiary's

right to payment thereof."  Swap Policy at 3.

### c. The Commitment Letter.

Radian Asset issued the Bond Policy pursuant to a Commitment Letter, which stated:

> Radian Asset Assurance Inc. (the "Insurer" or "Radian") hereby commits to issue a
> Financial Guaranty Insurance Policy (the "Policy") to the Bank of New York, as
> Insurance Trustee (the "Insurance Trustee") for the benefit of the holders of the debt
> obligations described on the front hereof under Bonds Insured (the "Bonds"), in
> accordance with and subject to the terms set forth in this Commitment.

Higher Education Revenue Bond Bond Insurance Commitment at i (dated June 8, 206), filed

October 29, 2010 (Doc. 198-1, Ex. C)("Commit Letter").  The College accepted the terms in Radian

Asset's Commitment Letter.  See Commitment Letter ¶ 12, at i.  A copy of the proposed Bond

Policy was attached to the Commitment Letter.

The Commitment Letter included schedules listing information that Radian Asset required

to be included in the Official Statement for the Bonds.  Schedule 13 discussed Radian Asset's credit

ratings and required that the following language to be included in the Bond documents.

> The Insurer has a financial strength rating of "AA" (outlook: negative) from
> Standard & Poors Rating Services, a division of The McGraw-Hill Companies, Inc.
> ("S&P"), an insurance financial strength rating of "Aa3" (outlook: stable) from
> Moody's Investors Service, Inc. ("Moody's") and a claims paying ability rating of
> "AA" (outlook: negative) by Fitch Ratings Services ("Fitch").  On April 27, 2005,
> Fitch affirmed the 'AA' insurer financial strength rating of the Insurer, but revised
> its rating outlook for the Insurer from "stable" to negative."  None of the Insurer's
> customers have the right to receptive business in connection with such ratings action.
> The ratings from the applicable rating agency reflect only the views of S&P,
> Moody's and Fitch, respectively, do not constitute a recommendation to buy, sell or
> hold securities and are subject to revision or withdrawal at any time by such rating
> agencies.  Any further explanation of any rating may be obtained only from the
> applicable rating agency.  Any downward revision or withdrawal of any of the above
> ratings may have an adverse effect on the market price of the [Bonds].  The Insurer
> does not guarantee the market price or investment value of the [Bonds] nor does it
> guarantee that the ratings on the Bonds will not be revised or withdrawn.

Commitment Letter at 3 (alteration in original).  The Official Statement for the Bonds repeated those representations.

The Commitment Letter also stated that the College would indemnify Radian Asset in certain circumstances:

> The Institution shall protect, hold harmless and indemnify the Insurer for, from and against any and all liability, obligations, losses, claims and damages paid or incurred in connection with its business or properties, the [Bond Documentation] and any related instrument (including all environmental liabilities regarding its properties), (except that the Institution shall not protect, hold harmless or indemnify the Insurer for the willful or wanton acts or omissions, mistakes, gross negligence of the Insurer, to the extent that such acts, omissions, mistakes, gross negligence of such party are successfully alleged to have caused the liability, obligation, loss, claim or damage) and expenses in connection herewith including reasonable attorneys' fees and expenses.  The obligations of the Institution to protect, hold harmless. reimburse and indemnify the Insurer as set forth under this Section shall survive any termination, release, satisfaction and discharge of the [Bond Documentation].

Commitment Letter Schedule 3, at 4.

### 3.   <u>Radian Asset's Financial Problems</u>.

Unbeknownst to the College, Radian Asset had been and was experiencing its own financial problems, which ultimately resulted in the financial collapse of Radian Asset's financial guaranty insurance business, payment of large obligations on the policies, the rescission or withdrawal of Radian Asset's ability or willingness to issue financial guaranty policies and other adverse financial consequences, some or all of which adversely impacted the College.  <u>See</u> Amended Answer ¶ 36, at 46-47.  In late 2006, Radian Asset was insuring subprime mortgage pools also with minimal due diligence, a fact that Radian Asset did not state in the disclosure information Radian Asset delivered to the College, and Radian Asset declined to certify that it had made full material disclosure.  <u>See</u> Amended Answer ¶ 36, at 46-47.  Radian Asset's condition did not improve, despite the influx of cash flow from institutions such as the College (almost one-million dollars from the College alone).

See id. ¶ 37, at 47.

In September of 2007, Radian Asset management requested Fitch Ratings, a rating agency, to withdraw its ratings following a rating downgrade of Radian Asset's financial guaranty subsidiaries.  See Amended Answer ¶ 39, at 47.  Radian Asset made this request despite its knowledge that, if a rating agency withdrew its ratings, the College could have to pay more for its obligations to Royal Bank under the Standby Bond Purchase Agreement.  See Amended Answer ¶ 39, at 47.  Radian Asset was informed that the quarterly fee increase to the College of Radian Asset's withdrawal rating could be $50,000 per quarter or $200,000 per year, but Radian Asset disregarded the College's interests and favored its own.  See Amended Answer ¶ 39, at 47.

###    4.    **The Default.**

Over one year later, in 2008, the Bonds went into default.  The College was unable to pay debt service on the Bonds, resulting in millions of dollars of payments by Radian Asset because of the College's action.  See FAC ¶ 4.60, at 27 (setting forth this fact); Amended Answer ¶ 187, at 26 (admitting this fact).  Radian Asset contends that these payments were for all claims made to Radian Asset under the Bond Policy for amounts outstanding on the Bonds and in full satisfaction of its obligations under the Bond Policy.  See FAC ¶ 4.63, at 12.  On October 10, 2008, Royal Bank gave notice to the Bond Trustee -- Wells Fargo -- of a default under the Standby Bond Purchase Agreement based on changes by two credit rating agencies in Radian Asset's financial strength ratings.  See Amended Answer ¶ 40, at 48.  That led the Bond Trustee to require a tender of the Bonds, which increased the interest rate on the Bonds and made them subject to amortization over five years.  See Amended Answer ¶¶ 40-41, at 46.  The Counterclaims call this event a "financial crisis" that Radian Asset allegedly "created" for the College, for which Radian Asset offered the

College no assistance.  See Amended Answer ¶ 42, at 48.  Radian Asset then allegedly "threatened suit," and "attempt[ed] to coerce and bully the College" to avoid making any payments under the Policies.  Amended Answer ¶ 43, at 48.  The College contends that, as a result of Radian Asset's actions, it lost "any chance of survival as a college."  Id. ¶ 43, at 49.

On October 21, 2008, Radian Asset informed the Bond Trustee that Radian Asset had become the "sole holder" of the Bonds, and possessed all rights and remedies granted to the Bondholders, including the right to control and direct enforcement actions.  Amended Answer ¶ 44, at 49.  Radian Asset informed the Bond Trustee that Radian Asset intended to enforce that right, and Radian Asset therefore instructed the Bond Trustee that the Bond Trustee could not take direction from any other party, including RBC Capital Markets.  See Amended Answer ¶ 44, at 49.  Radian Asset never withdrew this exercise of control, nor did it empower the Bond Trustee to take direction from any other party.  See Amended Answer ¶ 44, at 49.  The College contends that Radian Asset "controlled all of the dealings on the Bonds and manipulated the ultimate outcome of the fate of the College" by virtue of its position as the Bond insurer and its rights under the Bond documents. Amended Answer ¶¶ 44-45, at 49.  As of that date, Radian Asset could have directed the Bond Trustee to make a demand on Radian Asset for complete payment of the Bonds under the Bond Policy, and, according to the College, should have done so to limit Radian Asset's and the College's exposure to more damages. See Amended Answer ¶¶ 48, 62, at 50, 54.  Radian Asset did not direct the Bond Trustee to make a demand on Radian Asset for payment of the Bonds and did not work with the College to limit the College's exposure, thereby allegedly placing its interests above those of the College.  See Amended Answer ¶ 50, at 50.  Instead, Radian Asset again "threatened and bullied the College" with two additional demands that the College pay its obligations on the Bonds,

which included two allegedly false statements -- that the College's auditors had reported the existence of a deficit, and that Radian Asset had relied on projections and deficiencies relating to the College's FY2006 budgets.  See Amended Answer ¶¶ 51-59, at 50-53.  The Counterclaims allege that Radian Asset made these demands to avoid paying under the Policies and "sought in bad faith to impose financial harm to the College."  Amended Answer ¶ 55, at 52.

5.   **The Sale of Assets.**

In 2009, the College sold its assets and property, and applied the proceeds -- $19.5 million -- toward payment of the outstanding principal and accrued interest on the Bonds.  See Amended Answer ¶ 62, at 36, 54.  Radian Asset paid millions of dollars of payments under the Bond Policy for the remaining outstanding debt of the Bonds.  See FAC ¶ 4.60, at 27 (setting forth this fact); Amended Answer ¶ 187, at 26 (admitting this fact).  The College alleges that Radian Asset refused to enter other unspecified negotiations or deals aimed at restructuring the College's debt or allowing the College to be sold, because Radian Asset allegedly feared a lawsuit from Royal Bank on the Bond Policy if it agreed to such deals.  See Amended Answer ¶¶ 65-69, at 55-56.  Radian Asset paid Royal Bank $680,000.00 in payments under the Swap Policy from December 2008 through September 2009, increasing the amount it would seek in damages against the College, while avoiding a demand on the Bond Policy.  See Amended Answer ¶ 64, at 54-55; FAC ¶ 4.64, at 28-29. Radian Asset obtained a release of claims against Radian Asset from RBC and Royal Bank, but did not obtain a release of any claims by them against the College.  See Amended Answer ¶ 70, at 56. The College alleges -- on information and belief only -- that Radian Asset's agreement with RBC and Royal Bank was designed to make a settlement payment to those entities appear to be a payment under Radian Asset's Bond Policy so that Radian Asset could seek recovery of that amount from

the College.  See Amended Answer ¶74, at 56-57.

<h2 style="text-align:center"><strong><u>PROCEDURAL BACKGROUND</u></strong></h2>

Radian Asset filed its original Complaint against the College and the other Defendants on September 14, 2009.  See Doc. 1.  Radian Asset filed its FAC on October 8, 2009.  See Doc. 12. On October 15, 2010, the College filed its Amended Answer.

**1.      <u>The College's Counterclaims.</u>**

The College asserts six causes of action against Radian Asset: (i) violation of the UIPA; (ii) violation of the UPA; (iii) fraudulent inducement; (iv) breach of the implied covenant of good faith and fair dealing; (v) breach of duty to treat the interests of Radian Asset's insureds equal to its own; and (vi) prima-facie tort.  See Amended Answer ¶¶ 77-101, at 57-60.  The College seeks unspecified damages, statutory treble damages, punitive damages, attorney fees, and costs.  See Amended Answer ¶¶ 102-103, at 61.  The College's allegations are numerous and lengthy.  In substance, the Counterclaims rest on the premise that Radian Asset owed the College special duties under the Bond Policy.  The College asserts that the relationship was one of an "insurer" and its "insured" in the traditional sense, alleging that "Radian owed the College the duties typically owed by insurance companies to its insureds, as well as duties owed by Bond and Swap insurers to institutions such as the College."  Amended Answer ¶ 7, at 41.  The College contends that it was not sophisticated in Bond transactions, and that it relied on Radian Asset and RBC Capital markets to tell the College what information it should disclose to Radian Asset and how that information should be presented. See Amended Answer ¶ 5, at 41.

The College alleges that Radian Asset never intended to insure any risk in the Policies. Instead, Radian Asset allegedly intended to pursue payment from the College for any exposure it

suffered or payment it made.  <u>See</u> Amended Answer ¶¶ 8-9, at 42.  The College contends that Radian Asset's issuance of the Policies with such "undisclosed intent" was a deceptive and unfair practice. Amended Answer ¶ 10, at 42.

        2.    **Radian Asset's Motion.**

        On October 29, 2010, Radian Asset filed its motion.  Radian Asset moves the Court, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing with prejudice all Counterclaims asserted against it by the College in the College's Amended Answer.  Radian Asset contends that the Counterclaims fail to state a claim as a matter of law for the reasons it sets forth in detail in a memorandum it filed concurrently in support of its motion.  <u>See</u> Memorandum in Support of Radian Asset Assurance Inc.'s Motion to Dismiss College of Santa Fe's Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(6), filed October 29, 2010 (Doc. 197)("Memorandum").   In addition to that memorandum, Radian Asset also supports its motion with the Declaration of Gavin W. Skok (executed October 29, 2010), copies of the Bond and Swap Policies, and a copy of the Commitment Letter -- all of which Radian Asset submitted concurrently with the motion, and which Radian Asset contends are properly before the Court.  Radian Asset asserts that the dispositive nature of this motion obviates the necessity to seek the concurrence of opposing counsel.

        Radian Asset's arguments are that: (i) the College is a "stranger" to the Bond and Swap Policies, and thus the College has no standing to make contract or deceptive practice claims against Radian Asset; (ii) the College is not an "insured" under the Bond and Swap Policies; (iii) Radian Asset's Commitment Letter is the only contract it had with the College and Radian Asset has fulfilled the contract; (iv) each of the College's Counterclaims fails as a matter of law; and (v) the College's UPA, UIPA, and fraudulent-inducement claims are time barred.  Radian Asset requests

that the Court enter an order dismissing with prejudice all Counterclaims asserted against it in the College's Amended Answer to Plaintiff's First Amended Complaint and Counterclaims.

### 3.      The College's Response.

On November 16, 2010, the College filed its Response in Opposition to Radian Asset Assurance, Inc.'s Motion to Dismiss the College of Santa Fe's Counterclaims.  See Doc. 229 ("Response").  The College asserts that the Commitment Letter is not properly before the Court. The College contends that it was the insured under the Bond Policy, and that Radian Asset and the College had an insurance relationship, as demonstrated by the plain language of the Bond Policy, by the payment of consideration by the College, and by Radian Asset's statements on its website that it insured issuers of municipal Bonds.  The College further contends that this relationship is confirmed by the parties' unequal bargaining positions, by Radian Asset's take-it-or-leave-it approach with respect to the Policies, and by Radian Asset's complete and total control over its performance of its obligations under the Bond Policy.  The College argues, therefore, that, as an insurer, Radian Asset owed duties to its insured, the College.  The College further contends that all of its Counterclaims are adequately pled and not time barred.

On November 23, 2010, Radian Asset filed its Reply in Support of Radian Asset Assurance Inc.'s Motion to Dismiss College of Santa Fe's Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(6). See Doc. 248 ("Reply").  Radian Asset reiterates its arguments.  Radian Asset also asserts that the College stakes all of its claims on the Bond Policy, and not on the Commitment Letter or the Swap Policy.

On November 23, 2010, the College filed its Notice of Newly-Discovered Admission By Radian that the College Is an Insured.  See Doc. 250 ("Admission").  The notice cited deposition

-15-

testimony from Ari Ginsburg, Radian Asset's rule 30(b)(6) witness.  Ginsburg confirmed that "the College of Santa Fe reflected the type of issuer Radian Asset sought to insure."  Deposition of Ari Ginsburg at 124:16-125:12 (taken November 19, 2010), filed November 23, 2010 (Doc. 250).

At the November 29, 2010 hearing, Radian Asset conceded that the College is not a stranger to the Bond Policy.  Radian Asset agreed that the College's relationship to the Bond Policy is analogous to a father who arranges to pay the premium on his child's automobile insurance.  Radian Asset represented that the reason it requested that Fitch Ratings withdraw its ratings was because all of the Bond insurers requested Fitch to withdraw their rating at that time, based on Fitch Ratings' use of a new ratings model which assigned all of the bond insurers lower ratings.  Radian Asset surmised that it was better to withdraw its Fitch rating than to have a poor Fitch rating.  The College agreed that the Court could consider the Bond and Swap Policies, but argued the Commitment Letter is not properly before the Court.  The College also asserted that it based its claims not on the Commitment Letter, but only on the Bond and Swap Policies.

On January 11, 2011, the Court held a motion hearing on another matter in this case.  A the beginning of the hearing, the Court stated that it was inclined to grant Radian Asset's Motion.  In response, the College asks that the Court certify the question whether the College is insured to the Supreme Court of New Mexico.  The College formalized its request in its Defendant College of the Christian Brothers of New Mexico, Known as the College of Santa Fe's Conditional Motion for Certification to the New Mexico Supreme Court Or, Alternatively, for Inclusion of Language Permitting Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b), filed January 20, 2011 (Doc. 325)("Motion for Certification").  The College contends that this dispute presents a novel question under New Mexico law and possibly nationally.  In the alternative, the College requests that the

Court allow the College to file an interlocutory appeal to the United States Court of Appeals for the

Tenth Circuit.  Radian Asset opposes certification and allowing interlocutory appeal, arguing that

the College's Counterclaims fail under the Supreme Court of New Mexico's precedent, which

employ well-established principles of contract law.  Both parties agreed that they did not want the

Court to covert the Motion into a motion for summary judgment.[1]

_____

[1] "New Mexico law allows courts to consider 'collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear.'"  General Protecht Group, Inc. v. Leviton Mfg. Co., Inc., No. CIV 10-1020 JB/LFG, 2010 WL 5477266, at *5 (D.N.M. Dec. 7, 2010)(Browning, J.)(quoting Mark V, Inc. v. Mellekas, 114 N.M. 778, 781, 845 P.2d 1232, 1236 (1993)).  In this matter, neither party mentioned Mark V. Inc v. Mellekas, or asked for an Mark V hearing.

Moreover, while the parties dispute whether the College was the insured under the Bond Policy, their dispute does not turn on ambiguity in the language.  The only reference the College makes to the language of the Bond Policy is its contention that "the plain language of the Bond Policy states Radian was insuring the College's obligations and the College paid Radian the premiums for the Bond Policy."  Response at 8 ("This Policy does not insure against any risk other than nonpayment of the Obligation by or on behalf of the Obligor or any other obligator to the Bond Trustee." (quoting Motion at 5-6)).  These allegations -- that Radian Asset was insuring the College's obligations and the College paid the premiums on the Bond Policy -- are not in dispute; rather, the parties dispute what these allegations imply under the law.  The parties do not contest or dispute the language used in the Bond Policy.  The College bases its contentions instead on the "relationship between Radian and the College," Response at 11, their relative bargaining power, the adhesive nature of the contract, the College's payment of the premiums on the Bond Policy, and the College's position as an obligor.

The College points to some extrinsic evidence that it contends supports finding that it was an insured under the Bond Policy.  The College asserts that: (i) Radian Asset holds itself out as having "provided financial guaranty insurance and reinsurance to domestic and international issuers of municipal bonds,"  Response at 8 (quoting Radian, About Radian www.radian.biz/page?name=AboutUs (last visited January 5, 2010)); (ii) Radian Asset's rule 30(b)(6) representative testified that "the College of Santa Fe reflected the type of issuer Radian Asset sought to insure," Ginsburg Depo. at 124:16-125:12; and (iii) Radian Asset was registered as a surety under its certificate of authority, See Tr. at 55:18-21 (Baker).  This extrinsic evidence also goes to "the relationship between the parties."  Response at 11.  None of this extrinsic evidence relates to establishing that the terms of the Bond Policy are ambiguous.

At the November 29, 2010 hearing, the Court asked the parties if the question whether the College is an insured under the Bond Policy is a question of law.  In response to the Court's inquiry, the College stated that there were not ambiguities if the Court found it was the insured, but there were ambiguities otherwise:

## LAW REGARDING MOTIONS TO DISMISS

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations

---

Because the term insured does not appear in either one of the policies and because this is a different breed of insurance, suretyship, unless the Court finds as a matter of law that we are insured or are owed the obligations, I think that there is an ambiguity, then, in the policy and there may be an ambiguity in what Radian was selling to the college of Santa Fe and we should be able to go forward and try and prove that we were an insured and should be treated as an insured, because it is not defined, there would be an ambiguity . . . .

Transcript of Hearing at 58:15-59:7 (taken November 29, 2010)(Baker)("Tr.")(the Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers).  The College did not, however, point to any particular language or terms it contended were ambiguous. Radian Asset asserted that the language of the Bond Policy was "unambiguous."  Tr. at 77:1-5.  The parties also both represented that they did not want the Court to treat Radian Asset's Motion as a motion for summary judgment.

On the other hand, the College concedes whether it is an insured is a question of law.  The College moves this Court to certify the question whether it is an insured under the Bond Policy to the Supreme Court of New Mexico or in the alternative to certify the Court's order for interlocutory appeal.  To certify to the Supreme Court of New Mexico requires that there be a "question[ ] of law."  NMRA 12-607A(1).  In its Motion for Certification, the College concedes that the question whether it is an insured is a question of law, implying that there is not a question of fact before the Court that needs to be decided by a jury.  The College asserts that the matter presents "[t]he purely New Mexico state law question of whether the College is an 'insured' under Radian's financial guaranty insurance policy."  Motion for Certification at 3.  The College further asserts that "the question of whether the College is an 'insured' under Radian's financial guaranty insurance policy . . . presents a controlling question of law for which there is a substantial ground for difference of opinion."  Motion for Certification at 5 (emphasis added).

Thus, because the parties do not suggest that there is more evidence for consideration or that a Mark V hearing is needed or desired, the Court will interpret the documents on the record before it.  The parties concede that the issue of whether the College is an insured under the Bond Policy is a question of law.  Moreover, after careful review of everything put before the Court, the Court finds that the terms of the documents discussed herein are unambiguous.  The Court will, therefore, base its decision on the plain language of the Bond Policy.  See In Mountain Highlands, LLC v. Hendricks, No. Civ 08-0239 JB/ACT, 2010 WL 1631856, at *7 (D.N.M. Apr. 2, 2010)(Browning, J.).

-18-

as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint

is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must

accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light

most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.

See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of

Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual

allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief

"requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1965.  "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the allegations

in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1965

(internal citation omitted).  "[T]he Supreme Court recently . . . prescribed a new inquiry for us to

use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief

that is plausible on its face.'" Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th

Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1967, 1969). "The [Supreme] Court

explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in

order to survive a motion to dismiss." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177

(quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1974)(alterations omitted).  "Thus, the mere

metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded

claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C.

-19-

v. Schneider, 493 F.3d at 1177.   The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 127 S Ct. at 1974)(internal citations omitted).

### LAW REGARDING RULE 9(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Normally, a plaintiff need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Fraud claims, however, must meet more stringent standards.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

With respect to rule 9(b)'s scope, a court should require parties to plead a cause of action with particularity when that cause of action contains allegations grounded in fraud.  See 2 J. Moore, J. Parness & J. Smith, Moore's Federal Practice § 9.03(1)(d), at 9-20 (3d ed. 2008).  On the other hand, claims based on negligent or innocent misrepresentation, to the extent those claims do not require proof of fraud, may be pled in accordance with the more relaxed standards of rule 8(a).  See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-05 (9th Cir. 2003)("Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."); J. Moore, J. Parness & J. Smith, supra § 9.03(1)(d), at 9-21.

The primary motives that animate rule 9(b) help illuminate the reason for limiting the rule's reach to claims grounded in fraud.  First, the requirement of pleading with particularity protects

defendants' reputations from the harm attendant to accusations of fraud or dishonest conduct.  See Guidry v. Banks of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992)("[The particularity requirement] stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to defendant's reputation."); United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d 908, 921 (4th Cir. 2003)("Rule 9(b) protects defendants from harm to their goodwill and reputation.") (quotations and citations omitted).  Second, the requirement to plead with particularity puts defendants on notice of the allegedly fraudulent conduct so that they can formulate a defense. See United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d at 921.  A related goal of 9(b) is to prevent plaintiffs from tagging on specious fraud claims to their pleadings in an attempt "to induce advantageous settlements or for other ulterior purposes."  Banker's Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992).

The Tenth Circuit has fleshed out the components necessary to a successful 9(b) pleading. In Sheldon v. Vermonty, 246 F.3d 682 (10th Cir. Dec. 4, 2000), the Tenth Circuit held that the plaintiff alleged with specific particularity a violation of the Securities Exchange Act of 1934.  See 246 F.3d 68, at *4.  The Tenth Circuit concluded that the complaint

> adequately met Rule 9(b) requirements.  First, as the district court acknowledged, the Complaint alleged misrepresentations with background information as to date, speaker, and the medium of communication. . . .  Second, certain of the alleged misrepresentations involved profitable expectations arising from an unowned and inoperable meat-packing plant, a nonexistent lumber company, and fabricated contracts.  Accepting Sheldon's allegations as true, these are patently false statements of present fact.  The district court erred in determining they were mere conclusory allegations of falsity and in characterizing them as fraud by hindsight. . . .  Third, the allegations of scienter were sufficient.  In securities fraud cases, although speculation and conclusory allegations will not suffice, great specificity is not required if the plaintiff alleges enough facts to support a strong inference of fraudulent intent.

Id. at * 5 (internal quotation marks and citations omitted).  "At a minimum, Rule 9(b) requires that

a plaintiff set forth the who, what, when, where and how of the alleged fraud." United States ex rel.

Schwartz v. Coastal Healthcare Group, Inc., 232 F.3d 902, at * 3 (10th Cir. 2000).  "To survive a

motion to dismiss, an allegation of fraud must 'set forth the time, place, and contents of the false

representation, the identity of the party making the false statements and the consequences thereof.'"

Midgley v. Rayrock Mines, Inc., 374 F. Supp. 2d 1039, 1047 (D.N.M. 2005)(Browning, J.)(quoting

Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997)).  "On the other hand,

rule 9(b) does not require specific knowledge regarding the defendant's state of mind."  Midgley v.

Rayrock Mines, Inc., 374 F. Supp. 2d at 1047.

### LAW REGARDING CERTIFYING INTERLOCUTORY APPEALS

Rule 54(b) provides:

> Judgment on Multiple Claims or Involving Multiple Parties.  When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  "A district court order which stops short of adjudicating all claims and

liabilities of all parties is not final and appealable unless it is certified under rule 54(b)."  Hook v.

Regents of Univ. of Cal., No. 09-2102, 2010 WL 3529414, at *6 (10th Cir. Sept. 13, 2010)(citing

Atiya v. Salt Lake County, 988 F.2d 1013, 1016 (10th Cir. 1993)).   Rule 54(b) allows the district

court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties" so

long as "the district court expressly determines that there is no just reason for delay."  Fed. R. Civ.

P. 54(b).  The general rule, however, is that an order which "determines liability but leaves damages

to be calculated is not final." Harbert v. Healthcare Servs. Group, Inc., 391 F.3d 1140, 1145 (10th Cir. 2004). The Court of Appeals reviews a district court's denial of certification for abuse of discretion. See Graham v. Van Dycke, 318 F. App'x 654, 659 (10th Cir. 2009)(citing Blair v. Shanahan, 38 F.3d 1514, 1522 (9th Cir. 1994)(reviewing for abuse of discretion a district-court's denial of request to certify under Rule 54(b))).

In order to determine whether an order is "final" a district court must first consider the separability of the adjudicated and unadjudicated claims. See Jordan v. Pugh, 425 F.3d 820, 826 (10th Cir. 2005)(stating that, in considering whether an order is final, "the controlling jurisdictional question is . . . whether [the claim that has been resolved] is distinct and separable from the claims left unresolved" (quotation omitted)); Old Republic Ins. Co. v. Durango Air Serv., Inc., 283 F.3d 1222, 1225 (10th Cir. 2002)(same); Okla. Tpk. Auth. v. Bruner, 259 F.3d 1236, 1243 (10th Cir. 2001)(same). "For purposes of Rule 54(b), a claim comprises all factually or legally connected elements of a case." Jordan v. Pugh, 425 F.3d at 827 (quotation omitted). In determining whether claims are separable, courts should "consider whether the allegedly separate claims turn on the same factual questions, whether they involve common legal issues, and whether separate recovery is possible." Jordan v. Pugh, 425 F.3d at 827. "[C]ourts entering a Rule 54(b) certification should clearly articulate their reasons and make careful statements based on the record supporting their determination of 'finality' and 'no just reason for delay' so that [reviewing courts can] review a 54(b) order more intelligently[ ] and thus avoid jurisdictional remands." Stockman's Water Co. v. Vaca Partners, L.P., 425 F.3d 1263, 1265 (10th Cir. 2005)(some alterations in original)(internal quotation marks omitted).

## LAW REGARDING CERTIFICATION TO
## THE SUPREME COURT OF NEW MEXICO

Rule 12-607 NMRA provides:

A. Power to answer.

(1) The Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States, an appellate court of another state, a tribe, Canada, a Canadian province or territory, Mexico or a Mexican state if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling:

> (a) appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals; or
>
> (b) constitutional provision or statute of this state.

Rule 12-607(A)(1). Federal courts have the option of determining what a state supreme court would do if confronted with the same issue, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), or of certifying the question to the state supreme court for determination, see Lehman Bros. v. Schein, 416 U.S. 386, 390-91 (1974)("The decision to certify a question to the state supreme court 'rests in the sound discretion of the federal court.'"); Farm Bureau Mut. Ins. Co. v. Jameson, 472 F. Supp. 2d 1272, 1280 (D.N.M. 2006)(Browning, J.); Allstate v. Stone, 116 N.M. 464, 465, 863 P.2d 1085, 1086 (1993)("This matter comes before us by way of certification from the United States District Court for the District of New Mexico."). Pursuant to N.M.S.A. 1978, § 39-7-4, the Supreme Court of New Mexico may answer questions that the federal district court certifies to it "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of this state." N.M.S.A. 1978, § 39-7-4. See Swink v. Fingado, 115 N.M. 275, 276, 850 P.2d 978, 979 n.1 (1993); Schlieter v. Carlos, 108 N.M. 507, 508, 775 P.2d 709, 710 (1989).

-24-

In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court of the United States explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Thompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." 311 U.S. at 467. "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review." Id. See Adams-Arapahoe Joint School Dist. No. 28-J v. Continental Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case."). As the Tenth Circuit explained in Wade v. Emcasco Insurance Co., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . . The federal court must follow the most recent decisions of the state's highest court. . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . . In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state . . . . appellate decisions in other states with similar legal principles . . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . . Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (internal citations and quotation marks omitted).

## ANALYSIS

Many of the College's Counterclaims are founded on the assumption that the College is the insured under or a party to the Bond Policy. The Bond Policy's language shows that the College

was not insured under the Bond Policy.  Moreover, the Bond Policy's language reveals that the College was not a party to the Bond Policy.  Because the College was not a party to or insured under the contract on which it bases its Counterclaims, a number of the College's Counterclaims fail as a matter of law.  Moreover, the College did not plead facts that show malice, so its prima-facie tort claim fails as a matter of law.  Finally, the College's UIPA, UPA, and fraudulent-inducement claims are time barred.  The Court therefore grants Radian Asset's Motion.

## I.   THE BOND AND SWAP POLICIES, AND COMMITMENT LETTER, ARE PROPERLY BEFORE THE COURT.

The Bond and Swap Policies, and the Commitment Letter, are properly before the Court. Radian Asset contends that the Bond and Swap Policies, and the Commitment Letter, are central to the College's arguments, that they are repeatedly referenced in the Counterclaims, and that, accordingly, the Court may consider them on Radian Asset's rule 12(b)(6) motion even though the College did not attach them to its Counterclaims.  First, Radian Asset asserts that the Commitment Letter established the contractual relationship between the College and Radian Asset, and it is the document pursuant to which the Bond Policy was issued, making it central to the College's Counterclaims.  Second, Radian Asset contends that the Commitment Letter was referenced in the Counterclaims.  See Motion at 9 n.5 (citing Amended Answer ¶ 3, at 41 ("The College contracted with Radian to provide two insurance policies and Radian was paid by the College for those two policies."); Counterclaim ¶ 9, 42 ("Nor did Radian ever explain that it interpreted the insurance policies it was selling to the College and interpreted the language it required in the Sales Agreement as meaning Radian was insuring no risk at all . . . ."  (the College refers to the Commitment Letter as the "Sales Agreement"); ¶ 92, at 59 ("Radian entered into at least two contracts with the College.")).  Radian Asset argues, therefore, that the Bond and Swap Policies, and the Commitment

Letter, are central to and referenced in the College's Counterclaims, and that the Court may consider them on Radian Asset's rule 12(b)(6) motion.

The College does not dispute that the Court may consider the Bond and Swap Policies, but asserts that the Court should not consider the Commitment Letter when deciding Radian Asset's Motion.  The College contends that it does not rely on the Commitment Letter in its Counterclaims, that none of the College's claims or supporting allegations are based on the Commitment Letter, and that the College did not attach the Commitment Letter as an exhibit to the Counterclaims.  The College further argues that the paragraphs Radian Asset cites as referencing the Commitment Letter refer to or are based on the Bond Policy or Swap Policy, or, "[a]t most, the commitment letter is briefly alluded to and then only in reference to Radian's own claim that it is entitled to indemnification for any losses and all losses."  Response at 16.  The College also contends that the Commitment Letter had expired at the time of the contracts, and the terms of the Commitment Letter were not intended to be incorporated into the insurance policies.  The College asserts, therefore, that its Counterclaims are based on the Policies, not the Commitment Letter, and that the Court should not consider the Commitment Letter in deciding Radian Asset's Motion.

The Court may properly consider the Commitment Letter and the Policies on Radian Asset' rule 12(b)(6) motion, because they are central to the College's claims and are referenced in the Counterclaims, and the authenticity of the documents is not in dispute.  In Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210 (10th Cir. 2007), the Tenth Circuit stated that a "district court may consider documents referred to in the complaint if the documents are central to the plaintiffs claim and the parties do not dispute the documents' authenticity."  493 F.3d at 1215.  Similarly, in GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381 (10th Cir. 1997), the Tenth Circuit stated: "[I]f

a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." 130 F.3d at 1384-85 (citing Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1991); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196-97 (3d Cir. 1993); Venture Assoc. Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7th Cir. 1993); New Beckley Mining Corp. v. United Mine Workers of Am., 18 F.3d 1161, 1164 (4th Cir. 1994); Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994); Weiner v. Klais & Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997); Brooks v. Blue Cross & Blue Shield of Florida, Inc., 116 F.3d 1364, 1369 (11th Cir. 1997)).  As the United States District Court for the Eastern District of Louisiana stated in Mendler v. Derouen, No. 08-4217, 2009 WL 411244 (E.D. La., Feb. 18, 2009):

> The Court recognizes that it may consider an insurance policy attached to a motion to dismiss as part of the pleadings if the document is referred to in the complaint and central to plaintiffs' claims.  The insurance policy in question certainly fits this criteria, as plaintiffs' contract claim against ACA is premised on the insurance policy.

Mendler v. Derouen, 2009 WL 411244, *2 (citation omitted).  See Jarnigan v. New Mexico Mut. Cas. Co., No. ClV 03-0813 JB/ACT, 2004 WL 3426437, at *6 (D.N.M. Apr. 19, 2004)(Browning, J.)("[T]he target examination report includes alleged misrepresentations . . . important to the Plaintiffs' claims; [t]he Court believes the Plaintiffs' reference to it in the Complaint is sufficient to satisfy the 'central' standard.").  "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied."  GFF Corp. v. Assoc. Wholesale Grocers, Inc., F.3d at 1384.

The Commitment Letter is "referred to in the complaint,"  GFF Corp. v. Assoc. Wholesale

Grocers, Inc., F.3d at 1384, both indirectly and by the name "Sales Agreement."  E.g., Counterclaim

¶ 3, at 41 ("The College contracted with Radian to provide two insurance policies and Radian was

paid by the College for those two policies."  (emphasis added)); Counterclaim ¶ 9, at 42 ("Nor did

Radian ever explain that it interpreted the insurance policies it was selling to the College and

interpreted the language it required in the Sales Agreement as meaning Radian was insuring no risk

at all . . . ." (emphasis added))).  The College cites the assertion in Counterclaim ¶ 9, at 42 -- that

Radian Asset's insured no risk at all, which is founded on "the language [Radian Asset] required in

the Sales Agreement" -- in support of its UPA and fraudulent-inducement Counterclaims, and the

College cites the allegation that Radian Asset had "no intention of insuring any risk at all" in support

of its UIPA Counterclaim.  E.g., Amended Answer ¶ 78, at 57; Response at 23; Response at 25.

While downplaying the significance of the reference, the College concedes that "the commitment

letter is briefly alluded to . . . in reference to Radian's own claim that it is entitled to indemnification

for any losses and all losses."  Response at 16.

        The Commitment Letter is also central to the College's Counterclaims.  In Jarnigan v. New

Mexico Mutual Cas. Co., this Court considered a target examination report that included alleged

misrepresentations, which the defendants attached to their motion to dismiss.  The Plaintiffs asserted

that the Court could not consider the documents unless the Court converted the motion to one for

summary judgment.  The Court concluded that the report was properly before it on the defendants'

motion to dismiss:

> As to the second prong, the Plaintiffs contend that the report itself is not "central" to
> their claims, but merely the vehicle that the DOI and the NMMCC Defendants used
> to falsely accuse the Plaintiffs of wrongdoing.  Unlike a contract, for example, the
> form and the existence of the document itself are irrelevant.  Nevertheless, the form
> is what it is, and the fact that the target examination report includes alleged
> misrepresentations is important to the Plaintiffs' claims.  The Court believes the

> Plaintiffs' reference to it in the Complaint is sufficient to satisfy the "central" standard.

2004 WL 3426437, at *6.

Similarly, the Commitment Letter "is central to the plaintiff's claim." <u>GFF Corp. v. Assoc. Wholesale Grocers, Inc.</u>, F.3d at 1384.  While the College bases its Counterclaims on the Bond Policy, and not the Commitment Letter, the allegations supporting the Counterclaims turn on what Radian Asset disclosed -- or did not disclose -- in the Commitment Letter.  Namely, the College bases its UIPA, UPA, and fraudulent-inducement Counterclaims in part on the contention that Radian Asset insured "no any risk at all" because Radian Asset did not

> explain that it interpreted the insurance policies it was selling to the College and interpreted the language it required in the Sales Agreement as meaning Radian was insuring no risk at all because it would be fully subrogated and indemnified for any and all losses including deficiencies, interest, and attorneys' fees from the College.

Amended Answer ¶ 9, at 42.  <u>See</u>, <u>e.g.</u>, Amended Answer ¶ 78, at 57 (basing the UIPA counterclaim on Radian Asset having "no intention of insuring any risk at all"); Response at 23 (citing Amended Answer ¶ 9, at 42)(contending that its allegation that "Radian's interpretation of its own policies indicates that it was to be fully indemnified and subrogated" is sufficient to establish a UPA claim); Response at 25 (citing Amended Answer ¶ 9, at 42)(contending that Radian Asset's failure to disclose "it would be insuring no risk at all" and that Radian Asset "interpreted the language it required in the Sales Agreement to mean that it was insuring no risk" supported its fraudulent-inducement Counterclaim).  Consequently, central to the College's Counterclaims is the allegation that Radian Asset did not disclose in the Policies or in the Commitment Letter that it would look to the College to indemnify it.  This allegation makes the contents of the Commitment Letter central to the Counterclaims, in particular as the College's fraudulent-inducement Counterclaim requires

the College to allege reasonable reliance.  See Cain v. Champion Window Co. of Albuquerque, LLC,

142 N.M. 209, 216, 164 P.3d 90, 97 (Ct. App. 2007)(stating that a fraudulent-inducement claim

requires a party to show it relied on the representation or concealment).[2]

Moreover, the Commitment Letter is the contract pursuant to which Radian Asset issued the

Bond Policy.  Several of the College's Counterclaims are based on the relationship between the

College and Radian Asset under the Bond Policy, including the College's Counterclaim that Radian

Asset violated its duty to treat the College's interests as equal to its own, the College's Counterclaim

that Radian Asset violated the covenant of good faith and fair dealing, and its UIPA Counterclaim.

While the College does not bring those Counterclaims under the Commitment Letter, it is the

Commitment Letter that establishes those relationships that the College must allege as a basis for

its Counterclaims.  The Commitment Letter therefore is central to the College's claims, because it

establishes the relationships central to the College's Counterclaims.  Because the Commitment

Letter "is referred to in the [Counterclaims] and is central to the [College's] claim," the Court may

consider the three documents on Radian Asset's motion to dismiss."  GFF Corp. v. Associated

Wholesale Grocers, Inc., 130 F.3d at 1384.  See Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215

(10th Cir. 2007)("[T]he district court may consider documents referred to in the complaint if the

documents are central to the plaintiffs claim and the parties do not dispute the documents'

authenticity.")(internal quotation omitted).

By not agreeing that the Court can consider the Commitment Letter, an indisputably genuine

---

[2] The Court is not saying that, anytime there is an omission claim in a complaint, the defendant can ask the Court to consider any and all documents on a motion to dismiss without converting the motion to a motion for summary judgment.  When a party bases its claims on allegations that a document does not contain a disclosure, the Court may consider the document at issue on a motion to dismiss.

and authentic document that is central to the relationship between Radian Asset and the College, the College is artfully trying to keep the Court somewhat in the dark.[3]  While the Court believes the Commitment Letter is properly before the Court, the Court need not consider the Commitment Letter or rely upon it to decide Radian Asset's Motion, and the Court does not rely on it.  At the November 29, 2010 hearing, Radian Asset noted that it did not believe it was necessary for the Court to address the Commitment Letter for Radian Asset to prevail on its motion.  Radian Asset instead argued that the Court should consider the Commitment Letter if the Court did not find the Bond Policy alone established that the College was not insured under or a party to the Bond Policy.  Because the Bond Policy suffices to establish that Radian Asset prevails on its Motion, the Court does will not base it analysis on the Commitment Letter.[4]

## II.   THE BONDHOLDERS, AND NOT THE COLLEGE, ARE INSURED UNDER THE BOND POLICY.

The College bases its Counterclaims exclusively on the Bond Policy.  The College contends that Radian Asset owes it certain duties under the Bond Policy.  An examination of the Counterclaims reveals, however, that the College is neither an insured under nor a party to the Bond Policy.  Consequently, the College's Counterclaims that are founded on duties Radian Asset owes

---

[3] The College appears to be artfully pleading its Counterclaims based only on the Bond Policy, and not on the Commitment Letter, in order to keep the Court's from considering the terms of the Commitment Letter, including the provision that the College will indemnify Radian Asset.  See Commitment Letter Schedule 3, at 4.  The College may not, however, "survive a motion to dismiss simply by not attaching a dispositive document upon which the [it] relied."  GFF Corp. v. Assoc. Wholesale Grocers, Inc., F.3d at 1384.

[4] While the Court believes that the Commitment Letter is properly before it and will mention the Commitment Letter when useful to the analysis, the Court will be careful to give ultimate decisions based on the Bond Policy and the College's allegations in its Amended Answer, so that there will be no issue about the Commitment Letter being properly before the Court on the motion to dismiss and to avoid any question whether the Court converted the motion into a motion for summary judgment.

it under the Bond Policy fail.

A.    **THE COLLEGE FOUNDS ITS CLAIMS EXCLUSIVELY ON THE BOND POLICY.**

Radian Asset contends that the Counterclaims put two separate contracts at issue -- the Commitment Letter and the Bond Policy -- and that the College is party to only one of them.  The first contract is Radian's Commitment Letter.  Radian Asset contends that the: (i) Commitment Letter was expressly between Radian and the College; (ii) Radian Asset and the College signed the Commitment Letter; (iii) the Commitment Letter was not an insurance contract, but rather an agreement that Radian Asset would issue a financial guaranty insurance policy to the Insurance Trustee for the benefit of Bondholders if certain conditions were met; and (iv) Radian Asset's obligation under the Commitment Letter ended when Radian issued the Bond Policy.  The second contract is the Bond Policy, which Radian Asset contends: (i) states that it is "issued to the Insurance Trustee for the benefit of the Holders"; (ii) says that Radian's guaranty runs to the Insurance Trustee -- the Bank of New York -- for the benefit of the holders of the Bonds; (iii) identifies the College as the "Obligor" on the Bonds; (iv) does not identify the College as the insured or the beneficiary of the Bond Policy, and instead defines the "Holders" to whom the policy is issued and who benefit from the protection of the Bond Policy as specifically excluding the College as the Obligor.  Radian Asset argues that the document's plain language reveals that the College is not a party to the Bond Policy, and that the College is not insured under the Bond Policy.  Rather, Radian Asset contends, the College was a party only to the Commitment Letter.

Radian Asset also notes that its Motion discussed the Swap Policy, which was issued to the "Beneficiary" -- the Royal Bank of Canada -- and defined the College as the "Principal" on the Swap, and which obligated Radian Asset to make payments to the Beneficiary -- not the College.

-33-

Radian Asset argued in its Motion that the College was not the insured under the Swap Policy.  The College did not dispute this argument in its Response, apparently conceding the point.  Moreover, the College did not base any of its arguments in its Response on the Swap Policy.

The College bases its Counterclaims on the Bond Policy and its allegations that Radian Asset owes the College various obligations under that Policy.  The College argues in its Response that the Bond Policy creates an insurer-insured relationship between Radian Asset and the College, and that it was a contracting party to the Bond Policy.  Moreover, the College expressly states that it does not make any claims under the Commitment Letter.  See Response at 17 n.7 ("[N]either Radian nor the College make the claim that Radian did not honor its commitment to sell the College the two insurance policies nor that any of the prerequisites to Radian's commitment to sell the policies had not been met.").  The College further asserts that the "the commitment letter expired by its own terms at the time that the Bonds were sold and the insurers policies purchased."  Response at 17 n.7.  The College does not respond to Radian Asset's argument that it was not a party to or insured under the Swap Policy.  Additionally, the College did not base any of its arguments in its Response on the Swap Policy.  At the hearing, the College asserted that it based its Counterclaims on the Bond Policy and not on the Commitment Letter.  The College's position is that any contractual duty that Radian Asset can be said to owe the College, and any obligation of good faith pursuant to such duty, must come, if at all, from the Bond Policy.

**B.     THE COLLEGE WAS NOT AN INSURED UNDER OR A PARTY TO THE BOND POLICY.**

Radian Asset contends that all of the College's allegations rest on the principle that Radian Asset owed a heightened duty to the College because of the nature of the relationship between the College and Radian Asset.  In particular, the College argues that it was the insured party under the

Bond Policy.  The Court finds that the Bondholders, and not the College, were the insured under the Bond Policy.

Radian Asset contends that the College improperly attempts to create additional legal obligations outside the express language of the Bond Policy by painting itself as an "insured," but that the College's argument rests on a fundamental mischaracterization of the relationship between Radian Asset and the College.  Radian Asset argues that the College is not the insured under the Bond Policy or the Swap Policy, because neither policy identifies the College as an insured or beneficiary, and the policies were not issued to the College or for its benefit.  Rather, Radian Asset asserts, the Bond Policy references the College only as the entity creating risk of nonpayment and identifying it as the "Obligor" -- as opposed to the "Insured" -- and the Bond Policy says it is issued to the Insurance Trustee, Bank of New York, for the benefit of Bondholders.  Bond Policy at 1. Radian Asset also asserts that the Swap Policy says it was issued to the Swap Counterparty, Royal Bank, as the Beneficiary.  Radian Asset notes that neither policy provides for benefits to the College or allows it to make claims; and neither states any obligations owed to the College.

Radian Asset further contends that its relationship with the College under the Commitment Letter was that of two contracting parties at arms length, not that of an insurer and an insured. Radian Asset asserts that the College's status as a "purchaser of services" does not give it the legal status of an insured and confers no duties upon Radian Asset other than to provide the Bond Policy it agreed in the Commitment Letter to provide, upon satisfaction of the conditions stated in that letter.  The College's only status with respect to the Bond Policy, Radian Asset contends, was as the signator to the Commitment Letter, pursuant to which Radian Asset agreed to provide the Bond Policy in connection with the terms and conditions of the broader Bond transaction.  Radian Asset

argues that its only obligation to the College, as reflected in the Commitment Letter, was to provide a financial guaranty policy for the Bond transaction that would protect the Bondholders from the risk of nonpayment by the College, an obligation with which Radian Asset contends it fully satisfied when it issued the Policies to the Insurance Trustee and Royal Bank.  Moreover, the College only agreed that Radian Asset would be the Bond insurer, and then only on the terms and conditions specified in the Commitment Letter, which obligated the College to protect Radian Asset, not the other way around.  Accordingly, Radian Asset asserts, the College is neither an insured, nor a beneficiary under, nor a party to, the Bond Policy or Swap Policy.

The College responds that it was a party to and insured under the Bond Policy.  The College notes that to create a binding contract between two parties takes merely an offer, acceptance consideration and mutual assent.  See Nance v. L.J. Dolloff Assocs., Inc., 138 N.M. 851, 856, 126 P.3d 1215, 1220 (Ct. App. 2006).  The College contends that it has explicitly or implicitly alleged each of these elements.  The College asserts that its allegations state: (i) "[t]he College contracted with Radian to provide two insurance policies and Radian was paid by the College for those two policies,"  Counterclaim ¶ 3,at 41; and (ii) "[t]he two insurance policies purchased by the College were purchased in conjunction with a Bond transaction of the College in 2006,"  Counterclaim ¶ 4, at 41.  The College argues that, having (i) pled the existence of a contract; (ii) identified the two parties involved in the offer and acceptance; and (iii) having further alleged that the College paid the consideration, Radian Asset's argument that the College is a "stranger" to the two contracts is without a basis, because the College has alleged sufficiently a contractual relationship between it and Radian Asset relating to the Bond and Swap Policies.  The College further contends that, once the contractual relationship is alleged, the law and the contract establishes the contracting parties'

-36-

rights and duties, and that both Radian and the College owed each other the duty of good faith and fair dealing under the Policies.  See Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. 449, 452, 188 P.3d 1200, 1203 (2008)("New Mexico courts have held that every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract.").

The College further asserts that it was the insured, because the Bond Policy's plain language states Radian Asset was insuring the College's obligations and the College paid Radian Asset the premiums for the Bond Policy.  The College notes that the risk Radian Asset was insuring in the Bond Policy was non-payment of the obligation of the College, the Obligor.  The College also argues that it paid more than $900,000.00 in premiums on the Bond and Swap Policies.  The College further notes that Radian Asset holds itself out as having "provided financial guaranty insurance and reinsurance to domestic and international issuers of municipal bonds."  Response at 8 (quoting Radian, About Radian www.radian.biz/page?name=AboutUs (last visited January 5, 2010)).  The College presents deposition testimony that "the College of Santa Fe reflected the type of issuer Radian Asset sought to insure."  Ginsburg Depo. at 124:16-125:12.  Finally, the College contends that it was the insured, because Radian Asset was in a superior bargaining position.  In the alternative, the College asserts that, even if it was not the insured, it was a "quasi-surety," and the result is the same -- Radian Asset owed a duty to the College of good faith and fair dealing, and was obligated to treat the College's interests equal to its own.

The Court agrees that the College was not the insured under the Bond and Swap Policies.  The Bondholders, not the College, are the insured under the Bond Policy -- the sole document on which it bases its Counterclaims.  The Supreme Court of New Mexico recently determined that the

Legislature, in defining insurance, "articulate[d] a functional approach, looking to the substance of the contract rather than to its label." Guest v. Allstate Ins. Co., No. 31,602/31,603, 2010 WL 4878881, ¶ 62 (NMSC Oct. 25, 2010)(citing NMSA 1978, § 59A-1-5). The New Mexico Statute defining insurance states: "'Insurance' is a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies, or to act as surety." NMSA 1978, § 59A-1-5. The Supreme Court of New Mexico held that, for a "contract to be one of insurance, the definition simply requires that [an insurer] agreed to 'indemnify [a party] as to loss from certain specified contingencies or perils.'" Guest v. Allstate Ins. Co., 2010 WL 4878881, ¶ 62. Applying these standards to the Bond Policy demonstrates that the Bondholders are the insured because Radian Asset "undertakes to pay" the Bondholders. NMSA 1978, § 59A-1-5. Radian Asset does not "undertakes to pay or indemnify" the College -- rather, Radian Asset is subrogated to the Bondholders' rights against the College. See Bond Policy at 2 ("The Insurer shall, to the extent of any payment made by its pursuant to this Policy, be deemed to have acquired and become the Holder of the bonds or portions thereof or interest thereon paid from such payment and shall be fully subrogated to all rights to payment thereof."). The Bond Policy is "a contract whereby for consideration [Radian Asset] agreed to . . . guarantee [the Bondholders] against specified risks," namely, the College's failure to meet its obligation on the Bonds. Cordova v. Wolfel, 120 N.M. 557, 559, 903 P.2d 1390, 1392 (1995)(citing N.M. Life Ins. Guar. Ass'n v. Moore, 93 N.M. 47, 50, 596 P.2d 260, 263 (1979), and NMSA 1978 § 59A-I-5). See N.M. Life Ins. Guar. Ass'n v. Moore, 93 N.M. at 50, 596 P.2d at 263 ("Insurance usually involves a contract whereby the insurer, for an adequate consideration, undertakes to indemnify the insured against loss arising from specified

-38-

perils, or to reimburse him for all or part of an obligation he has incurred." (citing Barkin v. Bd. of Optometry, 269 Cal. App. 2d 714 (1969) and 43 Am. Jur. 2d Insurance § 1 (1969)). On the contrary, it was the College that "undert[ook] to pay or indemnify" Radian Asset. See Commitment Letter Schedule 3, at 4 ("The Institution shall protect, hold harmless and indemnify the Insurer for, from and against any and all liability, obligations, losses, claims and damages paid or incurred . . . .").

Moreover, the Bond Policy's terms further demonstrate that the College is not insured under the Bond Policy. The Bond Policy: (i) states that it is "issued to the Insurance Trustee for the benefit of the Holders"; (ii) says that Radian Asset's guaranty runs to the Insurance Trustee -- Bank of New York -- for the benefit of the Bondholders; (iii) identifies the College as the "Obligor" on the Bonds; and (iv) does not identify the College as the insured or the beneficiary of the Bond Policy, and instead defines the "Holders" to whom the policy is issued, and who receive the benefit and protection of the Bond Policy, as specifically excluding the College as the Obligor. Moreover, rather than placing the College and Radian Asset in the position of an insurer and insured, the Bond Policy makes plain that Radian Asset has the right to seek payment from the College. The Bond Policy states that, to the extent that Radian Asset makes a payment, Radian Asset is deemed to become the "holder of the bonds" and is "fully subrogated to all rights to payment thereof." Bond Policy at 2.

In Commercial Money Center, Inc. v. Illinois Union Ins. Co., 508 F.3d 327 (2007), the United States Court of Appeals for the Sixth Circuit held that a contract "which named Lease Funding as the Insured and Chase as an Additional Insured/Loss Payee on behalf of the noteholders under the Indenture" established a suretyship, and not an insured/insruer relationship.

This conclusion is further bolstered, as the district court observed, by Illinois Union's asserted right to indemnification. While an insurer generally does not have a right

of subrogation against its insured, a suretyship confers rights of recourse to the surety against the principal obligor. Restatement (Third) Suretyship and Guar. § 18. In fact, it is quite common for an indemnity agreement to be entered into between a principal obligor and the secondary obligor. Id. at comment b; see also Airlines Reporting, 37 Cal.Rptr.2d at 567.

508 F.3d at 341. See Restatement (Third) of Suretyship & Guaranty § 6 ("Each rule in this Restatement stating the effect of suretyship status may be varied by contract between the parties subject to it.").

Other courts have recognized that obligations under bond insurance policies run in favor of the Bondholders, not in favor of the issuer. In re Security Capital Assurance, Ltd. Securities Litigation, No. 07 Civ. 11086 (DAB), 2010 WL 1372688 (S.D.N.Y. 2010), the United States District Court for the Southern District of New York stated:

Financial guaranty insurers . . . protect investors against the risk of default by the issuers of debt securities. The financial guarantor issues a policy for a particular security, such as a bond or note, and promises to pay the security holders the principal or interest if the issuer of the security defaults on its obligation.

2010 WL 1372688, *2. See NPS, LLC v. Ambac Assurance Corp., 706 F. Supp. 2d 162, 177 (D. Mass. 2010)(stating that language of financial guaranty insurance contract that policy "insures the scheduled payments of principal of and interest" on the bonds suggested that the obligor's purpose in obtaining bond insurance was to ensure that Bondholders would still be paid in the event the obligor could not pay them). Moreover, courts recognize that, with bond insurance, the purpose of protecting investors is paramount over any incidental benefits to the issuer. See NPS, LLC v. Ambac Assurance Corp., 706 F. Supp. 2d at 177 (rejecting bond issuer's argument that the principal purpose of obtaining bond insurance was to make its bonds more marketable and less expensive by taking on the insurer's credit rating, and holding instead that the principal purpose of the bond insurance policy was to protect the bondholders by "ensuring that the bondholders would still be

paid in the event that [the issuer] itself could not pay them").

Moreover, the College was not a party to the Bond Policy.  A contract requires an offer, acceptance, consideration.  See Nance v. L.J. Dolloff Assocs., Inc., 138 N.M. at 856, 126 P.3d at 1220.  The College asserts that the Bond Policy is a contract between it and Radian Asset:

> Clearly each of these elements has been explicitly or implicitly alleged.  Broadly stated, the College alleged that "The College contracted with Radian to provide two insurance policies and Radian was paid by the College for those two policies" and "The two insurance policies purchased by the College were purchased in conjunction with a Bond transaction of the College in 2006."

Response at 5-6 (quoting Amended Answer ¶¶ 3-4, at 41).  Alleging that the College "contracted with [another] to provide" a product or service, and alleging a product or service was "purchased by" the College does not make the product or service a contract to which the College is a party.  Consequently, the College's allegations do not allege that it was a party to the Bond Policy, but that it contracted to purchase and did purchase the policies.

Moreover, the Bond Policy's language does not indicate that the College was a party to the Bond Policy, because the Bond Policy itself does not indicate that the College accepted it.  The College did not sign the Bond Policy, and the Bond Policy states it was issued to the Insurance Trustee -- the Bank of New York -- for the benefit of the Bondholders, and was not issued to the College, who was expressly excluded from the Bondholders.  The Bond Policy lists the College only as the "Obligor."  The Court concludes therefore that the College was not a party to the Bond Policy.

Additionally, while the College paid the premium on the Bond Policy pursuant to the Commitment Letter, it is unclear what legal consideration the College received under the Bond Policy.  The Bond Policy guarantees Bondholders payment if the College defaults, but that does not

alter the College's obligation under the Bonds, because Radian Asset is subrogated to the Bondholders' rights against the College -- or as the College frames the matter, the Bond Policy insured no risk at all as to the College. The Bond Policy made -- from a practical standpoint -- the bonds more marketable, but that benefit appears to be one for which the College contracted in the Commitment Letter. The legal benefit of the Bond Policy went to the Bondholders, who were protected against the College's default on its obligation, and Radian Asset was subrogated to the Bondholders rights against the College. Radian Asset's promise under the Bond Policy, therefore, does not appear to directly benefit the College, although the promise clearly had an indirect benefit to the College -- which is the reason the College contracted with Radian Asset to purchase the Bond Policy in the Commitment Letter.

Paying the premiums of the Bond Policy does not, as the College contends, make the College the insured under or a party to the Bond Policy. While paying premiums suggests some agreement exists between the parties, it does not mean that the College was insured under or party to the Bond Policy. Cf. Restatement (Third) of Suretyship & Guaranty, Consideration § 9 (1996)("A secondary obligation does not fail for lack of consideration if . . . the underlying obligation is supported by consideration and the later creation of the secondary obligation was part of the exchange for which the obligee bargained"). The agreement pursuant to which the College agreed to pay the premiums was the Commitment Letter, which specifies that the payment was in consideration for the issuance of the Bond Policy. See Commitment Letter ¶ 9, at i ("The insurance premium payable to the Insurer in consideration of the issuance of the Policy shall be the Premium multiplied by the total principal of and interest on Bonds (exclusive of accrued interest to closing)."). The Commitment Letter was a contract between the College and Radian Asset, in which they agreed that Radian Asset

-42-

would issue the Bond Policy, guarantying the College's payments of the Bonds.

The College's argument that it was insured because it was less sophisticated than Radian Asset is also unavailing.  All contracts of adhesion are not insurance contracts.  Taking as true, as the Court must, the College's allegation that it bargained with Radian Asset from an inferior position and less sophistication, the Court is unconvinced that these allegations are sufficient to establish an insurer/insured relationship.  The College contends that "[t]he relationship between Radian and the College epitomizes the circumstances under which New Mexico courts have concluded an insurance relationship exists."  Response at 11.  The College bases its argument on the policy underlying the reason insurance companies have special duties to the insured:

> The reasons why courts have recognized the special and unique relationship between insurer an insured include the inherent lack of balance in and adhesive nature of the relationship . . . as well as the quasipublic nature of insurance and the potential for the insurer to unscrupulously exert its unequal bargaining power at a time when the insured is particularly vulnerable.

Dellaira v. Farmers Ins. Exchange, 136 N.M. 552, 556, 102 P.3d 111, 114 (2004)(citations and internal quotation marks omitted).  See California Cas. Inc. Co. v. Garcia-Price, 133 N.M. 439, 443-44, 63 P.3d 1159, 1163-64 (2003)(recognizing that a motorist insurance contract is a contract of adhesion, in which insured has no bargaining power).  It is unclear the Bond Policy was a contract of adhesion.  Unlike the motorist insurance at issue in Dellaira v. Farmers Ins. Exchange and California Cas. Inc. Co. v. Garcia-Price, the law does not require the Bond Policy, and the College purchased the Bond Policy to make the Bonds a more attractive investment.  Second, the College's argument confuses the underlying policy considerations that motivate the imposition of heightened duties on insurance contracts for factors that establish insurance contracts.  Not all contracts of adhesion resulting from uneven negotiations are insurance contracts.  For example, high-interest

lenders may also enjoy superior bargaining power, but that does not make their loan agreements insurance contracts. The Court must look at the substance of the agreement, not the parties' bargaining power, to determine if the College is the insured. See Guest v. Allstate Ins. Co., 2010 WL 4878881, ¶ 62 (stating that the Legislature, in defining insurance, articulated a "functional approach," looking to the substance of the contract). Moreover, the agreement between the College and Radian Asset was the Commitment Letter, so whatever implications may flow from the parties' uneven bargaining power inform the duties under the Commitment Letter, and not under the Bond Policy, and the College concedes that it brings no claims under the Commitment Letter.

## C.    GUARANTORS DO NOT OWE PRINCIPALS THE DUTIES OF AN INSURER TO THE INSURED.

As a guarantor, Radian Asset's actions did not violate any duties to the College under the Bond Policy, because Radian Asset's duties under the Bond Policy were to the Bondholders, and not to the College. See Restatement (First) of Security, Division II. Suretyship ("[A] surety is an additional assurance to the one entitled to the performance of an act that the act will be performed.").[5] A guarantor's subrogation to the rights of the obligee and the right to compel a

---

[5] New Mexico state courts have followed the Restatement (First) of Security (1941) and the Restatement (Third) of Suretyship & Guaranty (1996) when addressing matters concerning suretyships and guaranties, as well as looking to New Mexico case law, and state and federal precedent. See, e.g., FDIC v. Moore, 118 N.M. 77, 879 P.2d 78 (1994)("[T]he surety is subrogated to the rights of a creditor if he satisfies the obligation" (citing Restatement (First) of Security § 132 cmt. b)); Shirley v. Venaglia, 86 N.M. 721, 724, 527 P.2d 316, 319 (1974)("A guarantor is entitled to a strict construction of his undertaking and cannot be held liable beyond the strict terms of his contract.")(quoting 24 Am.Jur. Guaranty § 71 (Supp.1967)); Employment Sec. Comm'n v. Big 4 Paving, Inc., 81 N.M. 26, 27-28, 462 P.2d 611, 612-13 (1969)("A different situation occurs when the surety completes the performance of a contract. The surety is not only a subrogee of the contractor, and therefore a creditor, but also a subrogee of the government and entitled to any rights the government has to the retained funds." (quoting Trinity Universal Ins. Co. v. United States, 382 F.2d 317, 320 (5th Cir. 1967))); State v. Davis, 67 N.M. 6, 8, 350 P.2d 748, 749 (1960)("Where a surety executes a judicial bond which is defective as . . . the principal has not followed the proper procedure in connection with the furnishing of the bond, the surety is nevertheless liable . . . if the

principal to perform define guaranties and suretyships. See Restatement (First) of Security, Principal's Duty To Surety: In General § 103 ("[I]t is the duty of the principal to the surety to satisfy the surety's obligation by performing his own duty to the creditor . . . .");[6] id., Reimbursement By Principal § 104 ("[I]t is the duty of the principal to reimburse the surety to the extent of his reasonable outlay . . . ."); id., Exoneration § 112 ("[T]he surety has the right to exoneration."); id. Subrogation § 141 ("Where the duty of the principal to the creditor is fully satisfied, the surety to the extent that he has contributed to this satisfaction is subrogated . . . to the rights of the creditor against the principal . . . ."); Restatement (Third) of Suretyship & Guaranty, Suretyship Status -- Recourse Of Secondary Obligor Against Principal Obligor § 18 ("Suretyship status gives the secondary obligor recourse against the principal obligor to cause the principal obligor to perform the underlying obligation or bear the cost of performance."). Moreover, the Bond Policy was a guaranty between the Bondholders and Radian Asset, to which the College was not a party. See Shirley v. Venaglia, 86 N.M. at 724-25, 527 P.2d at 319-20 ("The guaranty agreement is a separate, distinct contract . . . .").

The College argues that, if it is not an insured under the Bond Policy, then it is in a "quasi-surety" relationship with Radian Asset, which imposes all the same duties on Radian Asset

---

party on whose behalf the bond is delivered has obtained . . . the benefit sought . . . ." (quoting Restatement (First) of Security, § 188)); WXI/Z Southwest Malls v. Mueller, 137 N.M. 343, 349, 110 P.3d 1080, 1086 (Ct. App. 2005)("We also decline to impose a general affirmative duty on creditors to provide updates to guarantors during the course of the guaranty.")(citing Creditor's Duty of Disclosure to Surety or Guarantor After Inception of Suretyship or Guaranty, 63 A.L.R.4th 678 (1988); Restatement (First) of Security § 124(1); Restatement (Third) of Suretyship and Guaranty § 47)).

[6] "The term 'guaranty' is used in [the Restatement (First) of Security] as a synonym for suretyship. 'Guarantor' is used as a synonym for surety." Restatement (First) of Security § 82, cmt. g.

towards the College as if the College were insured under the Bond Policy.[7]  The College notes that suretyship "includes insurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings and contracts of suretyship."  NMSA 1978, § 59A-7-8(B).

Radian Asset replies that the College resorts to a made-up term -- "quasi-surety" -- unsupported by case law, and provides neither reason nor authority for applying that new concept in this case.  Radian Asset contends that the College is engaged in an attempt to read into the Bond Policy obligations that the Bond Policy language does not support.  Radian Asset contends that the College does not explain what it means by "quasi-surety" as opposed to a surety.  Radian Asset asserts that the College cites only cases dealing with ordinary surety situations involving contractors' performance bonds and other surety instruments that are specifically identified as such, and in which the surety in effect becomes jointly and severally liable with its principal for performance of the services that are the subject of the surety.  None of the cases cited by the College involved guaranty insurance for municipal bonds in which the insurance covers the Bondholders' loss payments.  Nor do any of them refer to a "quasi-surety."

Radian Asset further contends that it made no commitments to the College under the Bond Policy, regardless of the title the College seeks to assign it, and that titling it a surety does not alter the substance of the Bond Policy, and that the Bond Policy does not insure the College.  On the contrary, Radian Asset asserts, the Bond Policy establishes Radian Asset's right upon payment of any claims to step into the Bondholders' shoes and sue the College for the payments the College

---

[7] The College's argument that it is in a "quasi-surety" relationship with Radian does not appear in its Counterclaims.  Because the argument fails on the merits, the Court need not determine if the argument is procedurally improper, because the College failed to put Radian Asset on notice of its contention.

failed to make.  Radian Asset further contends that subrogation is an expected feature of insurance

policies that provides a means by which an insurer makes itself whole after paying on a loss.  See

Sw. Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co., 140 N.M. 720, 723, 148 P.3d 806, 809 (Ct.

App. 2006)("Subrogation encompasses the right of an insurance company, who has paid an insured's

claim, to step into the shoes of its insured and pursue recovery from the party who is legally

responsible for the insured's losses.").  Having chosen to rest their Counterclaims entirely on Radian

Asset's policies -- which were issued to, and run entirely to the benefit of, the Bondholders -- the

College cannot, Radian Asset contends, now try to read into them language and duties directly

contrary to the specific arrangements stated in their plain text.

### 1.    Radian Asset was a guarantor.

The Court agrees that Radian Asset does not owe the College a duty as a surety to treat the

College's interest as equal to its own, because Radian Asset is a not a surety -- Radian Asset is a

guarantor -- and because obligors owe special duties to guarantors and sureties, and not the other

way around.  First, Radian Asset is a guarantor, and not a surety.  Both sureties and guarantors

involve tripartite relationships between a party who is principally responsible for a debt -- the

principal, principal debtor, or principal obligor -- a party to whom the debt is owed -- the beneficiary

or obligee -- and the third party who answers for the debt of the principal under certain

circumstances -- the secondary obligor, surety, or guaranty.[8]  The key distinction between a surety

---

[8] Black's Law Dictionary defines a surety as:

A person who is primarily liable for paying another's debt or performing another's
obligation.  Although a surety is similar to an insurer, one important difference is that
a surety often receives no compensation for assuming liability.  A surety differs from
a guarantor, who is liable to the creditor only if the debtor does not meet the duties
owed to the creditor; the surety is directly liable.

and a guarantor is that a surety is jointly and severally liable for the debt from the initiation of the contract between the principal and the obligee, whereas a guarantor's obligation is collateral, usually comes from a separate instrument, and the guarantor's liability is triggered by the principal's failure to meet its obligation.  See L. Simpson, Handbook on the Law of Suretyship at 23 (1950).

> The words surety and guarantor are often used indiscriminately as synonymous terms; but while a surety and a guarantor have this in common, that they are both bound for another person, yet there are points of difference between them which should be carefully noted.  A surety is usually bound with his principal by the same instrument, executed at the same time and on the same consideration.  He is an original promisor and debtor from the beginning, and is held ordinarily to know every default of this principal. . . .  On the other hand, the contract of the guarantor is his own separate undertaking, in which the principal does not join.  It is usually entered into before or after that of the principal, and is often founded on a separate consideration from that supporting the contract of the principal.

Black's Law Dictionary at 1579 (9th ed. 2009).  Black's Law Dictionary defines a guarantor as:

> One who makes a guaranty or gives security for a debt.  While a surety's liability begins with that of the principal, a guarantor's liability does not begin until the principal debtor is in default.  The term is most common in finance and banking contexts.  While a warranty relates to things (not persons), is not collateral, and need not be in writing, a guaranty is an undertaking that a person will pay or do some act, is collateral to the duty of the primary obligor, and must be in writing.

Black's Law Dictionary at 773.

> A "surety" is typically jointly and severally liable with the principal obligor on an obligation to which they are both bound, while a "guarantor" typically contracts to fulfill an obligation upon the default of the principal obligor.  The provisions of a particular guaranty or suretyship contract, however, will often blur much of this distinction.  Although there are important differences between the two mechanisms that should not be obscured, these differences relate to the duties contractually imposed on the secondary obligor by the secondary obligation and not to the nature of the rights inherent in suretyship status.  Both sureties and guarantors that fulfill the criteria of § 1 have suretyship status, and the rights associated with that status are the same for sureties as for guarantors.  Thus, both are governed by the principles set forth in this Restatement.

Restatement (Third) of Suretyship & Guaranty, Scope § 1 cmt. c.

1 G. Brandt, The Law of Suretyship and Guaranty § 2, at 9 (3d ed. 1905)(emphasis added).  The

distinction between a suretyship and a guaranty has long been recognized.  As the Tenth Circuit

stated in Pavlantos v. Garoufalis, 89 F.2d 203 (10th Cir. 1937): "A contract of surety is the joint and

several obligation of the principal and surety," while a contract of guaranty "is a promise to pay or

an assumption of performance of some duty upon failure of another" which "usually is a separate

undertaking in which the person primarily liable does not join."  89 F.2d at 205-06 (emphasis

added).  See Shannon-Vail Five Inc. v. Bunch, 270 F.3d 1207, 1211 (9th Cir. 2001)("[B]y definition,

a guarantee is a separate undertaking in which the principal obligor does not join, and a guarantee

exists independent of the original obligations between the principal obligor and the obligee.");

Woods-Tucker Leasing Corp. of Georgia v. Kellum, 641 F.2d 210, 215 n.7 (5th Cir. 1981)("[O]ne

distinction drawn between a contract of suretyship and a contract of guaranty is that '(t)he contract

of suretyship is the joint and several contract of the principal and the surety; the contract of the

guarantor is his own separate undertaking, in which the principal does not join.'" (quoting 38

Am.Jur.2d Guaranty s 15, at 1012 (1968)); Koehler v. Bank of Bermuda Ltd., No. M18-302 (CSH),

2005 WL 551115, at *5 (S.D.N.Y. 2005)("A surety is usually bound with his principal by the same

instrument, executed at the same time, and on the same consideration."  (citation omitted));

Landover Corp. v. Bellevue Master, LLC,  2006 WL 47662, at *9 (W.D. Wash. Jan. 6, 2006)("A

guarantor makes a separate contract in which the principal does not join."  (citation omitted));

JPMorgan Chase Bank, N.A. v. Earth Foods, Inc., 238 Ill.2d 455, at *5 (Ill. 2010)("[T]he contract

of the guarantor is his own separate undertaking, in which the principal does not join"); Shirley v.

Venaglia, 86 N.M. at 724-25, 527 P.2d at 319-20 ("A guarantor, like a surety, is a favorite of the

law, and his liability is not to be extended by implication beyond the express limits or terms of the

instrument, or its plain intent."); <u>Bank of N.M. v. Nw. Power Prods., Inc.</u>, 95 N.M. 743, 747, 626 P.2d 280, 284 (Ct. App. 1980)(same).  Other than the difference in the underlying contractual bases for establishing a guaranty or suretyship, the rights and duties relating to sureties and guarantors are the same.  <u>See Shirley v. Venaglia</u>, 86 N.M. at 724-25, 527 P.2d at 319-20 (treating guarantors like sureties); <u>Restatement (Third) of Suretyship & Guaranty</u>, <u>Transactions Giving Rise To Suretyship Status</u> § 1 cmt. c ("[Sureties and guarantors] are governed by the principles set forth in this Restatement.");  <u>Restatement (First) of Security</u>, <u>Suretyship Defined</u> § 82 cmt. g ("The term 'guaranty' is used in this Restatement as a synonym for suretyship.").[9]  Parties may agree to modify

---

[9] "Both sureties and guarantors . . . have suretyship status, and the rights associated with that status are the same for sureties as for guarantors.  Thus, both are governed by the principles set forth in this Restatement."  <u>Restatement (Third) of Suretyship & Guaranty</u>, <u>Scope</u> § 1 cmt. c.  Similarly the reporter's note comment c to § 1 of the <u>Restatement (Third) of Suretyship & Guaranty</u> states:

> For purposes of rights provided by suretyship law, rather than by contract, the two mechanisms are, indeed, identical.  The point was stated well by Professor Williston:
>
>> "Most of the peculiar rules of suretyship in any form, whether of guaranty or otherwise, are based on this relation of the principal debtor to the surety and not on any difference between the form of contract which the surety makes with the creditor, and it is desirable to have a single word which includes all cases where the relation in question exists.  <u>The ordinary principles of contracts are generally sufficient to explain any differences in the creditor's right where the surety's undertaking is direct and where it is collateral.</u>"  2 <u>Williston on Contracts</u> § 2204.  <u>See</u>, <u>e.g.</u>, <u>Amick v. Baugh</u>, 66 Wash.2d 298, 402 P.2d 342 (1965); <u>General Phoenix Corp. v. Cabot</u>, 300 N.Y. 87, 89 N.E.2d 238 (1949); <u>Hamilton v. Meiks</u>, 210 Ind. 610, 4 N.E.2d 536 (1936); <u>Plummer v. Wilson</u>, 322 Pa. 118, 185 A. 311 (1936); <u>Welch v. Walsh</u>, 177 Mass. 555, 59 N.E. 440 (1901). <u>See also</u> L. Simpson, <u>Handbook on the Law of Suretyship</u> § 14, at 16 (1950); A. Stearns, <u>The Law of Suretyship</u> § 1.5, at 6 (J. Elder rev., 5th ed. 1951).

<u>Restatement of Security</u> § 82, Comment g, stated simply that "guarantor is used as a synonym for surety."  This statement, which served to emphasize the identical rights provided to those secondary obligors by suretyship law, <u>unfortunately obscured the differences between their contractual obligations</u>.

the rights attendant a suretyship or guaranty.  See Shirley v. Venaglia, 86 N.M. at 724-25, 527 P.2d

at 319-20 ("A guarantor is entitled to a strict construction of his undertaking and cannot be held

liable beyond the strict terms of his contract."  (citations omitted)); Bank of N.M. v. Nw. Power

Prods., Inc., 95 N.M. at 747, 626 P.2d at 284 (same); Restatement (Third) of Suretyship & Guaranty,

Suretyship Status -- Recourse Of Secondary Obligor Against Principal Obligor § 18 cmt. b

("Suretyship status confers on the secondary obligor certain rights of recourse against the principal

obligor.  Those parties may, by agreement, augment, modify, or limit those rights.").

New Mexico courts recognize the distinction between a guarantor and a surety.  In Shirley

v. Venaglia, the Supreme Court of New Mexico addressed the role of a guarantor.  The Supreme

Court strictly construed the guarantor's duties based on the language of the guaranty agreement:

> It appears from the relevant language of the guaranty agreement that it was
> the intent of the parties to limit the extent of the guaranty agreement to only the
> five-year-lease period.
>
> The guaranty agreement is a separate, distinct contract between guarantors
> and the lessors and should be strictly construed.
>
> > "A guarantor is entitled to a strict construction of his undertaking and
> > cannot be held liable beyond the strict terms of his contract. * * *
>
> > "* * *.
>
> In 24 Am.Jur., Guaranty, § 71, p. 158 (Supp.1962) we find:
>
> > "'A guarantor, like a surety, is a favorite of the law, and his liability
> > is not to be extended by implication beyond the express limits or terms of the
> > instrument, or its plain intent.'"

---

Restatement (Third) of Suretyship & Guaranty, Transactions Giving Rise To Suretyship Status § 1
reporter's note cmt. c (emphasis added).  See Restatement (First) of Security, Suretyship Defined
§ 82 cmt. g ("The term 'guaranty' is used in this Restatement as a synonym for suretyship.
'Guarantor' is used as a synonym for surety.  'Guarantee' is used as a verb meaning to assume a
suretyship obligation.  The spelling 'guaranty' is not used for the verb in the Restatement of this
Subject.").

National Bank of Eastern Arkansas v. Collins, 236 Ark. 822, 826, 370 S.W.2d 91, 93-94 (1963).

A strict construction of this guaranty agreement results in a limiting of the guarantor's liability to only the original five-year tenancy and any costs arising therefrom.

Shirley v. Venaglia, 86 N.M. at 724-25, 527 P.2d at 319-20.

Similarly, in Bank of New Mexico v. Northwest Power Products, Inc., the Court of Appeals of New Mexico addressed the role of a guarantor: "A guarantor is a favorite of the law.  He is entitled to a strict construction of his undertaking.  He cannot be held liable beyond the strict terms of his contract.  Neither can his liability be extended beyond the express limits or terms of the instrument, or its plain intent."  95 N.M. at 747, 626 P.2d at 284 (citing Shirley v. Venaglia, 86 N.M. at 724-25, 527 P.2d at 319-20).  The majority regarded the parties assuring performance, Priestley and Nuckols, as guarantors based on their signing a contract as such.  In dissent, Judge Hernandez argued that the case involved a suretyship, not a guaranty, because "[t]here was but one agreement and Priestley and Nuckols are bound by its terms and conditions as is [the principal,] Corona, Ltd.  There was but one debt and Priestley and Nuckols are directly and primarily responsible together with Corona, Ltd., to pay it."  Judge Hernandez explained:

Traditionally, the surety's undertaking and resultant obligation, is direct; and as to the creditor, primary; i.e. "I will pay."  It is usually, though not necessarily, made jointly or jointly and severally with the principal, at the same time and for the same consideration.  But it may be made after the principal became bound if based upon a new consideration, as where S promises C to pay P's debt if C will extend maturity.  On the other hand guaranty is a secondary obligation, created by a promise expressly conditioned upon the principal's default, and necessarily is a separate undertaking from that of the principal.  It also may be based upon the same consideration that supports the principal's promise, as where S contracts with C: "Sell goods to P and if P does not pay you, I will."  L. Simpson, Handbook on the Law of Suretyship (1950). s 14, p. 16.

. . . .

A guaranty "imports the existence of <u>two different obligations one being that of the principal debtor, and the other that of the guarantor</u>"; the "<u>undertaking of the former is independent of the promise of the latter; and the responsibilities which are imposed differ from those created by the contract to which the guaranty is collateral</u>." <u>Coombs v. Heers</u>, 366 F.Supp. 851 (D.C. Nevada 1973).

<u>Bank of N.M. v. Nw. Power Prods., Inc.</u>, 95 N.M. at 747, 626 P.2d at 284 (Hernandez, J., dissenting)(emphasis added).

Both the relationships among Radian Asset, the College, and the Bondholders, and the terms of the Bond Policy and the Commitment Letter demonstrate, that Radian Asset was a guaranty and not a surety. The contract between Radian Asset and the Bondholders -- the Bond Policy -- was a "separate undertaking" from the contract between Radian Asset and the College -- the Commitment Letter -- and the Bond Policy was separate from the undertaking between the College and the Bondholders -- the Bonds. 1 G. Brandt, <u>supra</u> § 2, at 9. The Bond Policy was "founded on a separate consideration" -- the College's premium -- "from that supporting the contract of the principal" -- the Bondholders' payment for the Bonds. 1 G. Brandt, <u>supra</u> § 2, at 9. The parties entered into the agreements at separate times -- Radian Asset issued the Bond Policy before the College issued the Bonds and after entering into the Commitment Letter with the College. The obligations between Radian Asset and the Bondholders, between the Bondholders and the College, and the College and Radian Asset all came from separate instruments, for separate consideration, and at separate times. Radian Asset was therefore a guaranty and not a surety. <u>See</u> <u>Pavlantos v. Garoufalis</u>, 89 F.2d at 205-06; <u>Shannon-Vail Five Inc. v. Bunch</u>, 270 F.3d at 1211; 1 G. Brandt, <u>supra</u> § 2, at 9; L. Simpson, <u>supra</u> 23; <u>Woods-Tucker Leasing Corp. of Georgia v. Kellum</u>, 641 F.2d at 215 n.7; <u>Koehler v. Bank of Bermuda Ltd.</u>, 2005 WL 551115, at *5; <u>Bank of N.M. v. Nw. Power Prods., Inc.</u>, 95 N.M. at 747, 626 P.2d at 284 (Hernandez, J., dissenting); 38 Am. Jur. 2d Guaranty

§ 1, at 996 (1968)("A transaction of guaranty involves at least three parties: a promisor, a creditor (the person to whom the promise is made), and a debtor -- although at the time the promise is made, the person denominated the 'creditor' need not have extended the credit to the person denominated as the 'debtor.'").

In addition to the functional relationship between the parties, the Commitment Letter and Bond Policy state that Radian Asset is a guarantor.  See Commitment Letter at i ("Radian Asset . . . hereby commits to issue a Financial Guaranty Insurance Policy . . . .")(emphasis added); Bond Policy at 1 ("Radian Asset . . . hereby unconditionally and irrevocably guarantees the payment of the Obligation . . . .")(emphasis added).  The use of the term "guaranty" further supports the Court's conclusion that Radian Asset is a guarantor and not a surety.  See Bank of N.M. v. Nw. Power Prods., Inc., 95 N.M. at 746, 626 P.2d at 283 (treating parties as guarantors because the contract stated parties "shall bear individual guarantees," despite the dissent's contention that the circumstances surrounding the relationships between the parties demonstrated the agreement was for a suretyship).  See also Shirley v. Venaglia, 86 N.M. at 724-25, 527 P.2d at 319-20 ("A guarantor is entitled to a strict construction of his undertaking and cannot be held liable beyond the strict terms of his contract."   (citations omitted)).   Cf. Venaglia v. Kropinak, 125 N.M. 25, 956 P.2d 824(1998)("The obligation referred to in Section 55-3-605(d) is the set of duties of the principal obligor set forth in the instrument itself.").

### 2.    As an guarantor, Radian Asset does not owe special duties to the College, the obligor.

As an guarantor, Radian Asset did not owe the College special duties.  The Restatements do not state that a guarantor or surety owes any duty to the obligor, beyond those specified in the contracts between them.  Under "Effect Of Suretyship Status On Rights And Duties Of The

Secondary Obligor -- Generally," the Restatement (Third) of Suretyship & Guaranty, states, in relevant part, only that the guaranty has rights against the obligor.  Effect Of Suretyship Status On Rights And Duties Of The Secondary Obligor --Generally § 17 ("The rights of the secondary obligor against the principal obligor are (i) those existing as a result of any contract between them, and (ii) those that arise out of suretyship status.").

Moreover -- contrary to the College's argument that Radian Asset, as a surety, owes the College special duties -- as an obligor, the College owes duties to Radian Asset.  See Restatement (Third) of Suretyship & Guaranty, Suretyship Status -- Recourse Of Secondary Obligor Against Principal Obligor § 18 cmt. b ("Suretyship status confers on the secondary obligor certain rights of recourse against the principal obligor.").  As the obligor, because the College knew of Radian Asset's guaranty, the College had a duty:

> (a) to perform the underlying obligation to the extent that failure to do so would leave the secondary obligor liable for performance that would entitle the secondary obligor to reimbursement by the principal obligor, and

> (b) to refrain from conduct that impairs the expectation of the secondary obligor that the principal obligor will honor its duty of performance.

Restatement (Third) of Suretyship & Guaranty, Principal Obligor's Duty Of Performance § 21.  The Restatement (Third) of Suretyship & Guaranty further states:

> [T]he principal obligor owes the secondary obligor a duty to perform the underlying obligation at the time the performance is due.  While, if the principal obligor breaches this duty and the secondary obligor is called on to perform the secondary obligation, the principal obligor will have the duty to reimburse the secondary obligor, it is inequitable for the secondary obligor to be compelled to suffer the inconvenience and temporary loss that performance of the secondary obligation will entail.  Thus, if the principal obligor has no defense to its duty of performance, the secondary obligor is entitled to appropriate relief protecting its interests.  The right to such relief is sometimes called the right of exoneration.

Restatement (Third) of Suretyship & Guaranty, Principal Obligor's Duty Of Performance § 21,

cmt. i.

In contrast to a guarantor being required to treat to an obligor's interests as equal to the guarantor's own, a defining characteristic of sureties and guarantors is that they can compel the performance of the principal, and they are surrogated to the rights of the obligee.

> Section 18 of the Restatement (Third) of Suretyship and Guaranty (1995) (Restatement of Suretyship) provides the source of a catalog of the surety's offensive rights: a surety has the right to cause the principal obligor to perform its obligation to the obligee or to obtain reimbursement from the principal obligor if the surety discharges the obligation of the principal obligor to the creditor.

> These rights are part of the signature of suretyship: A party who does not have these rights, in whole or in part, is not a surety, and general suretyship principles do not apply to that party's undertaking. If the terms of the parties' contract modify those rights, the party obligated pursuant to the terms of that contract is not, strictly speaking, a surety.

P. Alces, The Law of Suretyship and Guaranty, The Scope of Suretyship § 2:3 (2010). See In re Slamans, 69 F.3d 468, 475 (10th Cir. 1995)("[S]ubrogation under § 509(a) of the Bankruptcy Code is clearly available to entities that are 'liable with' the debtor such as sureties, guarantors, or comakers." (citing 3 Collier on Bankruptcy ¶ 509.01 (Lawrence P. King ed., 15th ed. 1995)); C.I.R. v. Condit, 333 F.2d 585, 586 (10th Cir. 1964)("The theory of the Court was that under the doctrine of subrogation the payment by a guarantor does not create a new debt and extinguish the original debt but preserves the original debt and substitutes the guarantor for the creditor." (citing Putnam v. Commissioner, 352 U.S. 82, 88-89 (1956)); Restatement (Third) of Suretyship & Guaranty, Suretyship Status -- Recourse Of Secondary Obligor Against Principal Obligor § 18 ("Suretyship status gives the secondary obligor recourse against the principal obligor to cause the principal obligor to perform the underlying obligation or bear the cost of performance.").

> [S]urety law, even in the absence of an express indemnification agreement, may in many circumstances imply this duty of indemnification. See, e.g., U.S. Fid. & Guar.

> Co. v. Centropolis Bank of Kansas City, Mo., 17 F.2d 913, 916 (8th Cir.1927)
> (applying Missouri law and recognizing a common law duty to indemnify a surety);
> 23 Williston on Contracts § 61:59 (Richard A. Lord 4th ed. 2008) ("[E]ven in the
> absence of any express contract of indemnity, the principal obligor is impliedly
> bound to indemnify the surety and make it whole."). Without such a duty, the surety
> would be more akin to an insurer with subrogation rights only as against third parties
> rather than a guarantor who may look to the contracting party itself for satisfaction.

Spirco Environmental, Inc. v. American Intern. Specialty Lines Ins. Co., 555 F.3d 637, 643-44 (8th

Cir. 2009)(emphasis added).

    The New Mexico state courts recognize that sureties and a guarantor are subrogated to the

rights of the obligee against the obligor.  In New Mexico State Highway and Transportation

Department. v. Gulf Insurance Co., 128 N.M. 634, 637 996 P.2d 424, 427 (Ct. App. 1999), the Court

of Appeals of New Mexico stated

> New Mexico has recognized the doctrine of subrogation in the suretyship
> context . . . .  See, e.g., Bank of New Mexico v. Romero, 1996-NMCA-065, ¶¶ 1-5,
> 121 N.M. 837, 918 P.2d 1337 (holding that subcontractor's surety could recover
> subrogation claim directly from the judgment secured by the subcontractor against
> the prime contractor); Employment Sec. Comm'n v. Big 4 Paving, Inc., 81 N.M. 26,
> 27-28, 462 P.2d 611, 612-13 (1969) . . . (recognizing subrogation as a remedy in the
> context of a secondary insurer seeking reimbursement from primary insurer for
> providing a defense to the insured).  In Romero, this Court recognized that case law
> from other jurisdictions supported the surety's claim for subrogation and held that the
> claim could be paid directly from the judgment secured by the subcontractor against
> the contractor for breach of contract.  See 1996-NMCA-065, ¶ 5, 121 N.M. 837, 918
> P.2d 1337 (citing Pearlman v. Reliance Ins. Co., 371 U.S. 132, 138, 83 S. Ct. 232,
> 9 L.Ed.2d 190 (1962); In re J.V. Gleason Co., 452 F.2d 1219, 1221 (8th Cir. 1971);
> Transamerica Ins. Co. v. Barnett Bank, 540 So.2d 113, 115-16 (Fla. 1989)).

128 N.M. at 637 996 P.2d at 427.  See Cadle Co., Inc. v. Wallach Concrete, Inc., 120 N.M. 56, 897

P.2d 1104 (1995)(recognizing "the guarantors' right to subrogation"); FDIC v. Moore, 118 N.M. at

82, 879 P.2d at 83 ("[T]he surety is subrogated to the rights of a creditor if he satisfies the

obligation" (citing Restatement (First) of Security § 132 cmt. b)); State Farm Mut. Auto. Ins. Co.

v. Found. Reserve Ins. Co., 78 N.M. 359, 363, 431 P.2d 737, 741 (1967)("The remedy [of

subrogation, in the insurance context] is for the benefit of one secondarily liable who has paid the debt of another and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor."); Fireman's Fund Am. Ins. Cos. v. Phillips, Carter, Reister & Assocs., 89 N.M. 7, 9, 546 P.2d 72, 74 (Ct. App. 1976)("New Mexico has allowed subrogation where one secondarily liable pays a debt and then proceeds against one primarily liable, stating that it is allowed in such a case because the one secondarily liable had a 'legal interest to protect.'"), cert. denied, 89 N.M. 5, 546 P.2d 70 (1976).[10]

New Mexico courts also recognize that sureties and guarantors have a right to compel the obligor to satisfy the obligation.  See, e.g., FDIC v. Hiatt, 117 N.M. 461, 468-69, 872 P.2d 879, 886-87 (1994)(Montgomery, C.J., dissenting)("[A] surety also has the right to exoneration against its principal if the surety has a current obligation to pay out on a guaranty of the principal's obligation." (citing Restatement of Security § 112));[11] Pope v. Lydick Roofing Co. of Albuquerque, 81 N.M. 661,

---

[10]  The College makes a number of arguments based on the Bond Policy being an unconscionable insurance contact, because Radian Asset was subrogated to the rights of the Bondholders.  On the contrary, subrogation is typical in guaranty contracts.  See In re Slamans, 69 F.3d at 475("[S]ubrogation under § 509(a) of the Bankruptcy Code is clearly available to entities that are 'liable with' the debtor such as sureties, guarantors, or comakers."  (citing 3 Collier on Bankruptcy ¶ 509.01 (Lawrence P. King ed., 15th ed. 1995)); C.I.R. v. Condit, 333 F.2d at 586 ("[U]nder the doctrine of subrogation the payment by a guarantor does not create a new debt and extinguish the original debt but preserves the original debt and substitutes the guarantor for the creditor."  (citing Putnam v. Commissioner, 352 U.S. at 88-89)); N.M. State Highway and Transp. Dept. v. Gulf Ins. Co., 128 N.M. at 637, 996 P.2d at 427("New Mexico has recognized the doctrine of subrogation in the suretyship context . . . ."  (citations omitted)).  The Court concludes that, as a matter of law, language in the Bond Policy subrogating Radian Asset to the rights of the Bondholders does not make it unconscionable, because subrogation defines suretyships and guaranties.

[11]  Black's Law Dictionary defines "exoneration" in the surety context as:

The equitable right of a surety -- confirmed by statute in many states -- to proceed to compel the principal debtor to satisfy the obligation, as when, even though the surety would have a right of reimbursement, it would be inequitable for the surety

-58-

667, 472 P.2d 375, 381 (1970)(finding that plaintiff pled "an action for exoneration on a lease executed as surety for Lydick"). In FDIC v. Hiatt, the Supreme Court of New Mexico held that New Mexico courts do not have personal jurisdiction over nonresident guarantors of a debt owed to New Mexico creditor. Chief Justice Montgomery argued in dissent that the protections that New Mexico law provides guarantors was adequate to establish personal jurisdiction:

> It cannot be denied that by signing the loan agreement and guaranty in this case the Hiatts invoked a number of benefits and protections under New Mexico law. These protections relate primarily to rights and remedies against the principal obligor, Deerfield, and against their co-guarantors, Mr. and Mrs. David. Under Section 103 of the Restatement of Security (1941) (the Restatement), the principal obligor on a debt has a duty to the surety (the guarantor) as well as to the creditor. When the surety pays out on the guaranty, it has the right to reimbursement against the principal. Id. § 104. Under Section 141, the surety who has paid out can be subrogated to the rights of the creditor against the principal, against any property that stands as security, and against any co-sureties. See In re Flores de New Mexico, Inc., 134 B.R. 433, 437 (Bkrtcy. D.N.M. 1991) ("'The familiar rule is that, instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes.'" (quoting Putnam v. Commissioner, 352 U.S. 82, 85 . . . (1956))).

> . . . .

> Under Section 112 of the Restatement, a surety also has the right to exoneration against its principal if the surety has a current obligation to pay out on a guaranty of the principal's obligation. Although I know of no New Mexico case that applies this right of exoneration, I see no reason why we would not adopt the law as contained in the Restatement and hold that, where the principal obligor can satisfy the obligation himself or itself, "[i]t is inequitable for the surety to be compelled to suffer the inconvenience and temporary loss which a payment by him will entail if the principal can satisfy the obligation." Id. § 112, cmt. a; Gardner v. Bean, 677 P.2d 1116, 1119 (Utah 1984) ("Exoneration permits a guarantor to compel a principal to pay an entire obligation then due.") (citing Restatement § 112).

---

to be compelled to perform if the principal debtor can satisfy the obligation.

Black's Law Dictionary at 657.

. . . .

Thus, under generally accepted principles of suretyship and in light of existing New Mexico caselaw, I surmise that the Hiatts would have, under New Mexico law, the rights of reimbursement and exoneration against their principal, Deerfield, as well as the right of subrogation to the Bank's interest in any assets that stood as security and the right of contribution against their co-guarantors, Mr. and Mrs. David.

FDIC v. Hiatt, 117 N.M. at 468-69, 872 P.2d at 886-87 (Montgomery, C.J., dissenting).

Moreover, because Radian Asset is a guaranty, not a surety, its obligations to the Bondholders spring from a separate undertaking, which is captured in a separate instrument -- the Bond Policy -- than its contractual obligations to the College under the Commitment Letter.  See Shannon-Vail Five Inc. v. Bunch, 270 F.3d at 1211 ("[B]y definition, a guarantee is a separate undertaking in which the principal obligor does not join, and a guarantee exists independent of the original obligations between the principal obligor and the obligee.")(emphasis added); Woods-Tucker Leasing Corp. of Georgia v. Kellum, 641 F.2d at 215 n.7 ("Indeed, traditionally one distinction drawn between a contract of suretyship and a contract of guaranty is that '(t)he contract of suretyship is the joint and several contract of the principal and the surety; the contract of the guarantor is his own separate undertaking, in which the principal does not join.'"  (quoting 38 Am. Jur. 2d Guaranty § 15, at 1012)); Pavlantos v. Garoufalis, 89 F.2d at 205-06 ("A contract of guaranty . . . . usually is a separate undertaking in which the person primarily liable does not join."); Landover Corp. v. Bellevue Master, LLC,  2006 WL 47662, at *9 ("A guarantor makes a separate contract in which the principal does not join."  (citation omitted)); JPMorgan Chase Bank, N.A. v. Earth Foods, Inc., 238 Ill. 2d 455, at *5 (2010)("[T]he contract of the guarantor is his own separate undertaking, in which the principal does not join"); 1 G. Brandt, supra § 2, at 9 ("[T]he contract of the guarantor is his own separate undertaking, in which the principal does not join."); Black's Law

-60-

Dictionary 773 ("[A] guaranty is an undertaking that a person will pay or do some act, is collateral

to the duty of the primary obligor . . . ."). This principle further bolsters the Court's conclusion that

the College is not a party to the Bond Policy, and Radian Asset therefore owes the College no

contractual obligations or a duty of good faith and fair dealing under the Bond Policy.[12]

The College cites a case from the United States District Court for the Southern District of

New York for the proposition that a "surety had obligation [sic] to principal 'to reasonably and in

good faith defend all claims.'" Response at 13 (citing St. Paul Fire & Marine Ins. Co. v. Pepsico,

Inc., 160 F.R.D. 464, 466 (S.D.N.Y. 1995)). In that case, the Honorable Kevin Thomas Duffy,

United States District Judge, entered "an order (the 'October Order') requiring Plaintiff to continue

fulfilling its obligations under the surety bonds and to act 'reasonably and in good faith in

administering, defending and settling' any claims to the bonds posted by Plaintiff." 160 F.R.D. at

465. The plaintiff admitted that it did not defend certain claims, arguing that "it was not obligated

under the October Order to defend those claims." 160 F.R.D. at 465. Based on this Response, Judge

Duffy stated:

> Plaintiff had an obligation to Defendant to reasonably and in good faith defend all
> claims under which Defendant's subsidiary became liable. By its own admission,
> Plaintiff defaulted on this duty, claiming it was not so obligated. Plaintiff blindly
> paid on bonds without investigating or defending claims and, therefore, did not act

---

[12] Moreover, an obligor may not even know guaranty exists. The Restatement (First) of
Security describes the following as an archetypical example of a suretyship:

> One person is or is about to be under an obligation to another. Without the consent
> of the debtor or prospective debtor, the creditor or prospective creditor enters into
> a contract with a third person who contracts to assume an obligation to the creditor
> conditioned on the debtor's performance. In other words, there is a contract of a
> surety to which the principal has given no consent, and of which he may have no
> knowledge.

Restatement (First) of Security, Division II. Suretyship (emphasis added).

> reasonably and in good faith.  Further, Plaintiff misled this court and the Second
> Circuit in an attempt to thwart the consequences of prior proceedings.

160 F.R.D. at 466.  It appears that Judge Duffy based the plaintiff's duty under the court's order, and not on the plaintiff's status as a surety.  This reading is confirmed by the statement that Judge Duffy ordered the plaintiff to "continue fulfilling its obligations under the surety bonds <u>and</u> to act 'reasonably and in good faith in administering, defending and settling' any claims to the bonds,'" suggesting that the order to act "reasonably and in good faith" was in addition to fulfilling the plaintiffs' obligations under the bonds.  160 F.R.D. at 465.  Judge Duffy also closely tracked the language in the order when stating that the plaintiff violated its duty, providing further support for reading the duty to spring from the order.  Consequently, this case is not on point.

The College cites cases from other jurisdictions in support of its contention that Radian Asset, as a surety, owed it a duty of good faith and fair dealing.  <u>See</u>, <u>e.g.</u>, <u>Dodge v. Fidelity & Deposit Co. of Md.</u>, 778 P.2d 1240, 1242-43 (Ariz. 1989)("We do not dispute that a surety has an enforceable obligation of good faith toward its principal.  However, the duty imposed on a surety to deal in good faith with its obligee does not require it to act in bad faith with its principal." (citation omitted)); <u>Bd. of Directors of the Ass 'n of Apartment Owners of the Discovery Bay Condominium v. United Pac. Ins. Co.</u>, 884 P.2d 1134, 1137 (Haw. 1994)("Clearly, the surety owes a duty of good faith and fair dealing to *both* the principal and the obligee on the bond.")(emphasis in original).  These cases involve construction bonds, where the surety enters into the contract with both the obligor and the obligee, and the parties must balance their duties of good faith.  The distinction between a suretyship and a guaranty is that a guarantor enters into a separate undertaking captured in a separate instrument.  Moreover, the <u>Restatements</u> address duties of good faith only in the context of limiting the parties freedom to contract, and not as a general right that exists between

parties to a suretyship or guaranty.  See Restatement (Third) of Suretyship & Guaranty, Rules Subject To Agreement Of Parties § 6 ("The freedom of contract afforded by this section is subject, of course, to general doctrines of contract law such as good faith and unconscionability that protect against overreaching and abuse.").  A guarantor's and surety's duties are contractual, and defined primarily by the instrument:

> Suretyship obligations are contractual, and the important point of inquiry should be the precise undertaking of the surety and the duty of the principal.  The recognition of the existence of different forms of contractual suretyship and the emphasis upon the obligation assumed in a particular case, are of greater significance than the distribution of labels to the various types of contracts.

Restatement (First) of Security, Suretyship Defined § 82 , cmt g.  In sum, Radian Asset does not owe the College special duties because it is a guarantor and the College is an obligor.  The College is neither a party to nor insured under the Bond Policy, so its status as obligor in Radian Asset's guaranty does not change the Court's analysis.  See Shirley v. Venaglia, 86 N.M. at 724-25, 527 P.2d at 319-20 ("A guarantor is entitled to a strict construction of his undertaking and cannot be held liable beyond the strict terms of his contract."  (citations omitted)); Bank of N.M. v. Nw. Power Prods., Inc., 95 N.M. 743, 747, 626 P.2d 280, 284 (Ct. App. 1980)(same).

The College cites an opinion from the United States District Court for the Northern District of Illinois for the proposition that an obligor in a guaranty is an insured.  In CWC, Inc. v. Illinois Insurance Guaranty Fund, No. 88 C 3947, 1988 WL 118873 (N.D. Ill. Nov. 1, 1988), the Honorable William T. Hart, United States District Court Judge, addressed the question whether an obligor in a guaranty contract was an insured under the Illinois Insurance Guaranty Statute, Ill. Review. Stat. ch. 73, ¶¶ 1065.82-.103.  A state guaranty statute assures payments of insurance policies: "Once an insurer is declared insolvent, and assuming the insured's loss is a statutory covered claim, the state

guaranty fund or association steps into the insolvent insurer's shoes and assumes all related rights and obligations."  1 L. Russ & T. Segalla, <u>Couch on Insurance</u> § 219:22 (3d Ed. 2010).

In that case, the plaintiff, CWC, which had contracted to perform construction work, subcontracted with A-1 to perform part of the work.

> On the same day, A-1 obtained a $321,000 performance bond from Allied . . . .  A-1 was the principal, CWC was the obligee, and Allied the surety.  A-1 obtained the bond and paid for it.  Only A-1 and Allied signed the bond.  Under the bond, Allied was obliged to pay . . . CWC's losses and damages caused by any failure or default in performance of A-1 for which A-1 did not pay CWC.  A-1 was bound to reimburse Allied for any payments Allied made under the bond.  A-1 breached its contract with CWC and CWC subsequently won a judgment against A-1 for $396,022.  Allied had also been a party to that suit, but had been dismissed without prejudice when it filed for liquidation in Indiana.  After Allied was liquidated, CWC presented its claim under the bond to defendant Illinois Insurance Guaranty Fund (the "Fund").  The Fund denied CWC's claim on the ground it was not a covered claim under the Guaranty Act.

<u>CWC, Inc. v. Ill. Ins. Guar. Fund</u>, 1988 WL 118873, at *1 (citations omitted).  The question whether the fund covered the claim turned on whether A-1 was an insured under the performance bond, and "the term 'insured' [wa]s not defined in the Guaranty Act."  <u>CWC, Inc. v. Ill. Ins. Guar. Fund</u>, 1988 WL 118873, at *1.  Judge Hart acknowledged that "[d]etermining who is the insured in the present case is made difficult because a performance bond is not an ordinary type of insurance and some states do not even recognize it as a form of insurance."  <u>CWC, Inc. v. Ill. Ins. Guar. Fund</u>, 1988 WL 118873, at *1 (citing 13 <u>Couch on Insurance</u> § 47:5 (2d rev. ed. 1982)).  Judge Hart looked to Illinois state law, noting that "the Illinois Insurance Code generally and the administrative regulations also did not define 'insured.'"  <u>Id.</u>

Judge Hart concluded that the obligor was an insured under the performance bond.  In reaching this conclusion, Judge Hart relied on Illinois case law stating that: (i) "[t]he 'insured' in a policy is not limited to the insured named in the policy, but applies to 'anyone who is insured

under the policy,'" CWC, Inc. v. Ill. Ins. Guar. Fund, 1988 WL 118873, at *2 (quoting Mw. Contractor's Equip. Co. v. Bituminous Cas. Corp., 251 N.E.2d 349, 352 (Ill. App. 1969))(internal quotation marks omitted); (ii) "both the principal and obligee of [a] surety bond . . . were insureds" where the surety had "no right to seek reimbursement from the principal," CWC, Inc. v. Ill. Ins. Guar. Fund, 1988 WL 118873, at *2 (citing Vill. of Rosemont v. Lentin Lumber Co., 494 N.E.2d 592, 597 (Ill. App. 1986)); and (iii) "where a party contracts for [fire] insurance, pays the premium, and the contract makes the loss payable to that party, that party is the only insured even if the policy is in another's name," CWC, Inc. v. Ill. Ins. Guar. Fund, 1988 WL 118873, at *2 (citing Traders' Ins. Co. v. Pacaud, 37 N.E. 460, 462 (Ill. App. 1894)).  Based on these principles, Judge Hart concluded:

> If CWC had taken out the policy and paid the premium, it would be considered the only insured.  But that is not the situation in this case.  A-1 obtained the policy and A-1 paid the premium.  Since A-1 took that action, A-1 is an insured under the policy.

CWC, Inc. v. Ill. Ins. Guar. Fund, 1988 WL 118873, at *2.

Judge Hart did not address the principles of the law of suretyships and guaranties in his decision.  This omission is understandable, because the question presented did not affect the rights between the parties in the guaranty.  Whereas the College asks the Court to import into the law of suretyships and guaranties all the rights that attach to the insured under New Mexico common law and the UIPA -- rights contrary to those recognized under the law of suretyships and guaranties, including a guarantor's right of subrogation and exoneration and an obligor's duty to preform -- Judge Hart considered only whether the Guaranty Act would assure the insurer's obligation under the performance bond.

In reaching his decision, Judge Hart considered and rejected a definition of "an insured" that is similar to the definition suggested under the Supreme Court of New Mexico's recent decision

announced in Guest v. Allstate Ins. Co.  See 2010 WL 4878881, ¶ 62 ("[F]or this contract to be one

of insurance, the definition simply requires that Allstate agreed to 'indemnify [a party] as to loss

from certain specified contingencies or perils.'" (citations omitted)):

> The Fund also cites Kent v. Dairyland Mutual Insurance Co., 177 Neb. 709, 131
> N.W.2d 146 (1964), which uses the following definition.
>
> > The definition recognized in the cases is that the insured, under a
> > contract of insurance upon property or of health and accident
> > insurance, is the person in whose favor the contract is operative and
> > who is indemnified against, or is to receive a certain sum upon, the
> > happening of a specified contingency or event.
>
> Id. at 154 (quoting 29 Am.Jur. Insurance § 239 at 623).  Accord 43 Am.Jur.2d
> Insurance § 189 at 272 (rev. ed. 1982).  Am.Jur.2d goes on to say, "As to contracts
> of life insurance, one who takes out a policy of insurance on his own life becomes,
> in so doing, a party to the contract, even though the benefits of the insurance are to
> accrue to someone else."  Id.  See also Burnet v. Wells, 289 U.S. 670 (1933).  The
> performance bond is not property or health and accident insurance.  It is more like
> the situation of a person who takes out life insurance on his or her own life.  The
> performance bond was insurance taken out by A-1 to protect another in case A-1
> could not pay its debt to the other.  Like a person who insures his or her own life,
> A-1 was an insured.  To any extent Kent is inconsistent with such a view, the holding
> in Kent is rejected.

1988 WL 118873, at *2-3 (emphasis added).  Because Judge Hart rejected a definition similar to the

one Guest v. Allstate Ins. Co. suggests, the Court finds CWC, Inc. v. Illinois Ins. Guar. Fund

inapposite.[13]

Moreover, the Court does not find Judge Hart's reasoning in rejecting Nebraska's definition

of "the insured" persuasive, because he based his analysis in part on an analogy to a life insurance

policy, citing the Supreme Court of the United States' decision in Burnet v. Wells, which states:

"One who takes out a policy on his own life, after application in his own name accepted by the

---

[13] CWC, Inc. v. Illinois Insurance Guaranty Fund is also factually distinguishable, because
it addresses a performance bond that the obligor signed and not a bond guaranty that the obligor did
not sign.

company, becomes in so doing a party to a contract, though the benefits of the insurance are to

accrue to some one else."  289 U.S. at 679.  Life insurance, however, is a poor analogy for a

suretyship or a guaranty.  "The essence of [guaranty] insurance is protecting a creditor against

potential loss by nonpayment of the debt, which is subtly but importantly different from ensuring

payment upon death of the insured or destruction of any goods which were purchased via the credit

involved."  1 L. Russ & T. Segalla, supra § 1:62.  The defining characteristic for a suretyship or a

guaranty is that the surety and guarantor is subrogated to the rights of the obligee against the obligor.

See P. Alces, supra § 2:3 ("[A] surety has the right to cause the principal obligor to perform its

obligation . . . or to obtain reimbursement from the principal obligor. . . .  These rights are part of

the signature of suretyship: A party who does not have these rights, in whole or in part, is not a

surety . . . .").  A life insurance company, on the contrary, is not entitled to reimbursement from the

deceased for payments under a life insurance policy, and the insurer has no right of exoneration

under which it can force the dying to avoid causing the insurer to preform under the policy.[14]

_____

[14] The College cites a section from Couch on Insurance, which states: "The 'insured' under
a contract of insurance is the person or entity that will receive a certain sum upon the happening of
a specified contingency or event.  'Insured' may also refer to the owner of the policy."  3 L. Russ
& T. Segalla, supra § 40:1 (emphasis added).  For the proposition that "'[i]nsured' may also refer
to the owner of the policy," Couch on Insurance cites a single case, Detrick v. Aetna Cas. & Sur.
Co., 261 Iowa 1246 (1968), which involved automobile insurance.  The Court finds more persuasive
the following excerpt from Couch on Insurance:

> While the definition of insurance proffered in the preceding sections is simple
> enough on its face, it can be extremely difficult to apply in those thankfully
> infrequent cases where the precise definition matters.  There are a number of other
> relationships that closely resemble the insurance agreement and may, for some
> purposes, be claimed to be the equivalent of insurance. Concepts that fall into this
> category are (1) performance bonds; (2) guaranty agreements; and (3) suretyship
> agreements.

1 L. Russ & T. Segalla, supra § 1:12.

The College asks the Court to import the duties of an insurer to an insured under the UIPA and the New Mexico common law into the law of suretyships. The governing principles, however, are distinct, and there is no sound reason, at this late stage of a well developed law governing commercial relationships, to attempt to collapse the two bodies of law. The Court is especially reluctant to collapse the two bodies of law because, unlike insurers, who owe duties to the insured, obligors owe duties to sureties and guarantors:

> While the right of an insurer to be subrogated has been compared to that of surety who, upon payment of debt, may resort to the principal debtor, in the case of property and casualty insurance, the insurer indemnifies its insured from a loss, and upon payment gains the right to pursue the responsible third party, while under a bond, the surety indemnifies third parties from losses at the hands of its principal, and upon payment gains the right to recover from its own principal. In essence, the surety has a right of indemnity against the principal and could recover from it for the payments made because of its default, without regard to whether the principle of subrogation was applied to transfer to the surety the rights of the obligee or other persons.

16 L. Russ & T. Segalla, <u>supra</u> § 222:101.

## III. BECAUSE THE COLLEGE WAS NOT A PARTY TO OR INSURED UNDER THE CONTRACT, ITS UIPA, BAD FAITH, AND DUTY COUNTERCLAIMS FAIL AS A MATTER OF LAW.

Because the College was neither a party to nor insured under the Bond Policy, on which it founds all of its Counterclaims, a number of the College's Counterclaims fail. Because the College was not insured under the Bond Policy, its Counterclaims based on UIPA and on the allegation that Radian Asset owed it a duty to treat the College's interest on par with its own fail as a matter or law. Moreover, because the College was not a party to the Bond Policy, its Counterclaim that Radian Asset violated the covenant of good faith and fair dealing also fails.

A.   **THE COLLEGE FAILS TO STATE A CLAIM FOR RADIAN ASSET'S VIOLATION OF AN INSURER'S DUTY TO TREAT THE INSURED'S INTERESTS AS EQUAL TO ITS OWN INTERESTS, THE FIFTH COUNTERCLAIM.**

The College contends that it was the insured under the Bond Policy, or, in the alternative, an obligor under a guaranty agreement with Radian Asset, and that Radian Asset therefore owes it a duty to treat the College's interest as equal to Radian Asset's own.  Radian Asset asserts that the Bondholders, and not the College, were insured under the Bond Policy, and that Radian Asset did not owe the College the duties of an insurer to the insured.  The Court agrees that Radian Asset did not owe the College a special duty.

Because the College is not insured under the Bond Policy, Radian Asset did not owe the College a duty to treat the College's interest equal to Radian Asset's own.  See Sloan v. State Farm Mutual Auto. Ins. Co., 135 N.M. 106, 113, 85 P.3d 230,237 (2004)("An insurer cannot be partial to its own interests, but rather must give the interests of its insured at least the same consideration or greater.").  In Dairyland Ins. Co. v. Herman, 124 N.M. 624, 954 P.2d 56 (1997), the Supreme Court of New Mexico stated:

> Thus, with insurance contracts, as with every contract, there is an implied covenant of good faith and fair dealing that the insurer will not injure its policyholder's right to receive the full benefits of the contract.  More specifically, this means that an insurer cannot be partial to its own interests, but must give its interests and the interests of its insured equal consideration.

124 N.M. 624, 629, 954 P.2d 56, 61.  See Chavez v. Chenoweth, 89 N.M. 423, 429, 553 P.2d 703, 709 (Ct. App. 1976)("The 'bad faith dealing' rule applies between an insurer and insured.  Plaintiff's dealings with State Farm in connection with damages based on Chenoweth's alleged fault were not dealings between insurer and insured, but arm's length dealings on the basis of plaintiff's claim against State Farm as the insurer of Chenoweth."  (citing Am. Employers' Ins. Co. v. Crawford, 87

N.M. 375, 533 P.2d 1203 (1975))); New Mexico Uniform Jury Instruction UJI 13-1701, Committee

Commentary ("Because the duty to use good faith derives from the contract of insurance, no cause

of action exists in favor of a third party.").[15]  Because the College was not insured under the Bond

Policy -- or a party to the Bond Policy -- Radian Asset had no duty to treat the College's interests

as equal to its own.

The College's alternative argument that Radian Asset owed it special duties as a guarantor

is similarly unavailing.  New Mexico law does not recognize special duties that a guarantor owes

to an obligor.  On the contrary, obligors owe special duties to guarantors.  See Restatement (Third)

of Suretyship & Guaranty, Suretyship Status -- Recourse Of Secondary Obligor Against Principal

Obligor § 18 cmt. b ("Suretyship status confers on the secondary obligor certain rights of recourse

against the principal obligor."); id. Principal Obligor's Duty Of Performance § 21 (stating that an

obligor who knows of the guarantor has a duty "to perform the underlying obligation" and to

"refrain from conduct that impairs the expectation of the secondary obligor that the principal obligor

will honor its duty of performance"); id. Principal Obligor's Duty Of Performance § 21, cmt. i.

("[T]he principal obligor owes the secondary obligor a duty to perform the underlying obligation

at the time the performance is due.").

Moreover, even if the College was the insured under the Bond Policy, its duty-of-the-insured

Counterclaim would fail as a matter of law.  The College states:

> Radian has violated the duty to treat the College's interest equal to its own by,
> among other things, threatening to sue the College unless the College prevented any
> claims being made against Radian under the insurance policies purchased by the
> College, by entering into releases with RBC and Royal Bank wherein Radian

---

[15] The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by
standing committees of the Court establishes a presumption that the instructions are correct
statements of law.  See State v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994).

obtained full releases of claims without protecting the College and by structuring and directing demands upon it to perfect potential damage claims against the College.

Amended Answer ¶ 97, at 60.  Under the common law, the College, as an obligor, had a duty to perform is obligation by paying on the Bonds, see Restatement (Third) of Suretyship & Guaranty, Principal Obligor's Duty Of Performance § 21 ("[T]he principal obligor has the duty to the secondary obligor . . . to perform the underlying obligation to the extent that failure to do so would leave the secondary obligor liable for performance that would entitle the secondary obligor to reimbursement by the principal obligor"), and Radian Asset, as an guarantor, had a right to exoneration, i.e. "threatening to sue the College unless the College prevented any claims," see FDIC v. Hiatt, 117 N.M. at 468-69, 872 P.2d at 886-87 (Montgomery, C.J., dissenting)("[A] surety also has the right to exoneration against its principal if the surety has a current obligation to pay out on a guaranty of the principal's obligation."  (citing Restatement (First) of Security § 112)); Pope v. Lydick Roofing Co. of Albuquerque, 81 N.M. 661, 667, 472 P.2d 375, 381 (1970)(recognizing a claim of exoneration); P. Alces, supra § 2:3 ("[A] surety has the right to cause the principal obligor to perform its obligation . . . .").

In addition to the College's common-law duty to preform its obligation and Radian Asset's common-law right to subrogation and exoneration, the Bond Policy and Commitment Letter also specify that Radian Asset had these rights.  Radian Asset's subrogation to the rights of the Bondholders is express in the Bond Policy.  Bond Policy at 2 ("The Insurer shall, to the extent of any payment made by its pursuant to this Policy, be deemed to have acquired and become the Holder of the bonds or portions thereof or interest thereon paid from such payment and shall be fully subrogated to all rights to payment thereof.").  Additionally, the College's indemnification of Radian Asset is express in the Commitment Letter.  See Commitment Letter Schedule 3, at 4 ("The

Institution shall protect, hold harmless and indemnify the Insurer for, from and against any and all liability, obligations, losses, claims and damages paid or incurred . . . .").[16]  An argument that a party acted in bad faith "cannot be used to overcome or negate an express term contained within a contract." Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. at 452, 188 P.3d at 1203 (citation omitted).  See Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 731, 749 P.2d 1105, 1110 (N.M. 1988)("We align also with those courts that have refused to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract.").  The College therefore fails to plead facts that would establish that Radian Asset violated its duty to treat the College's interests as its own.

## B.   THE COLLEGE FAILS TO STATE A CLAIM UNDER THE UNFAIR INSURANCE PRACTICES ACT -- THE FIRST COUNTERCLAIM.

The College asserts that Radian Asset owed it duties under UIPA, because it is the insured under the Bond Policy, or, in the alternative, because Radian Asset is a surety.  Radian Asset argues that it does not owe the College duties pursuant to UIPA, because the College is not insured under the Bond Policy.  The Court agrees that Radian Asset does not owe the College duties under UIPA.

### 1.   The College does not have a cause of action under the UIPA, because it is not "the insured."

The College's UIPA claim fails because UIPA does not apply to obligors who voluntarily enter into guaranty contracts.  The UIPA statute invoked by the College -- NMSA 1978, § 59A-16-20A, N -- is expressly limited to "insureds."  The UIPA provides:

> Any and all of the following practices with respect to claims, by an insurer or other person, knowingly committed or performed with such frequency as to indicate a general business practice, are defined as unfair and deceptive practices and are

_____

[16] The Court stresses that, while the Commitment Letter supports it reasoning, the Court's analysis does not rely on the Commitment Letter.

prohibited:

> A. misrepresenting to <u>insureds</u> pertinent facts or policy provisions relating to coverages at issue;
>
> . . . .
>
> N. failing to promptly provide an <u>insured</u> a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement . . . .

NMSA 1978, § 59A-16-20 (emphasis added).  Again, the Bondholders, and not the College, are the

insured under the Bond Policy.  Because the College is not insured under the Bond Policy, it does

not have a direct cause of action under the UIPA.  <u>See</u> NMSA 1978, § 59A-16-20N.

> ### 2. <u>The College does not have a third-party cause of action under the UIPA, because it is not a "special beneficiar[y] of a statutory scheme requiring mandatory insurance for the benefit of third parties."</u>

The College does not have a third-party cause of action under UIPA.  In <u>Jolley v. Associated</u>

<u>Electric & Gas Insurance Services Ltd.</u>, 148 N.M. 436, 237 P.3d 738 (2010), the Supreme Court of

New Mexico addressed a certified question from

> the United States District Court for the District of New Mexico to determine whether the third-party bad faith cause of action against a compulsory automobile liability insurance carrier, for failure to settle an underlying lawsuit, which [the Supreme Court of New Mexico] recognized in <u>Hovet v. Allstate Insurance Co.</u>, 2004-NMSC-010, 135 N.M. 397, 89 P.3d 69, should be extended to bad faith claims by third parties against carriers providing nonmandatory excess liability insurance coverage.

<u>Id.</u> at 739.  The Supreme Court of New Mexico held that "neither the holding nor the doctrinal

underpinnings of <u>Hovet</u> support[ed] such an extension, and [it] answer[ed] the certified question in

the negative."  <u>Jolley v. Assoc. Elec. & Gas Ins. Servs. Ltd.</u>, 237 P.3d at 739.  The Supreme Court

of New Mexico asserted that a third-party right of action "has been found only where specific

legislation indicated that our Legislature contemplated classes of persons to be protected under the

Insurance Code." Id. at 741.  The Supreme Court of New Mexico concluded that

> We conclude that the precedent and public policy considerations that dictated our
> result in Hovet neither compel nor support a private right of action for Plaintiff in
> this case.  Although AEGIS owed Energen an Article 16 duty to engage in fair
> claims practices, neither the Insurance Code nor any other statute imposed any such
> obligation on AEGIS with regard to Plaintiff.  We find nothing indicating that our
> Legislature intended to extend a private action to claimants who are neither parties
> to the insurance contract nor special beneficiaries of a statutory scheme requiring
> mandatory insurance for the benefit of third parties.

Id. at 743.

Like the excess liability insurance at issue in Jolley v. Associated Electric & Gas Insurance

Services Ltd., the Bond Policy is not "required by any New Mexico law," a factor on which the

Supreme Court of New Mexico put great weight:

> The purpose of excess coverage insurance, like the indemnification policy in this
> case that provided reimbursement to the insured for claims expenses incurred in
> excess of half a million dollars, is different from that of compulsory automobile
> liability insurance.  It is intended for the financial protection of the insured, not the
> protection of members of the public who may be injured by the insured's operation
> of an automobile.  While the insurance policy here ultimately may be of some benefit
> to an injured plaintiff, the fact remains that the benefit is not one mandated by New
> Mexico legislative policy.

Id. at 743.  By the same measure, the Bond Policy "is intended for the financial protection of the

insured, not the protection of members of the public who may be injured by the insured's operation

of an automobile."  Id.  The Court "find[s] nothing indicating that [the] Legislature intended to

extend a private action to claimants who are neither parties to the insurance contract nor special

beneficiaries of a statutory scheme requiring mandatory insurance for the benefit of third parties."

Id. at 743.  Because the Supreme Court of New Mexico demonstrated hostility to expanding third

party rights of action under UIPA, and its reasoning applies with equal force to bond insurance, the

Court concludes that the Supreme Court of New Mexico would not recognize that the College has

a third party cause of action against Radian Asset under the Bond Policy.  In particular, the Court

does not believe that the Supreme Court of New Mexico would extend a right of action to obligors,

who are not beneficiaries under guaranty agreements.

### 3.        As an obligor, the College is not "the insured" under the UIPA.

The College contends that, even if is not insured under the Bond Policy, Radian Asset still

owes it duties under the Bond Policy because Radian Asset is a surety.  The College notes that

section 59A-1-5 of the Insurance Code defines "insurance" to include a surety contract, NMSA

1978, § 59A-1-5 ("'Insurance' is a contract whereby one undertakes to pay or indemnify another as

to loss from certain specified contingencies or perils, or to pay or grant a specified amount or

determinable benefit in connection with ascertainable risk contingencies, or to act as surety."), and

section 59A-1-8A defines "insurer" to include a surety in the business of entering into contracts of

insurance, NMSA 1978, §  59A-1-8A ("'Insurer' includes every person engaged as principal and

as indemnitor, surety or contractor in the business of entering into contracts of insurance.").  The

parties do not dispute that Radian Asset is an insurer.

While Radian Asset is an insurer, as an obligor in a guaranty -- or a suretyship -- the College

is not an insured under the UIPA.  First, the Restatement (First) of Security, which the New Mexico

courts follow in surety law, recognizes a distinction between "the insured" and a principal obligor.

Restatement (First) of Security, Suretyship Defined § 82, cmt. h ("An insurer against damage to a

chattel has a primary liability to the insured, but as between himself and one who negligently causes

the damage, the relation is one of surety and principal.").  Second, while an obligor has duties to the

obligee and the guarantor, a guarantor does not have duties to the obligor as such, and the obligor

is not protected by the guarantor in a guaranty agreement -- the benefit of a guaranty flows to the

obligee.  Accordingly, New Mexico law and the <u>Restatements</u> recognize that sureties and guarantors have rights against the obligor by virtue of their relationship, and not the other way aounrd.  <u>See</u> <u>In re Slamans</u>, 69 F.3d at 475 ("[S]ubrogation under § 509(a) of the Bankruptcy Code is clearly available to entities that are 'liable with' the debtor such as sureties, guarantors, or comakers." (citing 3 <u>Collier on Bankruptcy</u> ¶ 509.01); <u>C.I.R. v. Condit</u>, 333 F.2d at 586 ("The theory of the Court was that under the doctrine of subrogation the payment by a guarantor does not create a new debt and extinguish the original debt but preserves the original debt and substitutes the guarantor for the creditor."  (citing <u>Putnam v. Commissioner</u>, 352 U.S. at 88-89); <u>Cadle Co., Inc. v. Wallach Concrete, Inc.</u>, 120 N.M. 56, 897 P.2d 1104 (1995)(recognizing "the guarantors' right to subrogation"); <u>FDIC v. Moore</u>, 118 N.M. at 82, 879 P.2d at 83 ("[T]he surety is subrogated to the rights of a creditor if he satisfies the obligation."  (citing <u>Restatement (First) of Security</u> § 132 cmt. b)); <u>FDIC v. Hiatt</u>, 117 N.M. at 468-69, 872 P.2d at 886-87 (Montgomery, C.J., dissenting)("[A] surety also has the right to exoneration against its principal if the surety has a current obligation to pay out on a guaranty of the principal's obligation."  (citing <u>Restatement of Security</u> § 112)); <u>Pope v. Lydick Roofing Co. of Albuquerque</u>, 81 N.M. at 667, 472 P.2d at 381 (finding that plaintiff pled "an action for exoneration on a lease executed as surety for Lydick"); <u>State Farm Mut. Auto. Ins. Co. v. Found. Reserve Ins. Co.</u>, 78 N.M. at 363, 431 P.2d at 741 ("The remedy [of subrogation, in the insurance context] is for the benefit of one secondarily liable who has paid the debt of another and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor."); <u>N.M. State Highway and Transp. Dept. v. Gulf Ins. Co.</u>, 128 N.M. at 637, 996 P.2d at 427 ("New Mexico has recognized the doctrine of subrogation in the suretyship context . . . ."  (citing <u>Employment Sec. Comm'n v. Big 4 Paving, Inc.</u>, 81 N.M. at 27-28, 462 P.2d

at 612-13; Bank of N.M. v. Romero, 121 N.M. at 839, 918 P.2d at 1339); Fireman's Fund Am. Ins.

Cos. v. Phillips, Carter, Reister & Assocs., 89 N.M. at 9, 546 P.2d at 74 ("New Mexico has allowed

subrogation where one secondarily liable pays a debt and then proceeds against one primarily liable,

stating that it is allowed in such a case because the one secondarily liable had a 'legal interest to

protect.'"); Effect Of Suretyship Status On Rights And Duties Of The Secondary Obligor --

Generally § 17 ("The rights of the secondary obligor against the principal obligor are (i) those

existing as a result of any contract between them, and (ii) those that arise out of suretyship status.");

Restatement (Third) of Suretyship & Guaranty, Suretyship Status -- Recourse Of Secondary Obligor

Against Principal Obligor § 18 cmt. b ("Suretyship status confers on the secondary obligor certain

rights of recourse against the principal obligor."); Restatement (Third) of Suretyship & Guaranty,

Principal Obligor's Duty Of Performance § 21 (recognizing that an obligor had a duty to perform

the underlying obligation); Restatement (Third) of Suretyship & Guaranty, Principal Obligor's Duty

Of Performance § 21, cmt. i (stating that an guarantor or surety has a right on exoneration,

subrogation, and indemnification).   The College, therefore, as an obligor in a suretyship or a

guaranty, is not "the insured" under the UIPA.

> [S]urety law, even in the absence of an express indemnification agreement, may in
> many circumstances imply [the obligor's] duty of indemnification.  See, e.g., U.S.
> Fid. & Guar. Co. v. Centropolis Bank of Kansas City, Mo., 17 F.2d 913, 916 (8th
> Cir.1927) (applying Missouri law and recognizing a common law duty to indemnify
> a surety); 23 Williston on Contracts § 61:59 (Richard A. Lord 4th ed. 2008) ("[E]ven
> in the absence of any express contract of indemnity, the principal obligor is impliedly
> bound to indemnify the surety and make it whole.").  Without such a duty, the surety
> would be more akin to an insurer with subrogation rights only as against third parties
> rather than a guarantor who may look to the contracting party itself for satisfaction.

Spirco Environmental, Inc. v. American Intern. Specialty Lines Ins. Co., 555 F.3d 643-44 (emphasis

added).

Moreover, Radian Asset is a guarantor, not a surety, and a guarantor's and an obligor's duties to the obligee are separate undertakings captured in separate instruments -- the Bond Policy -- than its contractual obligations to the College under the Commitment Letter.  The College, therefore is not a party to the Bond Policy, much less insured under it.   See Shannon-Vail Five Inc. v. Bunch, 270 F.3d at 1211 ("[B]y definition, a guarantee is a separate undertaking in which the principal obligor does not join, and a guarantee exists independent of the original obligations between the principal obligor and the obligee.")(emphasis added); Woods-Tucker Leasing Corp. of Georgia v. Kellum, 641 F.2d at 215 n.7 ("Indeed, traditionally one distinction drawn between a contract of suretyship and a contract of guaranty is that '(t)he contract of suretyship is the joint and several contract of the principal and the surety; the contract of the guarantor is his own separate undertaking, in which the principal does not join.'"  (quoting 38 Am. Jur. 2d Guaranty § 15, at 1012)); Pavlantos v. Garoufalis, 89 F.2d at 205-06 ("A contract of guaranty . . . .  usually is a separate undertaking in which the person primarily liable does not join."); Landover Corp. v. Bellevue Master, LLC,  2006 WL 47662, at *9 ("A guarantor makes a separate contract in which the principal does not join." (citation omitted)); JPMorgan Chase Bank, N.A. v. Earth Foods, Inc., 238 Ill. 2d 455, at *5 ("[T]he contract of the guarantor is his own separate undertaking, in which the principal does not join"); 1 G. Brandt, supra § 2, at 9 ("[T]he contract of the guarantor is his own separate undertaking, in which the principal does not join."); Black's Law Dictionary 773 ("[A] guaranty is an undertaking that a person will pay or do some act, is collateral to the duty of the primary obligor . . . .").

The Supreme Court of New Mexico recently determined that the New Mexico Legislature, in defining insurance, "articulate[d] a functional approach, looking to the substance of the contract rather than to its label."  Guest v. Allstate Ins. Co., 2010 WL 4878881, ¶ 62 (citing NMSA 1978,

§ 59A-1-5).  The New Mexico statute defining insurance states: "'Insurance' is a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies, or to act as surety."  NMSA 1978, § 59A-1-5.  The Supreme Court held that, for a "contract to be one of insurance, the definition simply requires that [an insurer] agreed to 'indemnify [a party] as to loss from certain specified contingencies or perils.'"  Guest v. Allstate Ins. Co., 2010 WL 4878881, ¶ 62.  Applying these standards to obligors, the rights and duties that attend obligors demonstrate that obligors are not "the insured" under guaranty agreements.  Under a guaranty, obligees, not obligors, are protected against "loss from certain specified contingencies or perils," namely the obligor's failure to perform.  Guest v. Allstate Ins. Co., 2010 WL 4878881, ¶ 62.  Thus, a guaranty is "a contract whereby for consideration [the guarantor  agree[s] to . . . guarantee [the obligee] against specified risks."  Cordova v. Wolfel, 120 N.M. 557, 559, 903 P.2d 1390, 1392 (1995)(citing N.M. Life Ins. Guar. Ass'n v. Moore, 93 N.M. 47, 50, 596 P.2d 260, 263 (1979) and NMSA 1978 § 59A-I-5).  See N.M. Life Ins. Guar. Ass'n v. Moore, 93 N.M. at 50, 596 P.2d at 263 ("Insurance usually involves a contract whereby the insurer, for an adequate consideration, undertakes to indemnify the insured against loss arising from specified perils, or to reimburse him for all or part of an obligation he has incurred."  (citing Barkin v. Bd. of Optometry, 269 Cal. App. 2d 714 (1969) and 43 Am. Jur. 2d Insurance § 1 (1969)).  Under the principles of guaranty and suretyship, the obligee -- the beneficiary of a guaranty -- may be consider to be "the insured," but the obligor -- who remains liable to the guarantor -- is not.

Limiting the definition of "the insured" to beneficiaries is consistent with Jolley v. Associated Electric & Gas Insurance Services Ltd., which explained that, where the Supreme Court

of New Mexico had extended coverage under UIPA to third parties, the third parties were the

intended beneficiaries of the insurance policies at issue:

> On two previous occasions, this Court has recognized that a third-party plaintiff who is an intended beneficiary of statutorily mandated insurance has a private right of action under Section 59A-16-30 to remedy an insurer's breach of the duty of fair settlement practices established by Article 16. See Hovet, 2004-NMSC-010, ¶¶ 20, 23, 135 N.M. 397, 89 P.3d 69 (explaining that "[t]hird parties, having claims against drivers who are insured under compulsory automobile liability policies, are intended beneficiaries of those insurance policies" and can "sue the insurer for unfair settlement practices under the Insurance Code"); Russell v. Protective Ins. Co., 107 N.M. 9, 13-14, 751 P.2d 693, 697-98 (1988) (allowing an injured worker to sue an insurer for bad faith refusal to pay workers' compensation benefits because the worker "was an intended beneficiary of the contract between his employer and the insurer"), superseded by statute as stated in Meyers v. Western Auto, 2002-NMCA-089, ¶ 16, 132 N.M. 675, 54 P.3d 79.

Jolley v. Assoc. Elec. & Gas Ins. Servs. Ltd., 237 P.3d at 741 (emphasis added).  Because obligors

are not beneficiaries under guaranties or suretyships, they are not "the insured."  In sum, based on

the standards that the Supreme Court of New Mexico set forth in Jolley v. Associated Electric & Gas

Insurance Services Ltd. and Guest v. Allstate Ins. Co., applied to well-established principles of the

law of suretyships and guaranties, the Court concludes that the Supreme Court of New Mexico

would not recognize that obligors are "the insured" in guaranty agreements or extend a third-party

cause of action to obligors in guaranty agreements under UIPA.

### C.    THE COLLEGE DOES NOT STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING -- FOURTH COUNTERCLAIM.

Because the College is not a party to the Bond Policy, it cannot bring a claim for breach of

the implied covenant of good faith and fair dealing.  Implied covenants of good faith and fair dealing

extend only to parties to an agreement.  See Sanders v. FedEx Ground Package Sys., Inc., 144 N.M.

at 452, 188 P.3d at 1203 ("The breach of this covenant requires a showing of bad faith or that one

party wrongfully and intentionally used the contract to the detriment of the other party." (citation omitted)); <u>Azar v. Prudential Ins. Co.</u>, 133 N.M. 669, 685, 68 P.3d 909, 925 (Ct. App. 2003)("The implied covenant is aimed at making effective the agreement's promises. Thus, it is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party.").

As an obligor in a guaranty, the College's relationships with the Bondholders and Radian Asset are separate undertakings captured in separate instruments than Radian Asset's relationship with the Bondholders, which is captured in the Bond Policy. <u>See</u> <u>Shannon-Vail Five Inc. v. Bunch</u>, 270 F.3d at 1211; <u>Woods-Tucker Leasing Corp. of Georgia v. Kellum</u>, 641 F.2d at 215 n.7 (quoting 38 <u>Am. Jur. 2d Guaranty</u> § 15, at 1012); <u>Pavlantos v. Garoufalis</u>, 89 F.2d at 205-06; <u>Landover Corp. v. Bellevue Master, LLC</u>, 2006 WL 47662, at *9; <u>JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.</u>, 238 Ill. 2d 455, at *5; 1 G. Brandt, <u>supra</u> § 2, at 9; <u>Black's Law Dictionary</u> 773.

While Radian Asset owes the College a duty of good faith and fair dealing under the Commitment Letter, <u>see</u> <u>Sanders v. FedEx Ground Package Sys., Inc.</u>, 144 N.M. at 452, 188 P.3d at 1203 ("New Mexico courts have held that every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract"), the College bases its Counterclaims on the Bond Policy. The College does not dispute that Radian Asset fully performed under the Commitment Letter. <u>See</u> Response at 17 n.7 ("[N]either Radian nor the College make the claim that Radian did not honor its commitment to sell the College the two insurance policies nor that any of the prerequisites to Radian's commitment to sell the policies had not been met."). Accordingly, the College has no implied-covenant claim under the Commitment Letter. <u>See</u> <u>Azar v. Prudential Ins. Co.</u>, 133 N.M. at 685, 68 P.3d at 925 ("The implied

covenant is aimed at making effective the agreement's promises.  Thus, it is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party.").

Moreover, even if the College was a party to the Bond Policy, Radian Asset's actions that the College alleges violated the covenant of good faith and fair dealing fall short of establishing a claim.  In its Response, the College contends that Radian Asset violated the covenant through the following actions: (i) Radian Asset failed to disclose "the likelihood that its credit rating would be downgraded" and "the adverse financial effect any such downgrading would have on the College," Response at 32; (ii) Radian Asset "threatened the College so that Radian would not have to comply with its contractual obligation," Amended Answer ¶ 43, at 48-49; (iii) Radian Asset "had defenses to payment but chose not to raise those defenses and instead made payments to obtain a release for itself while disadvantaging economically the College," Amended Answer ¶¶ 69-70, at 55-56; (iv) Radian Asset "obtained releases for itself and then claimed that the consideration paid for such releases were payments made under the Bond Policy," Amended Answer ¶¶ 70-74, at 56-57; and (v) Radian Asset "timed its payments by controlling the Bond Trustee to the detriment of the College," Amended Answer ¶¶ 44-46, at 49-50.

Radian Asset's downgraded credit rating did not violate the covenant of good faith and fair dealing, because one of the two downgrades was outside of Radian Asset's control, and the Commitment Letter expressly warned the College that it was subject to change.[17]  Other courts have held that a party is not responsible for a downgrading to its credit rating.  The court in Water Works Board of Birmingham v. Ambac Financial Group, Inc., No. CV-09-AR-2296, 2010 WL 2506087

---

[17] The Court concluded primarily that the College's covenant Counterclaim fails because the College is not a party to the Bond Policy.  The Court again emphasizes that it does not rely on the Commitment Letter for its decision.  The Court notes, however, that the Commitment Letter provides further support for its decision.

(N.D. Ala. Apr. 1, 2010), dismissed claims that a bond insurer's failure to maintain its credit rating

was a breach of its bond insurance policies:

> It should also be noted that Ambac has no direct control over its credit ratings.
> While Ambac can operate in a way that it hopes will contribute to good credit
> ratings, S & P and Moody's make the credit ratings. It would defy logic and common
> sense for Ambac to obligate itself to maintain for thirty-five ( 35) years the highest
> possible credit rating, when the determination and award of credit ratings are by
> separate entities.

Id at *3.

Indeed, the College contends that it bases its Counterclaims -- not on the downgrade to

Radian Asset's credit rating -- but on its failure to disclose the likelihood of a downgrade and the

ensuing harm to the College:

> The College does not allege that Radian guaranteed its credit rating, nor does the
> College base its Counterclaim on the idea that the downgrade per se in Radian's
> credit rating breached Radian's duties to the College. Rather, to the extent the
> Counterclaim refers to Radian's credit rating, it is based on Radian's failure to
> disclose material information it had a duty to disclose concerning not only the
> likelihood that its credit rating would be downgraded, but also, and more
> importantly, the adverse financial effect any such downgrading would have on the
> College. Moreover, they are based on Radian's request to Fitch to withdraw its
> ratings, one of the events that triggered the default and demise of the College, despite
> that Radian knew that action could adversely impact the College. See, e.g.
> Counterclaim ¶¶ 36-41 (Radian failed to disclose to the College that it was
> experiencing its own financial problems; that it was at risk of credit rating
> downgrading; that it was insuring subprime mortgage pools with minimal due
> diligence; and that it had requested Fitch to withdraw its ratings).

Response at 31-32.

Contrary to the College's contention that Radian Asset failed to disclose the potential effects

of a downgrade in its credit rating, the Commitment Letter contains language that other courts have

found precludes covenant-of-good-faith-and-fair-dealing claims. The Commitment Letter includes

schedules listing information that Radian Asset required to be included in the Official Statement for

-83-

the Bonds.  Schedule 13 of the Commitment Letter discusses Radian Asset's credit ratings and

requires that the following language to be included in the Bond documents:

> The Insurer has a financial strength rating of "AA" (outlook: negative) from
> Standard & Poors Rating Services, a division of The McGraw-Hill Companies, Inc.
> ("S&P"), an insurance financial strength rating of "Aa3" (outlook: stable) from
> Moody's Investors Service, Inc. ("Moody's") and a claims paying ability rating of
> "AA" (outlook: negative) by Fitch Ratings Services ("Fitch").  On April 27, 2005,
> Fitch affirmed the 'AA' insurer financial strength rating of the Insurer, but revised
> its rating outlook for the Insurer from "stable" to negative."  None of the Insurer's
> customers have the right to receptive business in connection with such ratings action.
> The ratings from the applicable rating agency reflect only the views of S&P,
> Moody's and Fitch, respectively, do not constitute a recommendation to buy, sell or
> hold securities and are subject to revision or withdrawal at any time by such rating
> agencies.  Any further explanation of any rating may be obtained only from the
> applicable rating agency.  Any downward revision or withdrawal of any of the above
> ratings may have an adverse effect on the market price of the [Bonds].  The Insurer
> does not guarantee the market price or investment value of the [Bonds] nor does it
> guarantee that the ratings on the Bonds will not be revised or withdrawn.

Commitment Letter at 3 (some alterations in original)(emphasis added).  The official Statement for

the Bonds repeat these representations.

The courts in NPS, LLC v. Ambac Assurance Corp., 706 F. Supp. 2d 162 (D. Mass. 2010),

and in In re Merrill Lynch Auction Rate Sec. Litig., No. 09-MD-2030, 2010 WL 1924719 (S.D.N.Y.

May 11, 2010), held that the issuer could not have reasonably relied on the bond insurer's rating in

light of such statements.  In NPS, LLC v. Ambac Assurance Corp., the United States District Court

for the District of Massachusetts stated:

> NPS cannot show that the non-occurrence of a reduction in Ambac's credit rating was
> a basic assumption on which the contract was based. A credit rating is determined
> by external institutions, not the rated agency.  The rating itself is subject to periodic
> review.   NPS was aware that these institutions could at some point alter their
> evaluation of the risks involved in Ambac's business model.  Indeed, NPS itself
> notified prospective bondholders that a reduction in Ambac's credit rating was
> possible, stating: "There is no assurance that such ratings will continue for any given
> period of time or that they will not be revised downward or withdrawn entirely by
> such rating agencies if, in the judgment of such rating agencies, circumstances so

-84-

warrant." While NPS may have selected Ambac as an insurer because of its strong credit rating history, and while NPS may have had reason to expect that the strong credit rating would continue, there is no indication that NPS's decision to enter the Agreement was or could reasonably have been premised on the basic assumption that Ambac's credit rating would not be reduced.

NPS, LLC v. Ambac Assurance Corp., 706 F. Supp. 2d at 177.  Similarly, in In re Merrill Lynch Auction Rate Securities Litigation, the Southern District Court of New York stated:

> The instant case involves an alleged cause that was explicitly contradicted by the terms of the Commitment Letters and that involved events expected to occur in the future.  LSED does not allege that the Commitment Letters contained a provision guaranteeing triple-A ratings.  Rather, the Commitment Letters referred to the attached "Official Statement Disclosure Language," which LSED was required to include in the Bonds.  The disclosure language stated that FGIC's triple-A ratings reflected the "ratings agencies' current assessments of the insurance financial strength of Financial Guaranty."  "These ratings [were] not recommendations to buy, sell or hold the Bonds, and [were] subject to revision or withdrawal at any time by the rating agencies."  "Financial Guarantee d[id] not guarantee the market price or investment value of the Bonds nor d[id] it guarantee that the ratings on the Bonds w[ould] not be revised or withdrawn."  The disclosure language also stated that the Policies did "not insure any risk other than Nonpayment by the Issuer."
>
> Given the absence of a clause in the contract guaranteeing credit enhancement, the attachment of the disclosure language to the Commitment Letters, and LSED's inclusion of the disclosure language in the Bonds, any erroneous belief by LSED that the principal cause of the Commitment Letters was to secure thirty years of credit enhancement was not reasonable.

In re Merrill Lynch Auction Rate Sec. Litig., 2010 WL 1924719, at *7 (internal citations omitted).

Similarly, Radian Asset's disclosure notified the College that its ratings were subject to change.

Additionally, the Commitment Letter did not state that Radian Asset would not withdraw a credit

rating; on the contrary, the Commitment Letter stated that Radian Asset "does not . . . guarantee that

the ratings on the Bonds will not be revised or withdrawn."

Regarding the College's allegation that Radian Asset "threatened the College so that Radian

would not have to comply with its contractual obligation," a guaranty has the right of exoneration --

the right to compel the performance of the principal.  "[A] surety has the right to cause the principal

obligor to perform its obligation to the obligee or to obtain reimbursement from the principal obligor

if the surety discharges the obligation of the principal obligor to the creditor."  P. Alces, supra § 2:3.

The College cannot therefore seek damages for Radian Asset's exercising its rights under the Bond

Policy.

The College's allegation that Radian Asset "had defenses to payment but chose not to raise

those defenses" fails to state a claim as a matter of law.  The College never explains what defenses

Radian Asset allegedly had that it did not exercise, stating only "Radian knew it had good defenses

to such claims."  Amended Answer ¶ 69, at 55.  This conclusory allegation is insufficient under the

pleading standard announced in Bell Atlantic v. Twombly.  To show that the allegation is plausible,

at a minimum the College would have to state what defenses were available to Radian Asset.  See

Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 ("[T]he complaint must give the court

reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these

claims.").

Regarding its allegation that Radian Asset "obtained releases for itself and then claimed that

the consideration paid for such releases were payments made under the Bond Policy," Amended

Answer ¶¶ 70-74, at 56-57, the College does not allege a duty that would require Radian Asset to

seek a release other than its contention that it was insured under the Bond Policy.  Because the Court

rejects the College's argument that Radian Asset had a duty to treat the College's interests as equal

to its own, the College's contention that Radian Asset had a duty to obtain a release for it also fails.

The College has also failed to allege facts establishing that Radian Asset had a duty to

exercise its right in a time frame that is favorable to the College.  In WXI/Z Southwest Malls v.

Mueller, 137 N.M. 343, 351, 110 P.3d 1080, 1088 (Ct. App. 2005), the Court of Appeals of New

Mexico held that a landlord under a commercial lease did not breach the covenant of good faith and

fair dealing when it failed to notify guarantors of the lease for approximately twenty months that the

principal had not paid rent, even though the landlord was in contact with the guarantors on other

matters.  The Court of Appeals reasoned that the landlord did not prevent the guarantors from getting

the benefit of their bargain, which was to assign the remainder of the lease, and the landlord did not

agree to provide guarantors notice of any missed rental payments:

> Even if all of the Ritters' claims are believed, there is no suggestion that Southwest
> Malls acted to injure the rights of the Ritters to receive the benefit of their agreement
> or that it acted to negate any of its promises.  Dairyland Ins. Co., 1998-NMSC-005,
> ¶ 12, 124 N.M. 624, 954 P.2d 56.  Southwest Malls promised to allow the Ritters to
> step out of their role as lessors and operators of the tavern in exchange for the Ritters'
> promise to guarantee performance of the lease.  We fail to see how Southwest Malls'
> failure to notify the Ritters of Aspen's unpaid rent prevented the Ritters from getting
> the benefit of their bargain -- a bargain that allowed them to assign the remainder of
> their lease.  Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶¶ 13, 14, 135
> N.M. 265, 87 P.3d 545 (stating that covenant of good faith is not breached when a
> party was given the product or service bargained for).  As Southwest Malls did not
> agree to provide the Ritters notice of any missed rental payments and met its
> obligation to allow the Ritters' assignment, there is no basis to find a breach of the
> duty of good faith.

WXI/Z Southwest Malls v. Mueller, 137 N.M. at 351, 110 P.3d at 1088.  Similarly, Radian Asset

provided the benefit of the bargain established under the Bond Policy; it paid the College's

obligations on the Bonds, which was the only obligation it assumed under the Bond Policy.  See

Bond Policy at 1 ("This Policy does not insure against any risk other than nonpayment of the

Obligation by or on behalf of the Obligor or any other obligor to the Bond Trustee.").  See also

Shirley v. Venaglia, 86 N.M. at 724-25, 527 P.2d at 319-20 ("A guarantor is entitled to a strict

construction of his undertaking and cannot be held liable beyond the strict terms of his contract."

(citations omitted)); Bank of N.M. v. Nw. Power Prods., Inc., 95 N.M. 743, 747, 626 P.2d 280, 284

(Ct. App. 1980)(same).  While Radian Asset did not perform under the Bond Policy at a time that was most beneficial to the College, it performed its obligation under the Bond Policy, fulfilling the Colleges' obligation towards the Bondholder, the only obligation Radian Asset assumed under the Bond Policy.  Consequently, even if the College was a party to the Bond Policy, Radian Asset's timing did not "prevent[ ] the [College] from getting the benefit of [its] bargain."  WXI/Z Southwest Malls v. Mueller, 137 N.M. at 351, 110 P.3d at 1088.

Moreover, the College's allegations that Radian Asset took control of the Bondholders and did not perform under the Bond Policy until the College had exhausted its resources, costing the College "any chance of survival as a college," amounts to no more than alleging that Radian Asset exercised its common-law right of subrogation and exoneration.  The College alleges that Radian Asset took control of the bondholders:

> Radian specifically informed the Trustee that it had the right to control and direct enforcement actions and that it had the intent to enforce that right, and Radian therefore instructed the Trustee that the Trustee could not take direction from any party, including RBC Capital Markets.  Radian never withdrew this exercise of control nor did it empower the Trustee to take direction from any other party. Such direction was given to the Trustee on October 21, 2008 based on § 9.12 of the Indenture, as well as possibly at other times, to the detriment and harm of the College.
>
> . . . .
>
> Radian controlled all of the dealings on the Bonds and manipulated the ultimate outcome of the fate of the College.  Such manipulation included when and how the Bonds would be repaid, when and how Radian would tender any payments, when, how, and if demand would be made on Radian under any insurance.
>
> . . . .
>
> Radian exercised this power and control to its own benefit and to the intended and foreseeable detriment of the College.

Amended Answer ¶¶ 44-46, at 49-50.  Rather than violating the covenant of good faith and fair

dealing, these allegations show Radian Asset exercising its right to step into the Bondholders shoes and exercising their rights, which Radian Asset was entitled to do both under the Bond Policy and as a guarantor under the common law.

The College further alleges that Radian Asset attempted to force the College to prevent Radian Asset from having to fulfill its obligations under the Bond Policy:

> Radian offered no assistance to the College relating to the financial crisis it created for the College. . . . Instead Radian threatened suit against the College in an attempt to coerce and bully the College into taking steps such that Radian would never have to honor the obligations it contracted to perform under the policies of insurance
>
> . . . .
>
> Radian as of October 21, 2008 could have therefore directed the Trustee, e.g., to make demand on the insurer for the complete payment of the Bonds plus interest under the insurance policy, thereby limiting Radian's exposure and protecting the College from exposure to more and more damages.
>
> . . . .
>
> Radian again threatened and bullied the College with exposure to more damages under the guise of ensuring "the extent of the College's current legal exposure to Radian is clear and unambiguous to the College." There was no legitimate, business, good faith purpose for such demands and/or threats. Radian in that letter reiterated that "Radian is looking to the College for payment of the full amount of Radian's damages, attorneys' fees, and expenses and will continue to do so until it is fully compensated and faces no further exposure under its policy on the Bonds." At this point Radian had still not paid a single cent on any insurance policy.
>
> . . . .
>
> Radian continued to issue threats to the College in the October and November 2008 time frame, including statements such as "Radian's Complaint is in the hands of our local counsel in New Mexico for filing at any time." These threats included threats by Radian's counsel to the College directly, sometimes from Radian's counsel to the College's counsel, and sometimes from Radian's officers to the College directly.
>
> . . . .

In retrospect, Radian's strategy was clear.  It would manipulate the system, placing pressure whenever it could to avoid, as long as it could, having a demand placed upon it to pay under the $25 million policy, while at the same time knowingly disregarding the damage it did to the College.  Radian would pick and choose what it would pay, how its payments would be characterized, when and if demand would be made upon it, and when it would pay, to fabricate its best claims against the College.  Furthermore, apparently throughout it was Radian's plan to charge the College for developing this strategy and implementing the strategy, including without limitation by allowing damages, interest, attorneys' fees and costs to accrue.

. . . .

Starting no later than November of 2008, with Radian's acquiescence, the Trustee started paying principal and interest on the Bonds out of the reserve funds.  At that time the reserve fund was at approximately $1 million.  Had Radian directed the Trustee at that time to make demand on Radian for the full $25 million of the Bonds and interest, Radian could have had the $1 million in reserve, the entirety of almost all the real estate assets of the College (pledged against the Bonds) as collateral, and would not have incurred the losses it is now claiming.  Instead it chose a path of paying nothing and allowing the College's assets and collateral to be depleted.

Amended Answer ¶¶ 43, 48, 51, 56, 61, at 48, 50-54.  The College's allegations show that Radian Asset attempted to force the College to fulfill its obligations under the Bonds so that Radian Asset was not forced to cover the College's obligation under the Bond Policy.  Radian Asset's actions were pursuant to its rights as a guarantor.  See FDIC v. Hiatt, 117 N.M. at 468-69, 872 P.2d at 886-87 (Montgomery, C.J., dissenting)("[A] surety also has the right to exoneration against its principal if the surety has a current obligation to pay out on a guaranty of the principal's obligation."  (citing Restatement (First) of Security § 112)); Gardner v. Bean, 677 P.2d at 1119 ("Exoneration permits a guarantor to compel a principal to pay an entire obligation then due.")(citing Restatement (First) of Security § 112); Restatement (First) of Security, Principal's Duty To Surety: In General § 103 ("[I]t is the duty of the principal to the surety to satisfy the surety's obligation by performing his own duty to the creditor . . . ."); id., Reimbursement By Principal § 104 ("[I]t is the duty of the principal to reimburse the surety to the extent of his reasonable outlay . . . ."); id., Exoneration § 112 ("[T]he

surety has the right to exoneration."); <u>Restatement (Third) of Suretyship & Guaranty</u>, <u>Suretyship Status -- Recourse Of Secondary Obligor Against Principal Obligor</u> § 18 ("Suretyship status gives the secondary obligor recourse against the principal obligor to cause the principal obligor to perform the underlying obligation or bear the cost of performance."); <u>id.</u>, <u>Principal Obligor's Duty Of Performance</u> § 21, cmt. i ("[T]he principal obligor owes the secondary obligor a duty to perform the underlying obligation at the time the performance is due. . . . Thus, if the principal obligor has no defense to its duty of performance, the secondary obligor is entitled to appropriate relief protecting its interests."); P. Alces, <u>supra</u> § 2:3 ("[A] surety has the right to cause the principal obligor to perform its obligation . . . ."). Because the College's allegations show only that Radian Asset was exercising its rights under the Bond Policy and as a guarantor under the common law, the College, even if it were a party to the Bond Policy, has not pled allegations establishing Radian Asset violated the covenant of good faith and fair dealing.

## IV.   THE COLLEGE FAILS TO STATE A FRAUDULENT-INDUCEMENT CLAIM -- THE THIRD CAUSE OF ACTION.

The College has not adequately pled a claim of fraudulent inducement. Under New Mexico law, the elements of a claim for fraudulent inducement are: (i) a misrepresentation of fact or failure to disclose a material fact; (ii) where the falsity was known to the maker or where the representation or concealment was reckless; (iii) the maker acted with the intent to deceive and to induce the other party to act in reliance; and (iv) the other party actually relied on the representation or concealment. <u>Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co.</u>, 170 F.3d 985, 994 (10th Cir. 1999); <u>Cain v. Champion Window Co. of Albuquerque, LLC</u>, 142 N.M. at 216, 164 P.3d at 97. The College does not plead its claim of fraudulent inducement with the specificity required under rule 9(b).

Radian Asset contends that the College fails to plead the specific misrepresentations, or the

circumstances of omission and the duty to disclose.  Radian Asset further contends that the College failed to plead facts that could establish an intent to deceive, making only the conclusory assertion that Radian acted in "bad faith," and that the College does not plead with particularity how any of Radian Asset's specific actions fraudulently induced the College to purchase the Bond Policy.

Radian Asset further contends that the College fails to plead facts that could establish justifiable reliance.  See Cain v. Champion Window Co. of Albuquerque, LLC, 142 N.M. at 216, 164 P.3d at 97 (stating that a plaintiff must show justifiable reliance on the alleged misrepresentations).  Radian Asset asserts that the College had the Bond Policy and the Commitment Letter, it was represented by counsel throughout the process, and that the language of the Commitment Letter and the Bond Policy clearly represented what obligations Radian Asset was and was not assuming, and that the College was not the insured under the Bond Policy.

Radian Asset also argues that the College never explains the how issuance of the Policies damaged the College, and Radian Asset contends it fully satisfied its obligations under the Policies by paying out over $4.8 million to the Bondholders and the Swap counterparty.  Radian Asset asserts that the College cannot now contend that the issuance of those Policies damaged it, because Radian Asset conferred the Policies' promised benefit.  See Water Works Board of Birmingham, No. CV-09-AR-2296-S, 2010 WL 2506087, at *4 (N.D. Ala. Apr. 1, 2010)(rejecting damages claim for return of bond insurance premium because payment of premium, had the effect of "secur[ing] the stated purpose of the Surety Bond, namely, the guarantee to pay the Bondholders in the event of the Board's default.").

The College responds that its Counterclaim alleges that Radian Asset knew the College understood it was purchasing insurance from Radian that was actually going to cover insurable risks

and that Radian was agreeing to insure such risks. See Amended Answer ¶ 7, at 41-42.  The College further alleges that Radian Asset made, among other misrepresentations and failures to disclose, the following knowing misrepresentations or failures to disclose: (i) Radian Asset never intended to insure any risk, see Amended Answer ¶¶ 7-8, at 41-42; (ii) if Radian Asset were called upon to cover a risk, it would sue the College for its exposure to any risk of payment, see Amended Answer ¶¶ 7-8, at 41-42; (iii) Radian Asset considered itself to have the right to manipulate its rights under the Policies to its own benefit and to the College's detriment, see Amended Answer ¶¶ 7-8, at 41-42; (iv) Radian Asset interpreted the Policies as meaning it would be insuring no risk at all, see Amended Answer ¶ 9, at 42; (v) Radian Asset interpreted the language it required in the Commitment Letter to mean that it was insuring no risk, see Amended Answer ¶ 9, at 42; (vi) the College was not likely to meet its obligations under the Bonds, see Amended Answer ¶¶ 24-28, at 44-45; (vii) Radian Asset failed to disclose its weak financial condition and what effect its financial condition may have on the Bond deal, see Amended Answer ¶¶ 36-41, at 46-48; (viii) these misrepresentations and failures to disclose by Radian Asset were made with the intent to deceive the College and to induce it to act in reliance thereon in purchasing the Policies so that Radian could collect the nearly one-million dollars in premiums, see Amended Answer ¶¶ 3-5, 10, 16-21, 35, 78, 82, 89, at 41-44, 46, 57-59; and (ix) the College actually and justifiably relied to its detriment on these and others misrepresentations and failures to disclose by Radian. see Amended Answer ¶¶ 29-34, 90, at 45-46, 59.  The College argues that it therefore pled fraudulent inducement with sufficient particularity.

The College also contends that it explains how Radian Asset's alleged fraudulent inducement damaged it, because it alleged that: (i) if Radian Asset had refused to insure the Bonds or been candid about the factors which Radian Asset now contends made the College likely or unlikely to

meet its Bond obligations, the College would not have gone forward with the Bond transaction, see Amended Answer ¶ 29, at 45; (ii) had Radian Asset disclosed the specific factors that it now contends were relevant to whether the College was able to meet its debt service obligation, the College would not have taken on this new debt by engaging in the Bond transaction and purchasing the Bond insurances, see Amended Answer ¶ 32, at 46; (iii) without the new debt, the College's assets -- even at fire sale prices -- were sufficient to cover its prior debts on the Bonds, see Amended Answer ¶ 33, at 46; and (iv) without the new indebtedness, including payment to Radian Asset of almost one-million dollars in premiums, the College may have been able to continue in existence, or at least would have been able to pay its debts by selling its assets, but instead, the College, after losing all of its assets, was left with claims and exposures to various entities of some ten-million dollars, see id. ¶ 34, at 46.

Radian Asset replies that the College attempts in its Opposition to construct a fraud claim that the Counterclaims do not explain or plead with sufficient factual detail. The Counterclaims contain 103 paragraphs peppered with numerous conclusory allegations of various wrongdoing by Radian Asset, but only three paragraphs under the "fraudulent-inducement" claim, one which incorporated all proceeding allegations, and two stating only that the College was fraudulently induced and damaged thereby. See Amended Answer ¶¶ 88-90, at 59. Radian Asset notes that this Court has held that such pleading does not even meet the ordinary Rule 8 standards. See Mountain Highlands, LLC v. Hendricks, No. CIV 08-0239 JB/ACT, 2009 WL 2426197, at *9 (D.N.M. July 14, 2009)(Browning, J.)("Although Mountain Highlands incorporates all the preceding paragraphs into the cause of action for breach of the covenant, the Complaint must still 'give the defendant fair notice of what the plaintiffs claim is and the grounds upon which it rests.'"  (citation omitted)).

Radian Asset contends, therefore, that the College has not met its heightened rule 9(b) pleading requirement.

Moreover, Radian Asset argues, the Bond Policy itself states that Radian Asset would be subrogated to the rights of Bondholders to the extent of any payments, and the Schedule to the Commitment Letter makes plain that Radian Asset will look to the College for payment of any losses and protection against any claims or liability.   Radian Asset contends that, under these circumstances, the College cannot claim to have justifiably relied on any unidentified representations by Radian Asset regarding the Policies. See Smith v. Price's Creameries, 98 N.M. 541, 650 P.2d 825 (1982)(stating that a party to an agreement who was given time and opportunity to fully examine contract, opportunity to be represented by counsel, yet failed to negotiate over terms, is bound to terms of the agreement); Wilburn v. Stewart, 110 N.M. 268, 271, 794 P.2d 1197, 1200 (1990)(stating that, although buyers were unfamiliar with the recreational vehicle  repair business they purchased, they did not justifiably rely on misrepresentations of business' value where one buyer was experienced mechanic and other buyer was attorney and both had opportunity to work in business for six weeks before consummation of sale); Berrendo Irrigated Farms Co. v. Jacobs, 23 N.M. 290, 305, 168 P. 483, 487 (1917)(stating a party that had access and means to ascertain facts cannot establish justifiable reliance; "[t]he law is that where a vendee undertakes to make investigation of his own, and is given full means to ascertain all the facts, and is not prevented from making the examination as full as he likes, he cannot be heard to complain because he relied upon representations of the vendor if his purchase proves unsuccessful."). The College responds that none of these cases applies here, where the issue is not the language per se of the two insurance Policies and related documents, but rather Radian Asset's unilateral, after-the-fact, undisclosed interpretation

of that language, and its failure to disclose its financial condition and the repercussions to the College of the inevitable rating agency downgrades. Radian Asset replies that the College is pleading a fraud claim based on Radian Asset's alleged failure to disclose at the time Radian Asset issued the Bond Policy in 2006 something that would happen in 2008 or 2009. Because the claim is based on failure to disclose, Radian Asset contends, the College must also allege facts sufficient to establish a duty to disclose. See Krupiak v. Payton, 90 N.M. 252, 253, 561 P.2d 1345, 1346 (N.M. 1977). Radian Asset asserts that the College has not alleged a duty that would require Radian Asset to disclose.

The College has not sufficiently pled its fraudulent-inducement claim. Rule 9(b) requires claims for fraud to be pled with particularity. See Shandong Yinguang Chemical Industries Joint Stock Co., Ltd. v. Potter, 607 F.3d 1029, 1032 (5th Cir. 2010)("[W]ith respect to the . . . fraudulent inducement claim[ ], Fed. R. Civ. P. 9(b) requires that [the College] 'state with particularity the circumstances constituting the fraud.'" (quoting Fed. R. Civ. P. 9(b)); Carl Kelley Constr. LLC v. Danco Technologies, 656 F. Supp. 2d 1323, 1333 (D.N.M. 2009)(Browning, J.). When the alleged fraud is based on affirmative misrepresentations, those statements must be specified in detail, including the date, speaker and medium of communication. See Carl Kelley Construction LLC v. Danco Technologies, 656 F. Supp. 2d at 1334 (quoting Sheldon v. Vermonty, Nos. 99-3202, 99-3389, 2000 WL 1774038 (10th Cir. Dec. 4, 2000); United States ex rel. Schwartz v. Coastal Healthcare Group, Inc., No. 99-3105, 2000 WL 1595976, *3 (10th Cir. 2000)("At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when where and how of the alleged fraud."). When the allegations are based on allegedly fraudulent omissions, the claimant must allege knowledge of material facts, a duty to disclose, and silence. See Krupiak v. Payton, 90 N.M. at 253,

561 P.2d at 1346.

  In particular, the College has not sufficiently pled its fraudulent-inducement claim, because it did not plead allegations showing Radian Asset had a duty to disclose.  Rule 9(b) requires claims for fraud to be pled with particularity.  <u>See</u> Fed. R. Civ. P. 9(b); <u>Carl Kelley Construction LLC v. Danco Technologies</u>, 656 F. Supp. 2d 1323, 1333 (D.N.M. 2009)(Browning, J.).  When the allegations are based on allegedly fraudulent omissions, the claimant must allege knowledge of material facts, a duty to disclose, and silence.  <u>See</u> <u>Nash v. The New Sch.</u>, No. 05 Civ. 7174(KMW)(FM), 2009 WL 1159166, at *3 (S.D.N.Y. 2009); <u>Krupiak v. Payton</u>, 90 N.M. at 253, 561 P.2d at 1346.  The College fails to plead the the "who, what, when where and how of the alleged fraud."  <u>United States ex rel. Schwartz v. Coastal Healthcare Group, Inc.</u>, 2000 WL 1595976, *3.  "A complaint does not 'suffice if it tenders naked assertions devoid of further factual enhancement.'"  <u>Barrett v. Orman</u>, 373 F. App'x 823, 825 (10th Cir. 2010)(quoting <u>Ashcroft v. Iqbal</u>, 129 S. Ct. at 1949).  In particular, the College alleges that Radian Asset failed to disclose material facts.  To advance this claim, the College must establish that Radian Asset had a duty to disclose.  The College's pleading does not allege facts establishing a duty.  The College's only allegations regarding Radian Asset's duties regard Radian Asset's duties of the insurer to the insured, <u>see</u> Amended Answer ¶¶ 95-98, at 60, which the Court rejects, and Radian Asset's duty of good faith and fair dealing, <u>see</u> Amended Answer ¶ 38, at 47 ("Radian took actions from 2007 through 2009 that detrimentally affected the College and did not meet Radian's contractual good faith and fair dealing covenants to the College.  Radian did not disclose these actions to the College when Radian had the duty to do so, and concealed them."), which the Court also rejects.  The conclusory statements fall short of the factual specificity required under rule 9(b) to establish a duty

to disclose.

Moreover, the College cannot establish justifiable reliance because it cannot establish a reasonable basis for believing that it was the insured under the Bond Policy.  See Saylor v. Valles, 133 N.M. 432, 438-39, 63 P.3d 1152, 1158-59 (Ct. App. 2002)(affirming dismissal of fraudulent misrepresentation claim where plaintiffs failed to allege detrimental reliance on misrepresentations and failed to state the circumstances constituting fraud with particularity).  As discussed above, the College's allegations of wrongdoing are premised on the idea that it was owed duties as an insured or party to the Bond Policy.  The College argues it is irrelevant that it had the Bond Policy, the Commitment Letter and other documents, but those documents state what duties Radian Asset was and was not assuming with respect to the Bonds and the College.  See Bond Policy at 1 ("This Policy does not insure against any risk other than nonpayment of the Obligation by or on behalf of the Obligor or any other obligor to the Bond Trustee."); id. at 2 ("The Insurer shall, to the extent of any payment made by it pursuant to this Policy, be deemed to have acquired and become the Holder of the Bonds or portions thereof or interest thereon paid from such payment and shall be fully subrogated to all rights to payment thereof."); Commitment Letter Schedule 3, at 4 ("The Institution shall protect, hold harmless and indemnify the Insurer for, from and against any and all liability, obligations, losses, claims and damages paid or incurred . . . .").  Under New Mexico law, the College cannot establish justifiable reliance by pleading its own unilateral expectation that it would be treated like an insured in light of clear and express statements that it was not.  See Wilburn v. Stewart, 110 N.M. at 271, 794 P.2d at 1200; Smith v. Price's Creameries, 98 N.M. at 650 P.2d 825 at 1200; Berrendo Irrigated Farms Co. v. Jacobs, 23 N.M. at 305, 168 P. at 487.  Because the College had the Bond Policy and Commitment Letter, which establish forth in plain terms what

Radian Asset was insuring, and that Radian Asset would be subrogated to the Bondholders rights

against the College, and look to the College to indemnify it, the College has not alleged facts

establishing that it justifiably relied on Radian Asset's representations that it was "insuring no risk."

Saylor v. Valles, 133 N.M. at 438-39, 63 P.3d at 1158-1159.

Moreover, the College's presentation of facts falls short of rule 9(b)'s requirements.  In

Mountain Highlands, LLC v. Hendricks, the Court stated:

> Although Mountain Highlands incorporates all the preceding paragraphs into the
> cause of action for breach of the covenant, the Complaint must still "give the
> defendant fair notice of what the plaintiffs claim is and the grounds upon which it
> rests."  There is a difference between simply re-alleging the same facts over and
> over, and giving notice of the claims those facts are meant to support.  While
> someone could construct this theory based upon the Complaint, no one reading the
> Complaint would assume that Mountain Highlands was raising such a claim.
> Mountain Highlands needs to explain what it is that the Defendants are supposed to
> have done wrong.  A defendant should not need to comb through a complaint,
> imagining every potential cause of action those allegations might support. Instead,
> a plaintiff should explain what the alleged wrong is.

Mountain Highlands, LLC v. Hendricks, 2009 WL 2426197, at *9.  The College fails to meet this

requirement.  In its Counterclaim, after incorporating the previous paragraphs by reference, the

College stated only:

> 89. Radian's conduct as set forth above induced the College to enter into the 2006
> Bond transactions including the purchase of the insurance policies.

> 90. The College has been damaged by Radian's conduct in fraudulently inducing it
> to enter into the 2006 Bond transaction including, but not limited to, the amounts
> paid to Radian and the amounts paid to Royal Bank from the Bond proceeds.

Amended Answer ¶¶ 89-90, at 59.  These conclusory statements do not set forth a fraudulent-

inducement claim with the particularity that rule 9(b) requires.  While the College fills out its claim

in its response, it is the pleading that must provide allegations with the factual specificity rule 9(b)

requires.  Like the allegations in Mountain Highlands, LLC v. Hendricks, the College's fraudulent-

inducement Counterclaim fails to provide Radian Asset with notice of the basis for its Counterclaim. "While someone could construct this theory based upon the [Counterclaims], no one reading the [Counterclaims] would assume that [the College] was raising such a claim. . . .  [Radian Asset] should not need to comb through a complaint, imagining every potential cause of action those allegations might support."  2009 WL 2426197, at *9.  In sum, the College fails to plead allegations supporting a claim for fraudulent inducement.

## V.     THE COLLEGE FAILS TO STATE A CLAIM FOR PRIMA-FACIE TORT -- THE SIXTH COUNTERCLAIM.

The College does not state a claim for prima-facie tort, because it does not allege malice. Radian Asset contends that the law does not support the College's broad attempt to mold prima-facie tort into a flexible "catch-all" cause of action for anyone who claims to have suffered injury due to the acts of another.  The College responds that it has alleged facts showing Radian Asset committed an intentional act, with the intent to injure the plaintiff, causing injury to the plaintiff, and without justification.  See Ruby v. Sandia Corp., 699 F. Supp. 2d 1247, 1268 (D.N.M. 2010)(Browning, J.))(citing Grover v. Stechel, 132 N.M. 140, 145, 45 P.3d 80, 85 (2002))(setting forth the elements of prima-facie tort).  The College asserts that it need not show that Radian Asset's actions were solely intended to injure the College to state a claim, and that New Mexico courts have recognized a claim for prima-facie tort even though the defendant's conduct bore a resemblance to another cause of action.  See Ruby v. Sandia Corp., 699 F. Supp. 2d at 1268.

The College has not adequately pled a claim of prima-facie tort, because it has not alleged facts showing that Radian Asset acted maliciously.  In Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726 (1990), the Supreme Court of New Mexico recognized a cause of action for prima-facie tort.  See Schmitz v. Smentowski, 109 N.M. at 396, 785 P.2d at 736.  The underlying theory of the

prima-facie tort is that a party who intends to cause injury to another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances.  See Schmitz v. Smentowski, 109 N.M. at 394, 785 P.2d at 734.  "Prima-facie tort is not to become a catch-all alternative for every action that cannot stand on its own legs." Hagebak v. Stone, 133 N.M. 75, 84, 61 P.3d 201, 209 (Ct. App. 2002)(internal quotations omitted).  The cause of action is to be applied narrowly.  See Lexington Ins. Co. v. Rummel, 123 N.M. 774, 777, 945 P.2d 992, 995 (1997)("In recognizing prima facie tort, this Court emphasized the importance of limiting the cause of action. . . .  Prima facie tort was not intended to provide a remedy for every intentionally caused harm.").  A party cannot use prima-facie tort as a way to "evade stringent requirements of other established doctrines of law."  Schmitz v. Smentowski, 109 N.M. at 398, 785 P.2d at 738.  See Yeitrakis v. Schering-Plough Corp., 804 F. Supp. 238, 249 (D.N.M. 1992)(Browning, J.)("Prima-facie tort should not be permitted to duplicate, or remedy a defect in, another established cause of action." (citation omitted)).

The elements of a cause of action for prima-facie tort are: (i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act.  See Lexington Ins. Co. v. Rummel, 123 N.M. at 777, 945 P.2d at 995; UJI 13-1631 NMRA (listing the elements as: (i) that the defendant intentionally did some act; (ii) that the defendant intended that the act would cause harm to the plaintiff or that the defendant knew with certainty that the act would cause harm to the plaintiff; (iii) that the defendant's act was a cause of plaintiff's harm; and (iv) that the defendant's conduct was not justifiable under all circumstances).  In Kitchell v. Pub. Serv. Co. of N.M., the Supreme Court of New Mexico stated:

> The terms malice and intent to injure have been used synonymously with our jurisprudence on prima facie tort." [Lexington Ins. Co. v. Rummel, 123 N.M. at 777, 945 P.2d at 995]. Malice in turn is the "intentional doing of a wrongful act without just cause or excuse. This means that the defendant not only intended to do the act which is ascertained to be wrongful, but that he knew it was wrong when he did it." Flores v. Baca, 117 N.M. 306, 312, 871 P.2d 962, 968 (1994) (internal quotation marks and citations omitted); see also Jones v. Citizens Bank of Clovis, 58 N.M. 48, 51, 265 P.2d 366, 368 (1954).

Kitchell v. Pub. Servo Co. of N.M., 126 N.M. at 530, 972 P.2d at 349. Because not every intentionally caused harm gives rise to an actionable tort, once a plaintiff establishes intent to injure, the trial court must balance the defendant's act or acts against the justification for the act or acts and the severity of the injury, weighing: (i) the injury, (ii) the culpable character of the conduct, and (iii) whether the conduct is unjustifiable under the circumstances. See Portales Nat. Bank v. Ribble, 134 N.M. 238, 240, 75 P.3d 838, 840 (Ct. App. 2003). The Court may decide this issue as a matter of law. See Portales Nat. Bank v. Ribble, 134 N.M. at 240, 75 P.3d at 840 ("The trial court must initially balance these factors and, if it finds that a jury could reasonably find in the plaintiff's favor, the trial court must submit the claim to the jury for its own balancing of the factors.").

For its prima-facie tort counterclaim to survive, the College must plead facts showing "actual intention to injure, not merely an intent to do an act which may result in the claimed injury." Kitchell v. Pub. Servo Co. of N.M., 126 N.M. at 530, 972 P.2d at 349. See Lexington Ins. Co. v. Rummel, 123 N.M. at 777, 785 P.2d at 738. "The terms malice and intent to injure have been used synonymously with our jurisprudence on prima facie tort." Kitchell v. Pub. Servo Co. of N.M., 126 N.M. at 530, 972 P.2d at 349. This standard is "quite distinct from an intent to commit an act that naturally and foreseeably results in injury." Saylor v. Valles, 133 N.M. at 439, 63 P.3d at 1159 (citing Lexington Ins. Co. v. Rummel, 123 N.M. at 777, 785 P.2d at 738). The College must demonstrate "more than a mere insensitivity towards the injured party." Lexington Ins. Co. v.

Rummel, 123 N.M. at 777, 785 P.2d at 738; Portales Nat'l Bank v. Ribble, 134 N.M. at 241, 75 P.3d at 841.

In Martinez v. Northern Rio Arriba Electric Co-op, Inc., 132 N.M. 510, 51 P.3d 1164 (Ct. App. 2002), the Court of Appeals of New Mexico performed the balancing test and held that the plaintiff did not make an actionable prima-facie tort claim.  See id. at 517, 51 P.3d at 1171.  The Court of Appeals found that the defendant's conduct had some justification, because: (i) the conduct related to furthering a legitimate business interest; (ii) the means the defendant used were not outside the ambit of legitimate employer behavior; (iii) the evidence did not support the view that the defendant acted maliciously with the intent to cause the injury and without sufficient justification; and (iv) the emotional difficulties the plaintiff experienced because of the defendant's actions did not, on balance, support a claim for prima-facie tort.  See id. at 516-17, 51 P.3d at 1170-71.  The Court of Appeals stated: "We are not persuaded that any of these allegations, or all of them taken together, rise to the level of both behavior and injury that is envisioned by the theory of prima facie tort."  Id. at 517, 51 P.3d at 1171.

The College does not state a claim for prima facie tort, because it does not allege malice. "Prima-facie tort provides a remedy for persons harmed by intentional and malicious acts that are otherwise lawful, but fall outside of the rigid traditional intentional tort categories." Ruby v. Sandia Corp., 699 F. Supp. 2d at 1267.  See Guest v. Allstate Ins. Co., 145 N.M. at 810, 205 P.3d at 857 (recognizing that prima-facie tort is intended as a remedy for persons harmed by intentional and malicious but otherwise lawful acts), aff'd in part and rev'd in part on other grounds, No. 31,602/31,603 (NMSC Oct. 25, 2010).  The College must show "actual intention to injure, not merely an intent to do an act which may result in the claimed injury."  Kitchell v. Pub. Servo Co.

of N.M., 126 N.M. at 530, 972 P.2d at 349.  The College does not allege that Radian Asset acted

with malice; the College alleges only that Radian Asset's actions in pursuit of its self interest

incidentally harmed the College.  The closet the College comes to alleging malice is its contention

that

> Radian took these steps, and made these false statements to protect itself from having
> to honor contractual obligations it undertook in the policies of insurance it issued and
> the College purchased, and because Radian as a whole was experiencing financial
> setbacks in its insurance and other businesses, and sought in bad faith to impose
> financial harm to the College.

Amended Answer ¶ 55, at 52.  First, the College again alleges only that Radian Asset was exercising

its rights of exoneration as a guarantor. Second, the allegations indicate that Radian Asset exercised

its rights against the College to protect its business interests by attempting to avoid paying out under

the Bond Policy.  Rather than pleading facts showing unjustified malicious action, the College

alleges "conduct [that] had [at least] some justification as it related to the furthering of a legitimate

business interest."  Martinez v. Northern Rio Arriba Elec. Co-op, Inc., 132 N.M. at 517, 51 P.3d at

1171.  The Court concludes therefore that the College does not allege that Radian Asset acted with

unjustified malice, but that Radian Asset acted in pursuit of its own business interests.

## VI.   THE STATUTE OF LIMITATIONS HAS RUN ON SOME OF THE COLLEGE'S COUNTERCLAIMS.

Radian Asset contends that the College's UPA, UIPA, and fraudulent-inducement claims are

all time barred.  Radian Asset contends that these Counterclaims are all subject to a four-year statute

of limitations.  It asserts that the statute of limitations expired no later than September 21, 2006.

The College responds that its claims are not time barred.  The College argues that the

relevant statutes of limitations do not begin to run until the cause of action accrues, which ordinarily

is the date of discovery.  The College further argues that it did not discover Radian's fraud until the

October-November 2008 time frame, when the College first learned "that Radian was taking the position that the Bond Policy did not insure the College for any risk." Response at 35-36.

Radian Asset replies that, by no later than September 21, 2006, the College had Radian Asset's Policies, the Commitment Letter, its own counsel, and was working with financial professionals. It knew or could have discovered by that time through simple document review or discussions that it was not the insured, and what Radian Asset was or was not promising to do in its Policies. Accordingly, Radian Asset asserts, the College's UIPA, UPA, and fraudulent-inducement causes of action accrued more than four years before it filed its Counterclaims on October 15, 2010, and the College's Counterclaims are therefore time barred.

The College's UIPA, UPA, and fraudulent-inducement Counterclaims are time barred, because the College should have known that Radian Asset would be subrogated under the Bond Policy when it was issued. The College's UPA, UIPA, and fraudulent-inducement Counterclaims are all subject to a four-year statute of limitations. The College's UPA and UIPA claims are subject to the four-year statute of limitations under NMSA 1978, § 37-1-4. See Nance v. L.J. Dolloff Associates, Inc., 138 N.M. 851, 856, 126 P.3d 1215, 1220 (Ct. App. 2005)("[C]laims . . . founded on violations of statutes . . . fall within 'other unspecified actions' under the four-year statute of limitations set forth in Section 37-1-4."). Causes of action sounding in fraud are also subject to § 37-1-4's four year statute of limitations.

A statute of limitations begins to run when the cause of action accrues, which ordinarily is the date when a party knew or reasonably should have known of a violation of the law. See State ex rel. Public Employees Retirement Ass'n v. Longacre, 133 N.M. 20, 59 P.3d 500 (2002)(citing Cummings v. X-Ray Associates of NM, P.C., 121 N.M. 821, 918 P.2d 1321 (1996)). See also

Porcell v. Lincoln Wood Products, Inc., 2010 WL 1541264, * 5 (D.N.M. 2010)(Armijo, J.)("In cases applying § 37-1-4, New Mexico appellate courts have adopted a two-part accrual rule by which a claim accrues when: (1) plaintiff sustains actual injury and (2) plaintiff discovers, or through reasonable diligence should discover, the facts essential to the cause of action.").

The College contends that it "did not discover Radian's fraud until the October-November 2008 time frame, when the College first learned . . . Radian was taking the position that the Bond Policy did not insure the College for any risk." Response at 35-36. The College makes the same argument with regard to the statute of limitations on its UPA and UIPA Counterclaims. The College's contention Radian Asset was not insuring the College for "any risk" is predicated on: (i) Radian Asset's subrogation of the Bondholders's rights upon paying out under the Bond Policy; (ii) Radian Asset's expectation that the College would indemnify Radian Asset; and (iii) Radian Asset's contention that it sought to insure clients it did not believe would default on their obligations. See Counterclaims at ¶¶ 8-9, at 42.

> Radian Asset wrote in the FAC:
>
> Insurance carriers writing life or automobile liability policies expect losses to occur, and therefore make coverage decisions and set premiums based on the likelihood and expected magnitude of a loss, i.e., they accept premiums in exchange for assuming a foreseeable risk of loss. Bond insurers do not follow that practice. Instead, the industry standard practice is for bond insurers to insure only those bonds that the bond insurer concludes are not at risk of defaulting.

FAC ¶ 4.13, at 10. In its Amended Answer, the College reads Radian Asset's allegation to state: "Radian did not inform the College that Radian never intended to be insuring any risk and that if it became apparent that it could be called upon to cover a risk it would in fact threaten and then sue the College for its exposure to any risk of payment." Amended Answer ¶ 8, at 42.

Nor did Radian ever explain that it interpreted the insurance policies it was selling

> to the College and interpreted the language it required in the Sales Agreement as
> meaning Radian was insuring no risk at all because it would be fully subrogated and
> indemnified for any and all losses including deficiencies, interest, and attorneys' fees
> from the College.   All in all, Radian did not explain that it would later use the
> language it required in its policies and in the Bond documents such that Radian was
> accepting no risk at all and thus providing no insurance at all.

Amended Answer ¶ 9, at 42.  First, the College's assertion that Radian Asset "was accepting no risk"

is without a basis in the facts of this case, because Radian Asset did assume a risk.  Namely, as a

guarantor, Radian Asset assumed the risk that the College would be unable to pay reimburse Radian

Asset for fulfilling the College's obligations under the Bond Policy after Radian Asset surrogated

the Bondholders' rights.  Moreover, the Bond Policy' plain language should have put the College,

who was represented by counsel, on notice that Radian Asset "would be fully subrogated."  The

Bond Policy states: "The Insurer shall, to the extent of any payment made by it pursuant to this

Policy, be deemed to have acquired and become the Holder of the Bonds Dr portions thereof or

interest thereon paid from such payment and <u>shall be fully subrogated to all rights to payment

thereof</u>."  Bond Insurance Policy at 2 (emphasis added).  This language appears towards the top of

the second page of the two-page Bond Policy, in the same size text as the rest of the operative text

in the Bond Policy.  Moreover, the Commitment Letter states:

> The Institution shall protect, hold harmless and indemnify the Insurer for, from and
> against any and all liability, obligations, losses, claims and damages paid or incurred
> in connection with its business or properties, the [Bond Documentation] and any
> related instrument (including all environmental liabilities regarding its properties),
> (except that the Institution shall not protect, hold harmless or indemnify the Insurer
> for the willful or wanton acts or omissions, mistakes, gross negligence of the Insurer,
> to the extent that such acts, omissions, mistakes, gross negligence of such party are
> successfully alleged to have caused the liability, obligation, loss, claim or damage)
> and expenses in connection herewith including reasonable attorneys' fees and
> expenses.  The obligations of the Institution to protect, hold harmless. reimburse and
> indemnify the Insurer as set forth under this Section shall survive any termination,
> release, satisfaction and discharge of the [Bond Documentation].

Commitment Letter Schedule 3, at 4.  A review of the provisions in the Bond Policy and the Commitment Letter should have alerted the College that Radian Asset was subrogated to the Bondholders' rights and that Radian Asset expected the College to indemnify it.  The College therefore should have known what risk Radian Asset insured by the time it issued the Bond Policy on September 21,2006.  Accordingly, the College's UIPA, UPA, and fraudulent-inducement causes of action accrued more than four years before it filed its Counterclaims on October 15, 2010, and the claims are time barred.

**V.   THE COURT WILL NOT CERTIFY THE QUESTION WHETHER THE COLLEGE IS "THE INSURED" TO THE SUPREME COURT OF NEW MEXICO BECAUSE IT DOES NOT INVOLVE A NOVEL QUESTION OF LAW, AND THE COURT DENIES THE COLLEGE'S REQUEST THAT IT ISSUE A CERTIFICATE OF <u>APPEALABILITY</u>.**

The College requests that the Court certify the question whether, as an obligor, it is "the insured" to the Supreme Court of New Mexico.  Because the answer to the question flows from Supreme Court of New Mexico precedent and well-established principles under the law of suretyships and guaranty, the Court denies the College's request.  NMRA Rule 12-607 provides:

A. Power to answer.

(1) The Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States, an appellate court of another state, a tribe, Canada, a Canadian province or territory, Mexico or a Mexican state if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling:

(a) appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals; or

(b) constitutional provision or statute of this state.

NMRA 12-607A(1).  Federal courts have the option of determining what a state supreme court would do if confronted with the same issue, <u>see</u> <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. at 78, or of

-108-

certifying the question to the state supreme court for review, see Allstate v. Stone, 116 N.M. at 465, 863 P.2d at 1086 ("This matter comes before us by way of certification from the United States District Court for the District of New Mexico.").  See Lehman Bros. v. Schein, 416 U.S. at 390-91 ("The decision to certify a question to the state supreme court 'rests in the sound discretion of the federal court.'"); Farm Bureau Mut. Ins. Co. v. Jameson, 472 F. Supp. 2d at 1280.  Pursuant to N.M.S.A. 1978, § 39-7-4, the Supreme Court of New Mexico may answer questions that the federal district court certifies to it if they involve propositions of New Mexico law that may be determinative of an issue before the certifying court and there are no controlling precedents from New Mexico appellate courts.  See Swink v. Fingado, 115 N.M. at 276, 850 P.2d at 979 n.1; Schlieter v. Carlos, 108 N.M. at 508, 775 P.2d at 710 (1989).

In Stoner v. New York Life Insurance Co., the Supreme Court of the United States explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Thompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." 311 U.S. at 467.  "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review." Id.  See Adams-Arapahoe Joint School Dist. No. 28-J v. Continental Ins. Co., 891 F.2d at 774 ("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case.").  As the Tenth Circuit explained in Wade v. Emcasco Insurance Co.:

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its
> own judgment regarding the substance of the common law, but simply to ascertain

and apply the state law. . . .   The federal court must follow the most recent decisions of the state's highest court. . . .  Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . .   In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state . . . .  appellate decisions in other states with similar legal principles, . . . .  district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . .  Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (internal citations and quotation marks omitted).

The question presented -- whether the College is an insured under the Bond Policy -- is determinative of issues in this case.[18]  While there is not state case that deals with these facts, the Court's analysis flows from recent the Supreme Court of New Mexico decisions in Jolley v. Associated Electric & Gas Insurance Services Ltd. and Guest v. Allstate Ins. Co., and from well-established principles from the law of suretyships and guaranties.  Because the College is an obligor, Radian Asset does not owe it duties by virtue of the guaranty; rather the guarantor is subrogated to the rights of the obligee, and the obligor's obligations are not discharged.  Under Jolley v. Associated Electric & Gas Insurance Services Ltd. and Guest v. Allstate Ins. Co., the College is not insured under the Bond Policy or as an obligor, because the College is not a beneficiary of the Bond Policy.  The Court, therefore, exercises its discretion to deny the College's request that it certify the question to the Supreme Court of New Mexico, because there are "controlling appellate decision[s] . . . of this state."  N.M.S.A. 1978, § 39-7-4.

_____

[18] Because the College's UIPA, UPA, and fraudulent inducement Counterclaims are time barred, to the extent those Counterclaims turn on whether it is an insured under the Bond Policy, the question is not determinative of those issues.  See NMRA 12-607(A)(1); Swink v. Fingado, 115 N.M. at 276, 850 P.2d at 979 n.1 ("Supreme Court may answer questions certified by certain federal courts if questions involve propositions of New Mexico law determinative of cause before certifying court . . . ."); Schlieter v. Carlos, 108 N.M. at 508, 775 P.2d at 710 (1989)("[W]e may undertake at our discretion to answer such questions when the answers are 'determinative' of the cause before the federal court.").

The Court also denies the College's request for a certificate of appealability.   Rule 54(b)

provides:

> When an action presents more than one claim for relief -- whether as a claim,
> counterclaim, crossclaim, or third-party claim -- or when multiple parties are
> involved, the court may direct entry of a final judgment as to one or more, but fewer
> than all, claims or parties only if the court expressly determines that there is no just
> reason for delay.  Otherwise, any order or other decision, however designated, that
> adjudicates fewer than all the claims or the rights and liabilities of fewer than all the
> parties does not end the action as to any of the claims or parties and may be revised
> at any time before the entry of a judgment adjudicating all the claims and all the
> parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

To determine whether an order is "final," a district court must first consider the separability

of the adjudicated and unadjudicated claims.  See Jordan v. Pugh, 425 F.3d at 826 (in considering

whether an order is final, "the controlling jurisdictional question is . . . whether [the claim that has

been resolved] is distinct and separable from the claims left unresolved" (quotation omitted)); Old

Republic Ins. Co. v. Durango Air Serv., Inc., 283 F.3d at 1225 (same); Okla. Tpk. Auth. v. Bruner,

259 F.3d 1236, 1243 (10th Cir. 2001)(same).  "For purposes of Rule 54(b), a claim comprises all

factually or legally connected elements of a case."  Jordan v. Pugh, 425 F.3d at 827 (quotation

omitted).  In determining whether claims are separable, courts should "consider whether the

allegedly separate claims turn on the same factual questions, whether they involve common legal

issues, and whether separate recovery is possible."  Jordan v. Pugh, 425 F.3d at 827.

Radian Asset's claims pending before the Court involve overlapping factual and legal issues

with the College's Counterclaims.  Radian Asset's claims, like the College's Counterclaims, turn

on the circumstances surrounding the establishment of the Bond and Swap Policies, and the

agreements and understandings between the parties.  The College's Motion for Certification

implicitly acknowledges the overlap of factual and legal issues that the College's Counterclaims and Radian Asset's claims present, stating: "The ultimate determination of this litigation will be advanced and the duties and obligations between the parties cannot be defined, and no trial should be conducted, until it is determined conclusively whether the College is an 'insured' under Radian's financial guaranty insurance policy."   Motion for Certification at 5-6.   Because the College's Counterclaims cannot be cleanly separated from Radian Asset's claims, certification is inappropriate.  See Jordan v. Pugh, 425 F.3d at 827.

Moreover, the proceedings would likely be delayed pending the College's appeal of this order.  In its Motion to Certify, the College requests that the College stay this case while it appeals. See Motion to Certify at 5 n.5.  Avoiding further delay in resolving this matter is a just reason for delay.

> The court also must take into account the possible impact of an immediate appeal on the remaining trial proceedings.  In this vein, consideration will be given to whether the appeal will have the undesirable effect of delaying the trial of the unadjudicated matters without gaining any offsetting advantage in terms of the simplification and facilitation of that trial.

10 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2659 (3d ed. 2010).  While it may be appealing to let a losing party appeal an order dismissing a party -- which might not delay the rest of the case -- appeals of orders dismissing only claims will likely delay the case.  In many cases -- if not most -- some claims are dismissed before trial.  If the Court certifies every claim dismissed, litigation would be brought to a halt.  Unless the issue is seriously in doubt, the Court should resolve all issues before sending the case to the Court of Appeals; the district court should avoid sending issues piecemeal to the court of appeals.  See 10 C. Wright, A. Miller & M. Kane, supra § 2659 ("Because of the strong federal policy against piecemeal review several courts have

stated that the district court should make the express determination only in the infrequent case in which a failure to do so might have a harsh effect."  (footnote omitted)).  Certifications should be infrequent, to avoid some harsh result. The Court does not think that this commercial case presents that situation.  The effect here is no more than usually occurs where a party loses.  Here, it is best to complete the case and send the entire case to the Court of Appeals, rather than stop the case now.

In Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1 (1980), the Supreme Court of the United States approved of a district court's reasons for denying a certificate of appealability based in part on the delay it would produce:

> [I]n deciding whether there are no just reasons to delay the appeal of individual final judgments in setting such as this, a district court must take into account judicial administrative interests as well as the equities involved.  Consideration of the former is necessary to assure that application of the Rule effectively "preserves the historic federal policy against piecemeal appeals."

446 U.S. at 9 (quoting Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 438 (1956)).  Because the College's Counterclaims are not easily separable from the remaining issues answer claims before the Court, and because certifying the College's dismissed claims would delay the proceedings before the Court, the Court denies the College's request that the Court certify its order for interlocutory appeal.

**IT IS ORDERED** that Plaintiff Radian Asset Assurance Inc.'s Motion to Dismiss Defendant College of Santa Fe's Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(6), filed October 29, 2010 (Doc. 196), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Daniel J. O'Friel
Pierre Levy
Aimee Sue Bevan
O'Friel and Levy
Santa Fe, New Mexico

*-- and --*

Jeffrey R. Brannen
Jeffrey R. Brannen, P.A.
Santa Fe, New Mexico

*-- and --*

Gavin W. Skok
John D. Lowery
Riddell Williams, P.S.
Seattle, Washington

  *Attorneys for the Plaintiff*

Clifford K. Atkinson
Douglas A. Baker
Justin Duke Rodriguez
Atkinson, Thal & Baker, P.C.
Albuquerque, New Mexico

  *Attorneys for Defendant College of the Christian Brothers of New Mexico and*
   *Christian Brothers of the College of Santa Fe*

W. Spencer Reid
Benjamin F. Feuchter
Keleher & McLeod, P.A.
Albuquerque, New Mexico

  *Attorneys for Defendant Sharon Bain*

Joe L. McClaugherty
Tamara R. Safarik
McClaugherty & Silver, P.C.
Santa Fe, New Mexico

     *Attorneys for Defendant Jerry Brisson*

Michael W. Brennan
Brennan & Sullivan, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Mark Lombardi*